## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CHAPTER 11** |
| **TARRANT COUNTY SENIOR LIVING** | § | |
| **CENTER, INC.**[1] | § | **CASE NO. 24-33082** |
| | § | |
| Debtor. | § | |

### DISCLOSURE STATEMENT FOR DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

NO CHAPTER 11 CASE HAS BEEN COMMENCED AS OF THE DATE OF DISTRIBUTION OF THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT IS DISTRIBUTED TO YOU AS PART OF A PREPETITION SOLICITATION OF YOUR VOTE ON A PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.

THE DEADLINE TO VOTE ON THE PLAN IS SEPTEMBER 27, 2024, AT 5:00 P.M. (PREVAILING CENTRAL TIME) UNLESS EXTENDED BY THE DEBTOR.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS AUGUST 26, 2024.

Dated:  August 30, 2024

---

[1] The last four digits of the Debtor's federal tax identification number are 8602.

Tarrant County Senior Living Center, Inc. d/b/a Stayton at Museum Way (the "*Debtor*" or "*Stayton*") is providing you with the information in this *Disclosure Statement for Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised, or supplemented from time to time, the "*Disclosure Statement*") because you are a creditor entitled to vote on the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised, or supplemented from time to time, the "*Plan*").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.  Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose. The Debtor is soliciting your vote to approve the Plan before the Debtor commences a voluntary reorganization under chapter 11 of the Bankruptcy Code.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Section 9 of the Plan.   There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.

If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtor intends to commence a case under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*") to implement the Plan.   Because the Chapter 11 Case has not yet commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code.   If the Debtor commences the Chapter 11 Case, then it will promptly seek an order of the Bankruptcy Court: (i) approving this Disclosure Statement as containing "adequate information"; (ii) approving the solicitation of votes as complying with sections 1125 and 1126 of the Bankruptcy Code; and (iii) confirming the Plan.

---

### RECOMMENDATION BY THE DEBTOR

The board of directors of the Debtor has approved the transactions contemplated by the Plan and described in this Disclosure Statement.  The Debtor believes the Plan is in the best interests of all stakeholders and recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.

Subject to the terms and provisions of that certain *Plan Support Agreement*; dated as of February 7, 2024 (and together with all exhibits and schedules thereto, the "*Plan Support Agreement*"), the following parties have agreed to vote in favor of or otherwise support the Plan:

- **holders of at least 67% of the aggregate principal amount of the Debtor's outstanding bonds**

- **Buckner Retirement Services, Inc., the Debtor's sole corporate member and the plan sponsor**

**The Debtor strongly recommends that all creditors vote to accept the Plan by returning their Ballots so as to be <u>actually received</u> by the Voting Agent no later than <u>September 27, 2024 at 5:00 p.m.</u> <u>(prevailing Central time)</u> pursuant to the instructions provided herein and on the Ballots.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT (OR THE MASTER BALLOT CONTAINING YOUR VOTE) MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.**

## **DISCLAIMER**

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING.   NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125.   NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY, OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.   ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.   IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.  ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 (BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS COMPLYING WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW.   PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.   THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.   NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THE DISCLOSURE STATEMENT) AND OTHER FORWARDLOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND, IN THE EXHIBITS, ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS THERETO, THAT IS ULTIMATELY APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE (I) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (II) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM TO (I) READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS DESCRIBED AS "RISK FACTORS" BELOW); AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.   YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.   THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE

**CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS.    HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES, OR TAX ADVICE AND SHOULD CONSULT THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.**

**THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN.  IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR.  ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.**

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY. ........................................................................................ 1

    A.    Introduction. ................................................................................................ 1
    A.    Overview of Stayton's Recent Financial Challenges and Strategic Transaction. .......... 2
    B.    Proposed Refinancing Transaction. ............................................................. 4
    C.    Purpose of the Disclosure Statement. .......................................................... 7
    D.    The Solicitation Package. ............................................................................ 8
    E.    The Plan. ..................................................................................................... 9

II.   BACKGROUND INFORMATION. ........................................................................ 13

    A.    Overview of the Debtor's Business. ........................................................... 13
    B.    Organizational Structure of the Debtor. .................................................... 14
    C.    The Debtor's Prepetition Capital Structure. .............................................. 15

III.  THE CHAPTER 11 PLAN. ..................................................................................... 16

    A.    Summary of Key Plan Provisions. ............................................................. 16
    B.    Treatment of Claims Under the Plan. ......................................................... 19
    C.    Means for Implementation of the Plan. ...................................................... 20
    D.    Release, Exculpation, and Injunction Provisions. ..................................... 21

IV.   RISK FACTORS IN CONNECTION WITH THE PLAN. ..................................... 24

    A.    Bankruptcy Considerations. ....................................................................... 24
    B.    Risks Related to the Debtor's Business and Industry. ................................ 25
    C.    Additional Factors. .................................................................................... 29

V.    PLAN CONFIRMATION AND CONSUMMATION. ............................................ 30

    A.    The Confirmation Hearing. ........................................................................ 30
    B.    Objections to Confirmation. ...................................................................... 30
    C.    Requirements for Confirmation of the Plan. .............................................. 32

VI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN. ..................................................................................................................... 35

    A.    Chapter 7 Liquidation. ............................................................................... 36
    B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ........... 36

VII.  CERTAIN FEDERAL TAX MATTERS RELATING TO THE SERIES 2024
    BONDS. ................................................................................................................... 36

    A.    Opinion of Bond Counsel. ......................................................................... 37
    B.    Other Tax Consequences. .......................................................................... 38

VIII. RECOMMENDATION AND CONCLUSION. ...................................................... 39

## **EXHIBITS**

Exhibit A      Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the
              Bankruptcy Code, dated August 30, 2024

Exhibit B      Plan Support Agreement

Exhibit C      2024 Bond Documents

Exhibit D      Financial Projections

## I.    EXECUTIVE SUMMARY.

### A.    Introduction.

Stayton submits this Disclosure Statement in connection with its solicitation of votes on the Plan.[2]  Stayton is commencing this Solicitation to implement a refinancing of the Debtor's outstanding Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2020 (the "***Bonds***").  Stayton anticipates filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court on or about October 1, 2024.

The purpose of the Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtor that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  The Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain documents related to the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.

As discussed in greater detail below, Stayton experienced financial difficulties that threatened the viability of the community.  Following a default under its bond documents in June and December 2021, Stayton retained nationally recognized restructuring consultants to help advise the Stayton on improving its financial position and entered into negotiations with the Trustee (defined below) and the Supporting Holders (defined below) to explore options for Stayton's long-term financial position.  The negotiations culminated in a marketing and sale process, including an auction and the selection of the Plan Sponsor as the winning bidder.  In connection therewith, the parties entered into the Plan Support Agreement by and among the Debtor, the Trustee, the Supporting Holders (defined below), and the Plan Sponsor (defined below) on February 7, 2024.  The Plan Support Agreement provides for a refinancing transaction (the "***Refinancing Transaction***") to be implemented pursuant to the Plan as follows:

i.    the substitution of the Plan Sponsor as the sole member of the Debtor through a Membership Substitution Agreement dated May 31, 2024 (the "***Membership Substitution Effective Date***");

ii.    a consensual, tax exempt refinancing of the Bonds, reducing the outstanding principal amount of the Bonds by approximately 28% from an initial principal amount of $112,261,464 to $81,000,000 (the "***Bond Refinancing***");

iii.    an agreement by the Trustee to forbear from exercising remedies under the Original Bond Documents (defined below) while the Debtor pursues the Bond Refinancing;

iv.    an agreement by the Plan Sponsor to provide $15,000,000 in additional liquidity to support the Refinancing Transaction comprised of (a) $5,000,000 equity contribution used to fund (1) administrative expenses

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

and costs of issuance of the Series 2024 Bonds (defined below), (2) $1,825,000 in advisor fees incurred by the Stayton prior to the Membership Substitution Effective, and (3) working capital, and (ii) $10,000,000 to be issued pursuant to that certain *Subordinated Promissory Note*, dated May 31, 2024, between the Debtor and Buckner Foundation, Inc. (the "***Subordinated Note***"), of which $6,666,666.66 has been funded to the Debtor, with the remaining amount available to the Debtor to supplement liquidity in the event the Debtor does not satisfy the liquidity requirements under the Series 2024 Bond Documents (defined below); and

v.    a pre-packaged chapter 11 bankruptcy proceeding to implement the Bond Refinancing.

The restructuring contemplated by the Plan is a significant achievement for Stayton. Indeed, the Plan is supported by several of the Debtor's key stakeholders, including, (i) BOKF, N.A., as Successor Trustee (the "***Master Trustee***" under the Original Master Indenture,[3] the "***Bond Trustee***" under the Bond Indenture,[4] and, for purposes of this Disclosure Statement, the "***Trustee***"), at the direction of the Supporting Holders; (ii) each beneficial holder or investment manager or advisor for such beneficial holders of the Bonds that are signatories to the Plan Support Agreement or execute joinders thereto, which holders currently collectively hold at least 67% of the aggregate principal amount of the outstanding Bonds, (each referred to herein as a "***Supporting Holder***" and, collectively, as the "***Supporting Holders***"); and (iii) Buckner Retirement Services, Inc. ("***Buckner***" or the "***Plan Sponsor***," and, together with the Debtor, the Trustee, and the Supporting Holders, the "***Plan Support Parties***"). The Plan is the culmination of extensive arm's length negotiations that have occurred over the past year with the Plan Support Parties and Lifespace Communities, Inc. ("***Lifespace***"), the former sole member and manager of Stayton. Stayton believes that the Plan will provide Stayton with a long-term resolution of its financial distress so that it can, among other things, service its debt obligations, fulfill its charitable mission, and honor its commitments to the residents of Stayton. Stayton strongly believes that the Plan is in the best interests of its creditors, interest holders, and estate, and represents the best available alternative at this time.

## A.    Overview of Stayton's Recent Financial Challenges and Strategic Transaction.

As discussed in greater detail herein, Stayton relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations, and honor its resident refund obligations. Stayton has faced challenges that have threatened Stayton's ability to pay principal and interest on the Bonds and maintain its operational stability.

---

[3] The "***Original Master Indenture***" means that certain *Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement*, amended and restated as of January 1, 2020, between the Debtor and UMB, as predecessor to the Trustee, as amended by the Supplemental Master Indenture Number 3, dated as of January 1, 2020

[4] The "***Bond Indenture***" means that certain *Indenture of Trust*, dated as of January 1, 2020, between the Tarrant County Cultural Education Facilities Finance Corporation and UMB, as predecessor to the Trustee.

These challenges first led Stayton to restructure its balance sheet pursuant to prepackaged chapter 11 cases commenced in November of 2019 – *In re Tarrant County Senior Living Center, Inc.*, Case No. 19-33756 (SGJ), in the United States Bankruptcy Court for the Northern District of Texas (the "***2019 Restructuring***").  As part of the refinancing transactions implemented in the 2019 Restructuring, Lifespace provided additional liquidity to the Stayton through a Liquidity Support Agreement ("***LSA***"), and Stayton completed a consensual, tax-exempt refinancing of its then outstanding bonds by (i) issuing the Bonds in the full amount of its outstanding debt obligations plus all accrued interests, fees, and other costs, (ii) delaying principal payments on the Bonds until December 15, 2024, and (iii) providing for mandatory sinking fund payments commencing in 2025.  In December 2019, the Bankruptcy Court entered an order confirming the Stayton's 2019 plan of reorganization and the plan went effective in January 2020.

Since the 2019 Restructuring, however, worsening market conditions continued to place pressure on the company's profitability.  When the Covid-19 pandemic impacted the United States of America starting in March 2020, it severely disrupted the senior living industry, especially because older adults are particularly vulnerable to the effects of COVID-19.  As a result of the pandemic, Stayton incurred significant, additional operating expenses, to, among other things, retain qualified staff, pay for additional staffing costs, and pay for the acquisition of personal protection equipment for all staff members.  To attempt to offset these additional costs, Stayton implemented four monthly service fee increases between 2020 and 2022.  Stayton was able to implement these fee increases while maintaining consistent occupancy trends in the majority of its facility.[5]  Still, despite its strong operating performance, due to pressures in the market caused by the Covid-19 pandemic, the resulting rise in the cost and availability of health care employees and suppliers, and the highly competitive market conditions in Fort Worth and surrounding areas as well as other factors, Stayton continued to face pressure on its margins and was not able to keep pace with the rise in its expenses.  From 2021 to 2022, Stayton's expenses grew 17%, while operating revenue grew 11% due to high inflation, labor pressure, and new vendors.

As a result of these challenges, Stayton defaulted on its Bond Obligations (defined below), the principal amount of which totals approximately $112 million, by, among other things, failing to (i) meet its debt service coverage ratio covenant on June 30, 2021 and December 31, 2021, and (ii) make debt service payments due on the Bonds on December 1, 2022.  Because the debt service coverage ratio was less than 1.0 on December 31, 2021, an event of default occurred under the Original Master Indenture.  To address its financial issues, in 2021, Stayton retained legal counsel and restructuring professionals to help it (i) evaluate its operations and marketing strategies and (ii) provide strategic advice on addressing the Stayton's financial issues.  Thereafter, Stayton and the Trustee, at the direction of the Supporting Holders, entered into a forbearance agreement on January 13, 2023, to enable the company to pursue a sale of the operating enterprise or its assets (the "***Strategic Transaction***").  Additionally, Stayton and Lifespace entered into an amendment of the LSA to allow the Trustee to withdraw $900,000 from the LSA account to pay the fees and expenses of its former counsel and existing advisors to pursue the Strategic Transaction.

Following the amendment to the LSA, in the first quarter of 2023, Stayton, with the aid of its financial advisor, Houlihan Lokey, commenced a marketing process for Stayton and its assets.

---

[5] Stayton's skilled nursing facility experienced a decline in occupancy related to the Covid-19 pandemic but had recovered to its pre-pandemic levels of occupancy by 2022.

The Strategic Transaction was structured as a competitive overbid process, pursuant to which Stayton entered into the Plan Support Agreement and Membership Substitution Agreement with the Plan Sponsor acting as stalking horse and subjected the Plan Sponsor's offer to higher or otherwise superior bids. The Stayton set the auction for March 5, 2024, and Stayton received competing bids from three other senior living operators, including Lifespace. Ultimately, Stayton chose not to convene the auction. Late in the evening on March 5, 2024, the Plan Sponsor's bid was selected by Stayton, in consultation with the Trustee and the Supporting Holders, as the highest and best bid received, and the parties elected to proceed with the proposed Refinancing Transaction.

### B.    Proposed Refinancing Transaction.

In order to address its financial condition, Stayton, Lifespace, the Plan Sponsor, the Trustee, and the Supporting Holders have agreed to the terms of the Refinancing Transaction, pursuant to which: (i) the Plan Sponsor has been substituted as the sole corporate member of Stayton; (ii) the Plan Support Parties executed the Plan Support Agreement; (iii) Stayton and the Trustee entered into a Forbearance Agreement (the "***Forbearance Agreement***"); and (iv) Stayton will solicit votes from Holders of Bond Claims[6] in favor of the Bond Refinancing described in the Plan and commence the Chapter 11 Case to effectuate the Bond Refinancing.

### i.    Plan Sponsor Substitutes as Sole Corporate Member of Stayton.

As an initial step in the Refinancing Transaction, Lifespace entered into that certain *Membership Substitution Agreement*, dated as of February 6, 2024, between Stayton, Lifespace, and the Plan Sponsor (the "***MSA***") to allow the Plan Sponsor to substitute as sole corporate member of Stayton (the "***Membership Substitution***") in accordance with the terms and conditions of the MSA. On the Membership Substitution Effective Date, all conditions precedent to the Membership Substitution were satisfied and the Plan Sponsor On the Membership Substitution Effective Date, all conditions precedent to the Membership Substitution were satisfied, and the Plan Sponsor became the sole corporate member of Stayton on June 1, 2024 (the "***Effective Time***"). Following the close of the MSA, Stayton is continuing to operate as follows:

a.    <u>**Separate Corporate Identity**</u>.    Stayton maintains its corporate identity separate and apart from the Plan Sponsor and its affiliated entities. Stayton retains separate ownership of its assets and remains separately responsible for its operations and liabilities.

b.    <u>**Management**</u>.    The Plan Sponsor is responsible for management of Stayton, including strategic, operational, financial, and legal oversight from the Plan Sponsor's headquarters.

c.    <u>**Impact on Residents**</u>.    The Plan Sponsor will honor the terms of all existing Residency Agreements (defined below), including, but not limited to, the entrance fee obligations outlined in the Residency

---

[6] "***Bond Claim***" means any Claim arising from, or related to, the Original Bond Documents and the Bonds, including any and all outstanding principal, which is owed in the amount $112,261,464.00, plus any and all accrued interest, fees (including, without limitation, professional fees), expenses, costs and other charges payable with respect to the Bonds.

Agreements.  In addition, the Plan Sponsor has committed to continue the existing charity care policy at the Stayton for a period for three (3) years and, thereafter to continue such charity care policy consistent with the other retirement communities owned by Plan Sponsor and its affiliated entities.

ii.    **Forbearance Agreement, Subordinated Note, and Plan Support Agreement.**

To effectuate the Bond Refinancing, Stayton, Buckner, the Trustee, and the Supporting Holders, as applicable, have negotiated and agreed to the terms of the: (i) Forbearance Agreement, (ii) Subordinated Note, and (iii) Plan Support Agreement.   The salient terms of each of these agreements are discussed in greater detail below:

a.    **Forbearance Agreement.**    Pursuant to that certain *Forbearance Agreement*, dated as of May 31, 2024, between Stayton and the Trustee, the Trustee has agreed to forbear from exercising remedies under the Original Bond Documents until December 31, 2024, unless terminated earlier, to provide the time necessary for Stayton to implement the Bond Refinancing through the Chapter 11 Case.

Pursuant to the Forbearance Agreement, Stayton is required to acknowledge, among other things, the validity of the Original Bond Documents, the outstanding amount owed under the Original Bond Documents, and the validity and priority of the Trustee's liens.

As a condition of the Forbearance Agreement, Stayton is required to meet, or cause to be met, certain milestones, including commencing the Chapter 11 Case by no later than October 1, 2024.

Finally, to induce the Trustee to enter into the Forbearance Agreement, Stayton released and discharged the Trustee, the Supporting Holders, and related parties from any and all claims, causes of actions, suits, and damages arising out of or related to the Original Bond Documents.

b.    **Subordinated Note.**    Pursuant to the Subordinated Note between Stayton and Buckner Foundation, Inc. (the "***Buckner Foundation***"), Buckner Foundation (i) transferred $3,333,333.33 to the Stayton on the Membership Substitution Effective Date, (ii) transferred an additional $3,333,333.33 on July 1, 2024, and (iii) has committed to provide the remaining $3,333,333.34 to the Stayton as needed to increase the Days Cash On Hand to meet the Liquidity Requirement (each as defined in the Amended Master Indenture) set forth in that certain *Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement* (the "***Amended Master Indenture***") so long as the total outstanding

amount under the Subordinated Note does not exceed $10,000,000.00.

The Subordinated Note provides $10,000,000.00 in delayed draw subordinated debt to fund future capital expenses at Stayton and provide additional liquidity support for Stayton.

Stayton is required to repay to Buckner Foundation any amounts drawn on the Subordinated Note, with interest thereon, in accordance with the Subordinated Note and the Amended Master Indenture. Stayton's repayment obligation under the Subordinated Note will constitute Subordinated Indebtedness (as defined in the Amended Master Indenture) as set forth in the Subordinated Note and the Amended Master Indenture.

c.  **Plan Support Agreement.**  Pursuant to the terms of the  Plan Support Agreement, a copy of which is attached hereto as **Exhibit B**, Stayton has agreed to commence the Chapter 11 Case in the Bankruptcy Court to implement the Bond Refinancing.  The Plan Support Agreement contemplates that Stayton will restructure and exchange the Bonds for new bonds to be issued by the Issuer and designated "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2024" (the "*Series 2024 Bonds*"). The Series 2024 Bonds will be issued under an Indenture of Trust (the "*Series 2024 Bond Indenture*") between the Issuer and the Trustee, as bond trustee, and the proceeds thereof will be loaned to Stayton pursuant to the terms of a Loan Agreement between the Issuer and Stayton (the "*Series 2024 Loan Agreement*").   The Series 2024 Bonds will be limited obligations of the Issuer and will be secured in part by the Series 2024 Note (the "*Series 2024 Note*") issued by Stayton pursuant to the Amended Master Indenture, which will amend and restate the *Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement*, amended and restated as of January 1, 2020, between the Debtor and UMB Bank, National Association, as predecessor to the Trustee, (the "*Original Master Indenture*") as well as substantially all assets of Stayton as further described herein. [7]   The forms of Series 2024 Bond Indenture (including the Series 2024 Bonds), Series 2024 Loan Agreement, and Amended Master Indenture (including the Series

---

[7] All references herein to the "*Master Indenture*" means the Original Master Indenture prior to the Effective Date and means the Amended Master Indenture on and after the Effective Date.

2024 Note) (collectively, the "**2024 Bond Documents**") are attached hereto as **Exhibit C**.

Pursuant to the Plan Support Agreement, the Trustee has agreed to permit Stayton to use its cash collateral for funding for the Chapter 11 Case in accordance with the terms and conditions set forth in a Cash Collateral Order, which shall be in form and substance acceptable to the Stayton, the Plan Sponsor, and the Trustee.

The Supporting Holders have agreed that, subject to the terms and conditions of the Plan Support Agreement and so long as no Agreement Termination Event (as defined in the Plan Support Agreement) has occurred, they will, among other things, support confirmation of the Plan and vote to accept the Plan.

iii.      **The Chapter 11 Case.**

As the final step in the Refinancing Transaction, and subject to receiving the requisite number of votes in favor of the Plan, Stayton will commence the Chapter 11 Case in the Bankruptcy Court to pursue the Bond Refinancing.   Among other things, the Plan provides as follows:

a.      Stayton shall cause the Issuer to issue the Series 2024 Bonds in an aggregate principal amount equal to $81,000,000, on the terms and conditions set forth in the 2024 Bond Documents.

b.      That all Classes of Claims, except for holders of Bond Claims, will be Unimpaired by the Plan.  Holders of such Claims will have their Claims paid in full in the ordinary course of the Stayton's business and will be deemed to accept the Plan.

c.      All executory contracts and unexpired leases, including all Residency Agreements, will be assumed pursuant to section 365 of the Bankruptcy Code.

d.      Stayton will release certain parties, including, without limitation, the Trustee, the Supporting Holders, and the Plan Sponsor.

Subject to receiving the necessary affirmative votes, Stayton will commence the Chapter 11 Case on or around October 1, 2024 (the "**Petition Date**").  In order to protect the tax-exempt status of the Bond Refinancing, it is contemplated that the Plan will become effective no earlier than six (6) months and one (1) day after the Membership Substitution Effective Date, or no earlier than December 2, 2024.

C.      **Purpose of the Disclosure Statement.**

Stayton submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with: (i) the solicitation of votes on the Plan, and (ii) following the Petition

Date, a hearing to consider confirmation of the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of a proposed chapter 11 plan of reorganization before soliciting acceptances of such proposed plan. Stayton provides this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to the beneficial holders of the Stayton's Bonds because Stayton is asking such Holders of Bond Claims to vote to accept the Plan prior to the filing of Stayton's Chapter 11 Case in a manner which is intended to be binding in the Chapter 11 Case. This Disclosure Statement sets forth certain information regarding (i) Stayton's prepetition operating and financial history; (ii) Stayton's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) the terms of the Plan; (iv) the manner in which distributions will be made under the Plan; (v) certain effects of confirmation of the Plan; (vi) certain risk factors associated with the Plan; and (vii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted. Stayton believes that the confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, its Creditors, and all other interested parties.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

> ### D. The Solicitation Package.

Only record holders of Claims in Class 3 as of the voting record date, August 26, 2024, are entitled to vote on the Plan. Holders of Claims in Class 3 will receive a solicitation package consisting of the following materials (collectively, the "***Solicitation Materials***"):

- a form ballot (the "***Ballot***"), which shall include the voting instructions;

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents; and

- a Solicitation Cover Letter.

### E.      The Plan.

#### i.      Purpose and Effect of the Plan.

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize or to liquidate and wind up its affairs for the benefit of the debtor and its creditors.   Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed.   A debtor will typically remain in control of its estate as a debtor-in-possession during the chapter 11 case.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed.   A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor.   Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

#### ii.      Analysis of Recoveries to Holders of Claims under the Plan and Recommendation of the Debtor.

After an extensive and competitive sale process and arm's length negotiations with the Plan Sponsor, the Trustee, and the Supporting Holders, the Debtor concluded that it could maximize recoveries to its stakeholders through a sale of its assets to the Plan Sponsor and implementing the Refinancing Transaction embodied in the Plan.   The Plan provides for a comprehensive restructuring of the Debtor's Bond Obligations through the exchange of the Bonds for the Series 2024 Bonds.   The Plan further provides for the Debtor to continue to honor its obligations to its other creditors in the ordinary course of its business.   The treatment provided to Holders of Bond Claims is the product of extensive negotiations between the Debtor, the Plan Sponsor, the Trustee, and the Supporting Holders.   As set forth more fully below, the Debtor and the Plan Sponsor believe that the Plan provides the best recoveries possible for the Debtor's stakeholders and recommend that, if you are entitled to vote, you vote to accept the Plan.

#### iii.      Classification and Treatment of Claims Under the Plan.

Bond Claims are impaired under the Plan.   The Debtor is seeking votes to accept the Plan from Holders of Bond Claims in Class 3.   For a full description of the Classes of Claims and their treatment under the Plan, see Sections 3 and 4 of the Plan - Classification and Treatment of Claims.

Each Class of Claims, except Administrative Expense Claims and Priority Tax Claims, are placed in the following Classes and will receive the following treatment under the Plan:

*Summary of Classification and Treatment of Claims Under the Plan*

| Class and Designation | Treatment | Impairment and Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|
| Class 1: Priority Non-Tax Claims | Paid in full in cash. | Unimpaired (**Not entitled to vote**. Deemed to Accept) | 100% |
| Class 2: Other Secured Claims | Reinstated. | Unimpaired (**Not entitled to vote**. Deemed to Accept) | 100% |
| Class 3: Bond Claims | Each Holder of an Allowed Bond Claim will receive its Pro Rata share of the Series 2024 Bonds. | Impaired (**Entitled to vote**) | Allowed in the amount of $112,261,464.00 plus interest and fees as of the Effective Date 63.1%[8] |
| Class 4: General Unsecured Claims | Unaltered by the Plan. The Reorganized Debtor shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Case had never been commenced. | Unimpaired (**Not entitled to vote**. Deemed to Accept) | 100% |
| Class 5: Subordinated Note Claims | Reinstated. | Unimpaired (**Not entitled to vote**. Deemed to Accept) | Allowed. 100% |

i.        **Summary of Voting Requirements for Plan Confirmation.**

a.        **In General.**

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. 11 U.S.C. § 1124. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of those creditors that actually cast ballots vote to accept such plan. 11 U.S.C. § 1126(c).

---

[8] The approximate percentage of recovery for the bonds incorporates principal and interest through an assumed Effective Date of December 2, 2024.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan.  11 U.S.C. § 1126(d).  Those classes that are not impaired are not entitled to vote and are deemed to accept a plan.  11 U.S.C. § 1126(f).  Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.  11 U.S.C. § 1126(g).

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained.  **Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.**

### ii.    Impaired Classes Entitled to Vote.

The Claims in Class 3 are Impaired under the Plan and Holders of Bond Claims in this Class are entitled to vote to accept or reject the Plan.

### iii.    Unimpaired Classes Deemed to Accept the Plan.

If a Creditor holds a Claim included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited.   Classes 1, 2, 4, and 5 are Unimpaired under the Plan.

### iv.    Voting Deadline.

The Debtor has engaged Kroll Restructuring Administration LLC as its voting agent (the "***Voting Agent***") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan.   Holders of Bond Claims will have the right to vote to accept or reject the Plan.  To be counted, votes must be submitted in accordance with the voting instructions, which require all votes to be in writing and submitted prior to September 27, 2024 at 5:00 p.m. (prevailing Central Time) (the "***Voting Deadline***").   The record date for determining which holders may vote on the Plan is August 26, 2024 (the "***Voting Record Date***").

### v.    Voting Instructions.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class, counting only those claims that actually vote to accept or to reject such plan.  11 U.S.C. § 1126(c).

As stated above, to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and timely delivered by the Voting Deadline

Most Holders of Claims related to the Bonds will submit votes by completing a Ballot  and returning it to their specified bank, broker, nominee, or other intermediary (a "***Nominee***").  Each Nominee may provide specific instructions to beneficial Holders of Claims related to the Bonds on how to submit a vote (whether in a beneficial Holder Ballot or otherwise according to

the Nominee's instructions).    Such Holders will be instructed to submit their vote to the Nominee to enable the Nominee to include such beneficial Holder vote(s) in, and complete and submit, a master Ballot to the Voting Agent so that it is actually received by the Voting Deadline.    Beneficial Holders of Claims related to the Bonds should carefully follow the instructions that accompany their Ballot to ensure that their vote is properly received by the Nominee with sufficient time for the Nominee to complete a master Ballot that can be delivered to the Voting Agent by the Voting Deadline.    Instructions for voting are more fully described in the Ballots.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor in its sole discretion, following consultation with the Trustee, and such determination will be final and binding unless otherwise ordered by the Bankruptcy Court.    Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Bankruptcy Court.    The Debtor also reserves the right to reject any and all Ballots not in proper form, if the acceptance of which would, in the opinion of the Debtor with the advice of its counsel, be unlawful.

The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.    The interpretation (including the Ballot and the respective instructions therein) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.    Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.    Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.    Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities are cured or waived.    Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.

### vi.    Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, or (iii) obtaining or replacing a Ballot, the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent by (a) calling (833) 917-0935 (US/Canada toll free) or +1 (646) 783-2230 (international toll); (b) writing to The Stayton at Museum Way Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; or (c) emailing StaytonInfo@ra.kroll.com  with a reference to "Stayton Solicitation Inquiry" in the subject line.    Questions regarding voting instructions provided to you by your Nominee should be directed to your Nominee.

### vii.     The Confirmation Hearing.

Following commencement of the Chapter 11 Case, the Debtor will request that the Bankruptcy Court schedule a combined hearing to consider, among other things, (i) approval of the Disclosure Statement, approval of the Solicitation Materials, which shall include the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan,  and (iii) confirmation of the Plan (the "***Confirmation Hearing***").    The Debtor will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on any master service list ordered by the Bankruptcy Court and  any entities which filed objections to the Plan, without further notice to parties in interest.   The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.   The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### viii.    Effect of Confirmation and Consummation of the Plan.

Following Confirmation, subject to Section 9 of the Plan, the Plan will be consummated on the Effective Date.   Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Section 10 of the Plan will become effective. As such, it is important to read the provisions contained in Section 10 of the Plan very carefully so that you understand how confirmation and consummation of the Plan will affect you and any Claim you may hold against the Debtor so that you cast your vote accordingly.

Following the Effective Date, the Bonds will be cancelled, and in return, Holders of the Bonds will receive a Pro Rata share of the Series 2024 Bonds.    Additionally, following the Effective Date, the 2024 Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor.

## II.     BACKGROUND INFORMATION.

### A.     Overview of the Debtor's Business.

Incorporated in 2006, Stayton is a not-for-profit corporation that owns and operates a best-in-class continuing care retirement community in Fort Worth, Texas dedicated to giving its residents a vibrant, active, and independent lifestyle.   The Stayton offers its senior residents a continuum of care in a luxury campus-style setting, providing living accommodations and related health care and support services to a market of seniors aged sixty-two (62) and older.    Stayton consists of approximately 188 independent living ("***IL***") apartment-style residences in one-, two-, and three- bedroom configurations within three towers, each of which are eleven stories.    Stayton also houses 42 residential-style assisted living ("***AL***") suites, 20 memory support ("***MS***") assisted living suites and a skilled nursing facility ("***SNF***") with 46 skilled nursing beds, all located on a 2.8 acre campus (the "***Facility***") adjacent to Trinity Park.    The Facility also contains an aquatic/fitness center, business center/library, beauty salon/barber shop, card lounge/game room, creative arts center, dining rooms and lounges, and other common spaces.

As is common practice in the continuing care retirement community ("***CCRC***") industry, the Debtor primarily receives its revenue from entrance fees, monthly service fees, and other fees charged by Stayton (collectively, the "***Fees***") pursuant to Residency Agreements. A resident interested in occupying an IL unit in the Facility must enter into a continuing care contract (a "***Continuing Care Contract***") with Stayton. As part of a Continuing Care Contract, each resident in an IL unit receives priority access to AL and/or SNF units should additional care ever be required. In addition, IL residents receive basic assisted living or nursing care upon permanent transfer to AL or the SNF, should the need for such services arise. Unlike a pure rental retirement community, whereby a resident pays monthly fees for services, the Continuing Care Contract is a life care residency contract whereby a resident will pay an entrance fee and monthly fees for Stayton's commitment to provide (i) priority access to AL and/or SNF units should additional care ever be required and (ii) basic assisted living or nursing care upon permanent transfer to AL or the SNF, should the need for such services arise (the "***Life Care Benefit***"). Residents receive these Life Care Benefits for the duration of the resident's life, regardless of whether the resident's needs change over time which may require additional services to be provided by Stayton. Significantly, Stayton's commitment to provide Life Care Benefits continues even if the resident's financial condition deteriorates and the resident is unable to continue to make its payments.

In addition to Continuing Care Contracts, Stayton also offers contracts for direct admission into an AL suite (the "***Assisted Living Residency Agreement***") or SNF (the "***SNF Residency Agreement***" and collectively with Continuing Care Contracts and Assisted Living Residency Agreements, the "***Residency Agreements***").

## B.      Organizational Structure of the Debtor.

### i.      Corporate Governance.

Stayton is governed by a Board of Directors that is elected by Buckner. Buckner has been the sole corporate member of Stayton since the Effective Time. Buckner is a faith-based nonprofit corporation chartered under the laws of the State of Texas and a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "***IRC***"). Buckner's mission is to inspire happiness for its residents, creating communities that provide seniors with connection, independence, purpose, security, and exceptional service. Buckner owns and operates six (6) other nonprofit senior living communities across Texas, making it the largest nonprofit senior living provider in Texas.

Prior to the Effective Time, Stayton's sole corporate member and sponsor was Lifespace. Lifespace is a non-profit corporation chartered under the laws of the State of Iowa and a tax-exempt organization under section 501(c)(3) of the IRC.

### ii.      Management by Buckner.

Pursuant to that certain *Management Services Agreement* (as may be amended, supplemented, or modified from time to time, the "***Management Agreement***"), effective as of June 1, 2024, Buckner agreed to serve as exclusive manager of the day-to-day operations of Stayton. The services provided by Buckner include, but are not limited to, the following: (i) general management services to administer the policies, directives, and strategic direction of

14

Stayton's operations; (ii) financial management services, including providing periodic financial reports and budgeting; (iii) legal services and compliance support; (iv) human resource services, including establishing employment policies, hiring, developing, and retaining employees, and setting wage, salary, and benefit terms; and (vii) marketing, public relations, and fundraising support, including  providing sales and marketing services for the community.  Pursuant to the Management Agreement, Stayton pays Buckner a management fee of five percent (5%) of its monthly gross revenues, as defined in the Management Agreement, for the services provided.

### iii.    Regulators.

The CCRC industry nationwide is regulated by various state and federal agencies.   Each state has a different regulatory scheme governing CCRCs.    As a Medicare-certified CCRC operating in the State of Texas, Stayton is regulated by, among others, the Centers for Medicare and Medicaid Services, the State of Texas Department of Health, and the Texas Department of Insurance.

### C.    The Debtor's Prepetition Capital Structure.

As of June 30, 2024, on a book value basis, Stayton had approximately $125.8 million in assets consisting of approximately: (i) $7.4 million in cash and cash equivalents; (ii) $1.2 million in accounts receivable; (iii) $94.2 million in fixed assets, net of accumulated depreciation; (v) $17 million of restricted cash; and (vi) $6 million of other assets, net of accumulated amortization and depreciation.

As of June 30, 2024, Stayton had approximately $ 214.3 million of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs, and original issue premium, which consisted of approximately: (i) $1.5 million of trade accounts payable; (ii) $21.5 million of current resident refund obligations; (iv) $75 million in entrance fee liabilities; (v) $112.3 million in principal amount of long-term municipal bond obligations; and (vi) 4.1 million of other liabilities, including $3.3 million of Subordinated Note obligations.   As of July 31, 2024, Stayton had $6.67 million of Subordinated Note obligations.

### i.    Long-Term Municipal Bond Obligations.

On January 1, 2020, Tarrant County Cultural Education Facilities Finance Corporation (the "*Issuer*") and UMB Bank, National Association, as former trustee, entered into an Indenture of Trust (the "*Bond Indenture*"), pursuant to which the Issuer issued Series 2020 retirement facility revenue bonds in the initial principal amount of $112,261,464.

Contemporaneously with the issuance of the Bonds, the Issuer loaned the proceeds of the Bonds to Stayton, pursuant to a Loan Agreement between Stayton and the Issuer (the "*Loan Agreement*"), to provide for the refinancing of a portion of the cost of acquiring, constructing, and equipping the Facility.    Additionally, on January 1, 2020, Stayton issued the Tarrant County Senior Living Center, Inc. Series 2020 Note (the "*Series 2020 Note*") under the Original Master Indenture.   The Series 2020 Note secures the obligations of Stayton to pay the principal of and interest on the Bonds.   The Bond Indenture, Loan Agreement, Original Master Indenture, and Series 2020 Note are collectively referred to herein as the "*Original Bond Documents*."   As of the date hereof, the outstanding principal amount owed by Stayton under the Original Bond

Documents is approximately $112,261,464.00 (together with interest, fees, expenses, and other amounts due under the Original Bond Documents, the "***Bond Obligations***").

Under the terms of the Original Bond Documents, certain accounts were established by Stayton and are being held by the Trustee, including, among others, the Revenue Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, the Working Capital Fund, the Operating Reserve Fund, and the Liquidity Support Fund (each as defined in the Original Bond Documents).    As of June 30, 2024, the total amount of funds held by the Trustee in said accounts was approximately $4.9 million (the "***Trustee-Held Funds***").

### ii.      Subordinated Note Obligations.

On May 31, 2024, Buckner Foundation, a Texas not-for-profit corporation and affiliate of the Plan Sponsor, and Stayton entered into the Subordinated Note.   Pursuant to the Subordinated Note, Buckner Foundation agreed to loan up to $10,000,000 in funds to Stayton in three tranches. As of the date hereof, the Buckner Foundation has transferred $6,666,666.66 to Stayton and has committed to provide the remaining $3,333,333.34 to Stayton as needed to increase the Days Cash On Hand to meet the Liquidity Requirement set forth in the Amended Master Indenture.  Stayton is required to repay to Buckner Foundation any amounts drawn on the Subordinated Note, with interest thereon, in accordance with the Subordinated Note and the Amended Master Indenture. The Subordinated Note is subordinated to the Bond Obligations.   The Plan contemplates that Stayton's rights and obligations under the Subordinated Note will be reinstated.  On and after the Effective Date, Stayton's repayment obligation under the Subordinated Note will constitute Subordinated Indebtedness (as defined in the Amended Master Indenture) as set forth in the Subordinated Note and the Amended Master Indenture.

## III.      THE CHAPTER 11 PLAN.

This section of the Disclosure Statement provides a summary of the key terms, structure, classification, treatment, and implementation of the Plan, a copy of which is annexed hereto as **Exhibit A**.  **Although this section of the Disclosure Statement includes summaries of the provisions of the Plan and certain of the documents referenced therein, it is not a complete statement of the terms and provisions contained in the Plan and should not be relied upon as a comprehensive restatement of the Plan.**  This Summary is qualified in its entirety by reference to the Plan and the Plan Supplement.  To the extent there are any inconsistencies between the Disclosure Statement and the Plan and the Plan Supplement, the terms of the Plan and the Plan Supplement, as applicable, shall govern.

### A.      Summary of Key Plan Provisions.

| Section | Pages | Summary |
|---------|-------|---------|
| **1** | 1-11 | **Definitions and Interpretation**.  This section contains the definitions used throughout the Plan as well as the rules of construction for the Plan and conventions for computing time. |

| 2 | 11-12 | **Administrative and Priority Claims**.  This section details the treatment of certain Priority and Administrative Expense Claims, such as state and federal taxes, expenses incurred by the Debtor during the course of the Chapter 11 Case, fees owed to the Debtor's bankruptcy professionals, and statutory fees owed to the United States Trustee.  Pursuant to the Bankruptcy Code, these types of Claims are afforded higher payment priority and the Debtor must ensure that these Claims are paid in full before affording payment to any other Claims.  Pursuant to the Plan, all Allowed Administrative Expense Claims and Priority Tax Claims will be paid in full. |
| :---: | :---: | :--- |
| 3 | 12-14 | **Classification of Claims**.  This section summarizes the different categories of Claims against the Debtor.  It also contains provisions regarding voting and solicitation as well as a provision summarizing how the Debtor may seek to confirm the Plan notwithstanding the rejection of the Plan by a Class of creditors. |
| 4 | 14-15 | **Treatment of Claims**.  This section details the treatments of each Class of Claims against the Debtor.  Pursuant to the Plan, each Class of Claims against the Debtor other than Class 3 are Unimpaired by the Plan and will be treated as if the Chapter 11 Case had never been filed.  Holders of Bond Claims in Class 3 will receive their pro rata share of the Series 2024 Bonds.  A more detailed description of the Plan treatment for each Class is set forth immediately below. |
| 5 | 16-20 | **Means for Implementation of the Plan**.  This section of the Plan sets forth the various provisions that are key to the implementation of the Plan such as provisions authorizing the 2024 Bond Documents, granting legally binding and enforceable Liens and security interests in the Debtor's assets in accordance with the 2024 Bond Documents, and providing for the continued corporate existence of the Debtor following the Effective Date of the Plan.  The provisions regarding the authorization of the 2024 Bond Documents and summarizing the Series 2024 Bonds are set forth below. |
| 6 | 21-22 | **Distributions**.  This section of the Plan describes how Distributions under the Plan will be handled and empowers the Disbursing Agent to make such Distributions. |
| 7 | 23 | **Procedures for Resolving Claims**.  This section of the Plan clarifies that Holders of Claims need not file a proof of claim |

17

| | | |
|---|---|---|
| | | and that any disputes with respect to such claims will be resolved by the Debtor in the ordinary course of its business. |
| **8** | 23-26 | **Assumption of Executory Contracts and Unexpired Leases**.  This section of the Plan describes how the Debtor's executory contracts and unexpired leases will be treated under the Plan.  The Debtor is assuming all such contracts and leases, including Residency Agreements, and will continue to operate under the agreements as if the Chapter 11 Case had never occurred. |
| **9** | 26-27 | **Conditions Precedent to Confirmation and the Effective Date**.  This section lists all of the conditions precedent to confirmation of the Plan and the Effective Date of the Plan. As set forth in section 9.2, each of the conditions precedent to the Effective Date of the Plan may be waived by joint agreement of the Debtor, the Plan Sponsor, the Trustee, and the Supporting Holders. |
| **10** | 28-33 | **Effect of Confirmation**.  This section sets forth the effect that confirmation of the Plan will have on the Debtor's creditors. As described more fully below, this section also contains releases by the Debtor (section 10.6), exculpations (section 10.7), and an injunction (section 10.8). |
| **11** | 33-35 | **Retention of Jurisdiction**.  This section contains provisions regarding the items over which the Bankruptcy Court will retain jurisdiction to decide after Confirmation and the Effective Date if they become issues in the future. |
| **12** | 35-39 | **Miscellaneous Provisions**.  This section contains miscellaneous provisions of the Plan such as the governing law for the Plan, where to provide notice, and provisions for modifying and amending the Plan. |

### B.    Treatment of Claims Under the Plan.

#### i.    Class 1: Priority Non-Tax Claims.

This Class consists of all Allowed Priority Non-Tax Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim, Fee Claim, or Priority Tax Claims, if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Priority Non-Tax Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Priority Non-Tax Claim against the Debtor.

#### ii.    <u>Class 2: Other Secured Claims</u>.

This Class consists of all Other Secured Claims against the Debtor.   Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date each Other Secured Claim shall be Reinstated.

#### iii.    <u>Class 3: Bond Claim</u>.

This Class consists of the Claims of the holders of the Bonds and the Trustee against the Debtor.  The Bond Claims are Allowed Claims.  Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Bond Claims, each Holder of a Bond Claim shall receive its Pro Rata share of the Series 2024 Bonds on the Effective Date or as soon as practicable thereafter.

#### iv.    <u>Class 4: General Unsecured Claims</u>.

This Class consists of all General Unsecured Claims against the Debtor.   Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on and after the Effective Date, the Reorganized Debtor shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Case had never been commenced.

#### v.    <u>Class 5: Subordinated Note Claims</u>.

This Class consists of all Subordinated Note Claims against the Debtor.  The Subordinated Note Claims are Allowed.  On the Effective Date, each Allowed Subordinated Note Claim shall be Reinstated.

#### vi.    <u>Interests in the Debtor</u>.

The Debtor is a nonprofit corporation, and, as such, there are no equity interests in the Debtor to be classified and treated under the Plan.

C.      **Means for Implementation of the Plan.**

i.      **Refinancing Transactions.**

On the Effective Date, the Debtor, the Reorganized Debtor, and any other Entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of restructuring, reorganization, disposition, or transfer containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, duty, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; (iv) the Refinancing Transaction; and (v) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines are necessary or appropriate including, without limitation, making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

ii.     **2024 Bond Documents.**

The Reorganized Debtor shall be authorized to enter into the 2024 Bond Documents on the Effective Date.  On the Effective Date, and following the consummation of the Refinancing Transaction, the 2024 Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor, enforceable in accordance with their terms.  The financial accommodations to be extended under the 2024 Bond Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the 2024 Bond Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the 2024 Bond Documents, (iii) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtor, the Trustee, or any of Holders of Series 2024 Bonds), having the priority set forth in the 2024 Bond Documents and subject only to such Liens and security interests as may be permitted under the 2024 Bond Documents, and (iv) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtor and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the

20

Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### iii.    Series 2024 Bonds.

On the Effective Date, the Reorganized Debtor shall cause the Issuer to issue the Series 2024 Bonds, the primary economic terms of which are described below:[9]

| | |
|---|---|
| **Principal:** | $81,000,000 on the terms and conditions set forth in the 2024 Bond Documents. |
| **Rate of Interest**: | The Series 2024 Bonds will bear interest at a fixed rate of 5.75% per annum. |
| **Maturity Date:** | December 1, 2054 |
| **Collateral:** | Pursuant to the Amended Master Indenture, the Liens and security interests granted in the Original Master Indenture will continue to secure the obligations under the Amended Master Indenture including the Series 2024 Note. Pursuant to such grants, the Trustee has first priority Liens and security interests in substantially all of the Debtor's assets, including all real and personal property, including Debtor's Gross Revenues (as defined in the Amended Master Indenture), except as otherwise provided in the 2024 Bond Documents. |
| **Amortization** | The Series 2024 Bonds shall amortize pursuant to the Amortization Schedule.  The Amortization Schedule is Addendum A to the Plan Support Agreement attached as **Exhibit B** hereto. |

The issuance of the Series 2024 Bonds for distribution under the Plan is authorized without the need for further corporate action, and all of the Series 2024 Bonds issued or issuable under the Plan shall be duly authorized and validly issued under the Plan.  The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the Series 2024 Bonds, in form and substance acceptable to the Trustee, including, without limitation, the Opinion of Bond Counsel described in the 2024 Bond Documents, subject to such exceptions as are reasonably acceptable to the Trustee.

### D.    Release, Exculpation, and Injunction Provisions.

Section 10 of the Plan provides for standard debtor releases, exculpations, and injunctions to ensure the enforceability of the Plan and prior orders of the Bankruptcy Court.  The Debtor

---

[9] The information set forth in the accompanying chart is solely for summary purposes.  To the extent there is any discrepancy between the information set forth in the chart and the 2024 Bond Documents, the 2024 Bond Documents, copies of which are attached hereto as Exhibit C, control.

believes that the releases, injunctions, and exculpations set forth in the Plan are appropriate and in accordance with applicable law. The Debtor believes that the Plan Sponsor, the Trustee, and the Supporting Holders have contributed value to the Debtor and its estate by, among other things, directing and approving the sale of the Debtor to the Plan Sponsor, settling their Bond Claims for the treatment provided in the Plan, negotiating the Plan Support Agreement, and agreeing to the Forbearance Agreement, each of which directly facilitated the Chapter 11 Case and the Refinancing Transaction implemented by the Plan.

     i.     **Releases by the Debtor.**

**Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the Confirmation Order, the 2024 Bond Documents, or the Plan Supplement, for good and valuable consideration, including the consummation of the transactions contemplated by the Plan, as of the Effective Date, each Released Party will be deemed released and discharged by each and all of the Debtor, the Reorganized Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Original Bond Documents, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Refinancing Transaction, the Plan, the 2024 Bond Documents, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to a Released Party's gross negligence, willful misconduct, fraud, or criminal activity as determined by a Final Order of the Bankruptcy Court; provided, that any right to enforce the Plan and the Confirmation Order is not so released by Section 10.6 of the Plan.**

**The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order,**

or rule or the vote, consent, authorization, or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released under the foregoing release.  Notwithstanding the foregoing, nothing in Section 10.6 of the Plan shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action, or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under Bankruptcy Rule 9019, of foregoing release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable, and reasonable; and (v) given and made after due notice and opportunity for hearing.

ii.    Exculpation.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligations, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of the Plan Support Agreement, the Refinancing Transaction, the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan, the occurrence of the Effective Date, the administration of the Plan, the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, except for: (i) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release, or other agreement or document to be entered into or delivered in connection with the Plan; or (ii) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined to have constituted fraud, gross negligence, willful misconduct, or a criminal act as determined by a Final Order.

iii.    Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order, including but not limited to any right arising under or related to the 2024 Bond Documents, from and after the Effective Date, all persons and entities who have held, hold, or may hold Claims are, with respect to any such Claim, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, directly or indirectly, any suit,

**action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind that does not comply with or is inconsistent with the provisions of the Plan, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, or remedy released or to be released, settled or to be settled, or discharged or to be discharged under the Plan or the Confirmation Order against any person or entity so released or discharged (or the property or Estate of any person or entity so released or discharged).**

## IV.    RISK FACTORS IN CONNECTION WITH THE PLAN.

The Holders of Bond Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.    Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in section 9 of the Plan, and there can be no assurance that such conditions will be satisfied or waived.   In the event the conditions precedent described in section 9 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims will be restored to the status quo ante as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class.   The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims encompass Claims that are substantially similar to the other Claims in each such Class.   Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.** **Risks Related to the Debtor's Business and Industry.**

    **i.** **Even if the Plan is confirmed, the extent of the Debtor's remaining indebtedness may impair its financial condition and the Debtor's ability to grow and compete.**

As of the date hereof, the Debtor's total secured debt is approximately $112.3 million. Although the Debtor anticipates that the Plan will significantly decrease the annual debt service requirements of Stayton and, over time, increase its liquidity, it still will have a significant level of debt upon consummation of the Plan. The Debtor's debt has important consequences for its financial condition, including:

    (i) making the Debtor vulnerable to general adverse economic, competitive, and industry conditions;

    (ii) limiting the Debtor's ability to obtain additional financing to support its operations and make capital improvements, if necessary;

    (iii) requiring a substantial portion of the Debtor's cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital, capital expenditures, execution of its business strategy, acquisitions, operations, and general corporate requirements; and

    (iv) limiting the Debtor's ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less leveraged competitors.

    **ii.** **Servicing the Debtor's debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

The Debtor's ability to make payments on and refinance its debt, fund planned capital expenditures, and execute its business strategy depends on its ability to generate cash flow in the future. To some extent, this is subject to general economic, financial, competitive, and other factors that are beyond the Debtor's control. Even if the Plan is consummated, there can be no assurance that the Debtor's business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs. If the Debtor is unable to service its debt or experiences a significant reduction in its liquidity, the Debtor could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt, or seek additional capital from its affiliates, and the Debtor may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow the Debtor to service its debt obligations or may have a materially adverse effect on its results of operations and financial condition. The Debtor's failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition. If the Debtor cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and the Debtor's future lenders could,

under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

### iii. The Debtor may fail to maintain turnover or occupancy.

The economic feasibility of the Facility depends upon the ability of the Facility to attract new residents and to maintain substantial occupancy of the Facility. If the Debtor does not achieve the required levels of occupancy for the Facility, the revenues anticipated by the Facility from Fees could be adversely affected. Additionally, if a substantial number of residents live beyond the life expectancies anticipated by the Debtor, new residents will be admitted at a slower rate and the receipt of additional, potentially higher entrance fees will be curtailed with a consequent impairment of the Facility's cash flow. Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by the Debtor.

### iv. The Debtor may be faced with competition from other similar facilities.

The Debtor faces competition from similar facilities operating in or near its market area, from other residential facilities for older adults, and from existing facilities offering custodial, intermediate, and skilled nursing care. The Debtor may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by the Facility as well as in the areas surrounding the area served by the Facility.

### v. The Plan and the related transactions, which contemplate transactions that will modify the Debtor's capital structure, are based in large part upon assumptions and analyses developed by it. If these assumptions and analyses prove to be incorrect, the Debtor's Plan may be unsuccessful in its execution of the restructuring, and it may be unable to continue as a going concern.

The Plan and the transactions related thereto, which contemplate transactions that will affect the Debtor's capital structure, are premised upon assumptions and analyses of the Debtor that are based upon the Debtor's experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that it considers appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depend on a number of factors.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. The Debtor's actual financial condition and results of operations may differ, perhaps materially, from what it anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor's business or operations. The failure of any such

results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

> ### vi.    Uncertainties related to the Debtor's business may impact its ability to attract new residents.

The Debtor's success depends on its ability to consistently, accurately, and effectively provide affordable living accommodations and related healthcare and support services to middle-income seniors.    Should seniors perceive that the uncertainties related to the Debtor's business have adversely affected its services, there will a decrease in new residents attracted to its  Facility.

> ### vii.    Uncertainties related to the Debtor's business may create a distraction for or cause a loss of personnel and may otherwise adversely affect its ability to attract new personnel.

The market for qualified personnel is competitive and the Debtor's future success will depend upon, among other factors, its ability to attract and retain key personnel.    Uncertainties about the future prospects and viability of its business may impact the Debtor's ability to attract and retain key personnel.  If the Debtor loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it, or if personnel are distracted due to the uncertainties about the future prospects and viability of its business, the Debtor may not be able to effectively implement its business strategy and its business could suffer.    The loss of the services of any of the Debtor's other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and  financial condition due to disruptions in its leadership and the continuity of its business relationships.

> ### viii.    Third party reimbursement may be reduced or eliminated.

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicare reimbursement program, and other federal, state, and local governmental agencies.    As a result, the Debtor is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs.    Congress has in the past enacted a number of provisions which affect health care providers and additional legislative changes can be expected.    Previous legislative actions have included limitation of payments to nursing homes under the Medicare program.

Future legislation, regulation, or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services.    At present, no determination can be made concerning whether, or in what form, such legislation would be introduced and enacted into law.    Similarly, the impact of future cost control programs and future regulations upon the Debtor's financial performance cannot be determined at this time.

The Debtor may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations.    Most of these programs make payments at rates which are less than actual charges.    Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

### ix.   The income of the elderly may diminish.

A large percentage of the monthly income of the residents of the Facility is fixed income derived from pensions and social security or income from investments.   If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs, wages, benefits, and other expenses, residents may have difficulty paying such monthly fees. Furthermore, investment income of the residents may be adversely affected by declines in the stock market and sustained historically low market interest rates, also resulting in payment difficulties.

### x.   Other Possible Risk Factors.

The occurrence of any of the following events, or other unanticipated events, could also adversely affect the financial condition or results of operations of the Debtor:

(i)   reinstatement of or establishment of mandatory governmental wage, rent, or price controls;

(ii)   adoption of federal, state, or local legislation or regulations having an adverse effect on the future operating or financial performance of the Debtor;

(iii)   events adversely affecting the operation of the Facility, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare or comparable regulations, or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities;

(iv)   a decline in the population, a change in the age composition of the population, or a decline in the economic conditions of the Debtor's market area;

(v)   developments or events affecting the federal or state exemption of the Debtor's income from taxation;

(vi)   suspension or revocation of or failure to renew any license, certificate, or approval to operate the Facility, or any portion thereof, or any restriction on new admissions to licensed beds;

(vii)   reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved occupational health and safety, development and utilization of medical and scientific research and technological advances, and other developments;

(viii)   changes in reimbursement procedures or in contracts under public or private insurance programs;

(ix)  increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals, including trained nurses vital to the Facility;

(x)  increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues;

(xi)  inability of the Debtor to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges, and the quality and scope of care or any limitation on the availability of tax-exempt or other financing for future projects; and

(xii)  the occurrence of natural disasters, including floods, hurricanes, tornadoes, and earthquakes, could damage the Facility, interrupt utility service, or otherwise impair the operations of the Debtor and the generation of revenues from the Facility.  The Facility is required to be covered by general property insurance in amounts which management of the Debtor considers to be sufficient to provide for the replacement of such Facility in the event of a natural disaster.

**C.    Additional Factors.**

**i.     No Duty to Update Disclosures.**

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court.    Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**ii.    Representations Outside this Disclosure Statement.**

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are subject to approval by the Bankruptcy Court.   Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims that are entitled to vote to accept or reject the Plan.

**iii.   No Admission.**

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims.

29

### iv.     Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in section VII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business, or other professional advice.   Holders of Claims should seek advice from their own independent tax, legal, or other professional advisors based on their own individual circumstances.

## V.     PLAN CONFIRMATION AND CONSUMMATION.

### A.     The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a Confirmation Hearing.   On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtor will request that the Bankruptcy Court schedule the Confirmation Hearing.   Notice of the Confirmation Hearing will be provided to all known creditors or their representatives.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.     Objections to Confirmation.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.     Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules of the United Stated Bankruptcy Court for the Northern District of Texas, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order, by the deadline that will be set forth in the notice of Confirmation Hearing:

i)  **Debtor** at
    Tarrant County Senior Living Center, Inc.
    c/o Jeff Gentry, Executive Vice President &
    Chief Operating Officer Buckner International
    700 North Pearl Street, Suite 1200
    Dallas, Texas 75201
    Attention:  Jeff Gentry
                Renee Reimer

    Email:     jgentry@buckner.org
               rreimer@buckner.org

ii) **Counsel to the Debtor** at
    Butler Snow LLP

2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219


Attention: Martin A. Sosland
              Candice M. Carson

E-mail:    martin.sosland@butlersnow.com
           candice.carson@butlersnow.com

-and-

Butler Snow LLP
6075 Poplar Avenue, Suite 500,
Memphis, TN 38119
Tel: (901) 680-7200
Fax: (901) 680-7201

Attention: Adam M. Langley
              Kenneth Groce

E-mail:    adam.langley@butlersnow.com
            kenneth.groce@butlersnow.com

-and-

Butler Snow LLP
1819 Fifth Avenue North, Suite 1000
Birmingham AL 35203
Tel: (205) 297-2200
Fax: (205) 297-2201

Attention: Xan Flowers

E-mail:    [xan.flowers@butlersnow.com](mailto:xan.flowers@butlersnow.com)

iii) **Office of the U.S. Trustee for the Northern District of Texas** at
    Office of The United States Trustee
    Earle Cabell Federal Building
    1100 Commerce Street, Room 976
    Dallas, TX  75242

iv) **Counsel to the Trustee and the Supporting Holders** at
    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
    One Financial Center
    Boston, MA 02111

31

Attention: Daniel S. Bleck
Eric Blythe
E-mail: DSBleck@mintz.com
ERBlythe@mintz.com

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.    **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### C.    Requirements for Confirmation of the Plan.

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan (a) "does not discriminate unfairly," (b) is "fair and equitable" as to such Class and (c) in the "best interests" of the holders of Claims impaired under the Plan (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code); and (ii) feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan).

### i.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan.   A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.   As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such claim or equity interest; or (iii) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall

be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### ii.     Best Interests of Creditors.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Class 3, consisting of Bond Claims, is the only impaired class under the Plan.

In chapter 7 cases, a chapter 7 trustee is appointed to commence a liquidation of the debtor's assets because the debtor is insolvent.  To do so, the chapter 7 trustee retains professionals, conducts an initial evaluation of the debtor's assets, and then proceeds with what is generally referred to as a "fire sale" of the debtor's assets, seeking, if possible, to sell substantially all of the debtor's remaining assets either wholesale or through piecemeal liquidation in a compressed timeframe.  In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (i) holders of secured claims (to the extent of the value of their collateral); (ii) holders of priority claims; (iii) holders of unsecured claims; (iv) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (v) holders of interests.  Accordingly, any cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtor, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation.  Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

The Debtor believes that confirmation of the Plan will provide each Holder of a Bond Claim with a recovery greater than or equal to the value of any distributions if the Chapter 11 Case were converted to a case under chapter 7.  As detailed in the section regarding the Debtor's prepetition capital structure, the Debtor's current liabilities far exceed their assets on a book value basis.  Importantly, the Debtor has already conducted a robust market sale process, which effectively set the going concern value of its business.

As discussed above, beginning in the first quarter of 2023, Stayton, Lifespace, and the Supporting Holders conducted a year-long out-of-court sale process, during which Stayton and its advisors canvassed the market for potential purchasers for the Stayton.  During that process, the Plan Sponsor emerged as the front-runner and was initially selected as the stalking horse purchaser. The Stayton then commenced an overbid process, seeking a higher and better offer than that of the Plan Sponsor.  Despite receiving three competing bids, the Plan Sponsor's offer was ultimately

chosen by the Stayton, its advisors, the Trustee, and the Supporting Hoolders as the highest and best offer received.  Accordingly, given the robust out-of-court marketing process, the Debtor believe that the highest and best offer available for the Debtor's assets is that represented by the Plan, which provides all Holders of Claims (other than Holders of Bond Claims) payment in full.

The Debtor further believes that any recovery received by the Holders of Bond Claims in a hypothetical chapter 7 liquidation would be substantially reduced.  Pursuant to the Plan, the Supporting Holders have agreed to reduce the outstanding principal amount of the bond debt by approximately 28%. Any liquidation pursuant to chapter 7 of the Bankruptcy Code would have to take into account the required time and resources necessary to effectuate an orderly wind down of the Facility, which provides critical care to residents and must comply with numerous federal and state regulations, as well as the fees incurred by the chapter 7 trustee in doing so.  Accordingly, even in a best-case scenario where a chapter 7 trustee is able to sell the Debtors' assets for an amount near the current going concern value of $81,000,000 that the Holders of Bond Claims are being offered under the Plan, the amount such Holders will likely recover in a hypothetical chapter 7 liquidation will be less.  Finally, given the fact that the expected recovery for the Debtor's secured creditors would be less than the full value of their claims, the Debtor expects that all other holders of claims in the Debtor would receive nothing in a hypothetical chapter 7 liquidation.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### iii.    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed the Financial Projections attached hereto as **Exhibit D**.  The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.   The Financial Projections are unaudited.  Impaired creditors and other interested parties should review Section IV of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Debtor anticipates that the Financial Projections will show that the Reorganized Debtor will have a viable operation following the Chapter 11 Case and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### iv.       No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority but are receiving different treatment under the plan.

### v.       Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured.  The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class, i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class (a "*Dissenting Class*"), the following requirements apply:

### a.       Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

### b.       Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### c.       Class of Interests.

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtor believes the Plan does not "discriminate unfairly" against holders of Class 3 Bond Claims.  To the extent that holders of Class 3 Bond Claims vote to reject the Plan, notwithstanding the agreement by the Supporting Holders to support the Plan, the Debtor reserves the right to (i) resolicit the Plan or (ii) withdraw the Plan and seek an alternative transaction.

## VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed.   If the Plan as proposed, however, is not confirmed, the following

alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to chapter 7 of the Bankruptcy Code; or (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed.

### A.    Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.    The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because: (i) the delay associated with the conversion of the Chapter 11 Cases; (ii) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations.    The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) may propose a different plan, which might involve either (i) an alternative means for the reorganization and continuation of the Debtor's business or (ii) an orderly liquidation of the Debtor's assets.    However, the Debtor believes that the terms of the Plan provide for an orderly and efficient restructuring of the Debtor's obligations and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

## VII.    CERTAIN FEDERAL TAX MATTERS RELATING TO THE SERIES 2024 BONDS.

**THE FOLLOWING FEDERAL INCOME TAX CONSIDERATIONS ARE FOR GENERAL INFORMATION ONLY AND ARE NOT TAX ADVICE. THE SUMMARY DOES NOT DEAL WITH THE TAX TREATMENT OF PERSONS WHO HOLD SERIES 2020 BONDS AND RECEIVE SERIES 2024 BONDS PURSUANT TO THE EXCHANGE DESCRIBED IN THIS DISCLOSURE STATEMENT, AND BOND COUNSEL IS NOT EXPRESSING ANY OPINION REGARDING ANY FEDERAL OR STATE INCOME TAX CONSEQUENCES TO THE HOLDER OF THE SERIES 2020 BONDS AS A RESULT OF THE EXCHANGE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR AS TO THE TAX CONSEQUENCES OF THE ACQUISITION, OWNERSHIP, AND DISPOSITION OF THE SERIES 2024 BONDS.**

A.      **Opinion of Bond Counsel.**

In the opinion of Bracewell LLP, the Debtor's bond counsel ("***Bond Counsel***"), assuming compliance with certain covenants and based on certain representations, under existing law, (i) interest on the Series 2024 Bonds is excludable from gross income for federal income tax purposes under IRC Section 103, and (ii) the Series 2024 Bonds are "qualified 501(c)(3) bonds" under IRC Section 103, and, as such, interest on the Series 2024 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax on individuals.

The IRC imposes a number of requirements that must be satisfied for interest on state or local obligations, such as the Series 2024 Bonds, to be excludable from gross income for federal income tax purposes.   These requirements include a requirement that the Borrower be an organization described in IRC Section 501(c)(3), limitations on the use of proceeds of such bonds and the source of repayment of bonds, limitations on the investment of such proceeds prior to expenditure, a requirement that excess arbitrage earned on the investment of such proceeds be paid periodically to the United States of America and a requirement that the Issuer file an information report with the Internal Revenue Service ( the "***IRS***").   The Borrower and the Issuer have covenanted in the Bond Indenture, the Loan Agreement, and the Tax Compliance Agreement that they will comply with these requirements.

For purposes of its opinion that the Series 2024 Bonds are "qualified 501(c)(3) bonds," Bond Counsel will assume continuing compliance with the covenants of the Bond Indenture, Loan Agreement, and Tax Compliance Agreement pertaining to those sections of the IRC that affect the status of the Borrower as an organization described in IRC Section 501(c)(3) and the excludability from gross income of interest on the Series 2024 Bonds for federal income tax purposes.   In addition, Bond Counsel will rely on representations by the Issuer, the Borrower, and other parties involved with the issuance of the Bonds with respect to matters solely within the knowledge of the Issuer, the Borrower, and such parties, respectively, which Bond Counsel has not independently verified, to the effect that the Borrower is an organization described in IRC Section 501(c)(3).   If the Borrower or the Issuer should fail to comply with the covenants in the Bond Indenture, Loan Agreement, or the Tax Compliance Agreement, or if such representations should be determined to be inaccurate or incomplete, interest on the Series 2024 Bonds could become includable in gross income for federal income tax purposes from the Effective Date of the Plan, regardless of the date on which the event causing such inclusion occurs.

Bond Counsel will express no opinion as to the amount or timing of interest on the Series 2024 Bonds or, except as stated above, to any federal, state or local tax consequences resulting from the ownership of, receipt of interest on, or disposition of, the Series 2024 Bonds.   Certain actions may be taken or omitted subject to the terms and conditions set forth in the Bond Indenture, Loan Agreement, or Tax Compliance Agreement upon the advice or with the approving opinion of nationally recognized bond counsel.   Bond Counsel will express no opinion with respect to Bond Counsel's ability to render an opinion that such actions, if taken or omitted, will not adversely affect the excludability of interest on the Series 2024 Bonds from gross income for federal income tax purposes.

Bond Counsel's opinions are based on existing law on the Effective Date of the Plan, which is subject to change.   Such opinions are further based on Bond Counsel's knowledge of facts as of

the date thereof.  Bond Counsel assumes no duty to update or supplement its opinions to reflect any facts or circumstances that may thereafter come to Bond Counsel's attention or to reflect any changes in any law that may thereafter occur or become effective.  Moreover, Bond Counsel's opinions are not a guarantee of result and are not binding on the IRS; rather, such opinions represent Bond Counsel's legal judgment based upon its review of existing law and in reliance upon the representations and covenants referenced above that it deems relevant to such opinions. Bond Counsel observes that the Borrower has covenanted in the Loan Agreement not to take any action, or omit to take any action within its control, that if taken or omitted, respectively, will result in treatment of interest on the Series 2024 Bonds as includable in gross income for federal income tax purposes.  The IRS has an ongoing audit program to determine compliance with rules that relate to whether interest on state or local obligations, such as the Series 2024 Bonds, is includable in gross income for federal income tax purposes.  No assurance can be given regarding whether the IRS will commence an audit of the Series 2024 Bonds.  If an audit is commenced, in accordance with its current published procedures, the IRS is likely to treat the Issuer as the taxpayer and the owners of the Series 2024 Bonds may not have a right to participate in such audit.  Public awareness of any future audit of the Series 2024 Bonds could adversely affect the value and liquidity of the Series 2024 Bonds regardless of the ultimate outcome of the audit.

**B.     Other Tax Consequences.**

**i.      Collateral Tax Consequences.**

Prospective purchasers of the Series 2024 Bonds should be aware that the ownership of tax-exempt obligations may result in collateral federal income tax consequences, including but not limited to those noted below.  Therefore, prospective purchasers of the Series 2024 Bonds should consult their own tax advisors as to the tax consequences of the acquisition, ownership and disposition of the Series 2024 Bonds.

An "applicable corporation" (as defined in IRC Section 59(k)) may be subject to a 15% alternative minimum tax imposed under IRC Section 55 on its "adjusted financial statement income" (as defined in IRC Section 56A) for such taxable year.  Because interest on tax-exempt obligations, such as the Series 2024 Bonds, is included in a corporation's "adjusted financial statement income," ownership of the Series 2024 Bonds could subject certain corporations to alternative minimum tax consequences.

Ownership of tax-exempt obligations also may result in collateral federal income tax consequences to financial institutions, life insurance and property and casualty insurance companies, certain S corporations with Subchapter C earnings and profits, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, low and middle income taxpayers otherwise qualifying for the health insurance premium assistance credit and individuals otherwise qualifying for the earned income tax credit.  In addition, certain foreign corporations doing business in the United States may be subject to the "branch profits tax" on their effectively connected earnings and profits, including tax-exempt interest such as interest on the Series 2024 Bonds.

Prospective purchasers of the Series 2024 Bonds should also be aware that, under the IRC, taxpayers are required to report on their returns the amount of tax-exempt interest, such as interest on the Series 2024 Bonds, received or accrued during the year.

### ii.     Tax Legislative Changes.

Current law may change so as to directly or indirectly reduce or eliminate the benefit of the excludability of interest on the Series 2024 Bonds from gross income for federal income tax purposes.  Any proposed legislation, whether or not enacted, could also affect the value and liquidity of the Series 2024 Bonds.  Prospective purchasers of the Series 2024 Bonds should consult with their own tax advisors with respect to any recently enacted, proposed, pending or future legislation.

## VIII.   RECOMMENDATION AND CONCLUSION.

The Debtor believes the Plan is in the best interests of its Estate, Creditors, and other interested parties and urge the Holders of Impaired Bond Claims to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: August 30, 2024                    Respectfully submitted,

TARRANT COUNTY SENIOR LIVING
CENTER, INC.

By:      */s/ Jeff Gentry*
         Name: Jeff Gentry
         Title: Director, Senior Vice
         President, and Chief Financial
         Officer