# EXHIBIT B

# PLAN SUPPORT AGREEMENT

This Plan Support Agreement (including all schedules and exhibits thereto, as amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof; the "Plan Support Agreement"), dated as of February 7, 2024, is entered into by and among: (1) Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way ("The Stayton"); (2) BOKF, N.A., as Successor Trustee (the "Master Trustee" under the Master Indenture, the "Bond Trustee" under the Bond Indenture, and, for purposes of this Plan Support Agreement, the "Trustee"); (3) each (a) beneficial holder or investment manager or advisor for such beneficial holders that are signatories hereto, currently collectively holding at least 67% of the aggregate principal amount of the 2020 Bonds outstanding and (b) beneficial holder or investment manager or advisor for such beneficial holder of the 2020 Bonds that executes a Joinder to this Plan Support Agreement pursuant to Section 6(b) hereof (each referred to herein as a "Supporting Holder" and, collectively, as the "Supporting Holders"); and (4) Buckner Retirement Services, Inc. ("Plan Sponsor"). The Stayton, the Trustee, the Supporting Holders, and Plan Sponsor are referred to herein as the "Parties" and individually as a "Party." Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the term sheet describing the key terms of an anticipated chapter 11 plan of reorganization for The Stayton (the "Plan Term Sheet") attached hereto as Schedule 1.

# PRELIMINARY STATEMENTS

A.      The Issuer and UMB Bank, National Association, are parties to an Indenture of Trust, dated as of January 1, 2020 (the "Bond Indenture"), pursuant to which the Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") issued its Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2020 (collectively, the "Bonds") in the initial principal amount of $112,261,464.

B.      The Issuer loaned the proceeds of the Bonds to The Stayton pursuant to a Loan Agreement dated as of January 1, 2020 (the "Loan Agreement").

C.      The Stayton and UMB Bank, National Association, entered into an Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of January 1, 2020 (as the same may be further amended from time to time in accordance with its terms, the "Master Indenture"), pursuant to which The Stayton issued the Tarrant County Senior Living Center Inc. Series 2020 Notes (collectively, the "Notes") to provide for its loan repayment obligations under the Loan Agreement.

D.      As of the date hereof, The Stayton acknowledges that it owes unpaid principal in the amount of $112,261,464 on the Bonds, plus any unpaid interest and fees pursuant to the Master Indenture, the Bond Indenture and the Loan Agreement.

E.      As of the date hereof, The Stayton acknowledges that it is in default of certain of its obligations under the Master Indenture and the Loan Agreement.

F.     On January 13, 2023, The Stayton and the Trustee entered into a Forbearance Agreement pursuant to which the Trustee agreed to forbear from exercising its rights and remedies as a result of The Stayton's defaults under the Master Indenture and the Loan Agreement (as the same may be amended and modified, the "<u>Forbearance Agreement</u>").

G.     Contemporaneously with entry into this Plan Support Agreement, The Stayton, Plan Sponsor, and Lifespace Communities, Inc. ("<u>Lifespace</u>"), the sole member of The Stayton, are entering into a Member Substitution Agreement (the "<u>MSA</u>"), pursuant to which, among other things, Plan Sponsor will become the sole member of The Stayton (the "<u>Membership Substitution</u>") on terms set forth in the MSA (the actual date of such Membership Substitution, the "<u>Membership Substitution Effective Date</u>").  All references in this Plan Support Agreement to The Stayton after the Membership Substitution Effective Date shall mean The Stayton as controlled by Plan Sponsor.

H.     Contemporaneously with entry into this Plan Support Agreement, the Trustee and The Stayton are entering into the "<u>Second Amendment to Forbearance Agreement</u>" amending the Forbearance Agreement and covering the period from the Agreement Date (defined below) until the Membership Substitution Effective Date, and on the Membership Substitution Effective Date, the Trustee and The Stayton will execute the "<u>New Forbearance Agreement</u>," consistent with <u>Section 4.c</u> below and attached hereto as <u>Exhibit C</u>, covering the period from the Membership Substitution Effective Date until the Petition Date (defined below).

I.     Within six (6) Business Days (defined below) of its entry into this Plan Support Agreement, Plan Sponsor shall tender a refundable earnest money deposit with The Stayton in the amount of $8 million (the "<u>Deposit</u>") to secure its obligations under this agreement.

J.     The Parties have agreed to implement a refinancing of the 2020 Bonds in accordance with, and subject to the terms and conditions set forth in this Plan Support Agreement and the Schedules hereto (the "<u>Refunding Transaction</u>").

K.     As set forth herein, and subject to the Auction and bid procedures set forth in <u>Section 12</u> hereof, on or after the Member Substitution Effective Date (as defined herein) The Stayton will: (a) solicit approval from the holders of the 2020 Bonds (the "<u>Bondholders</u>") for a plan of reorganization reflecting the terms set forth in the Plan Term Sheet (including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "<u>Plan</u>"); and (b) thereafter, commence a prepackaged bankruptcy reorganization case (the "<u>Anticipated Bankruptcy Proceeding</u>") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") to obtain Bankruptcy Court approval of the Plan; and (c) take all actions necessary to consummate the Plan and the Refunding Transaction.

92329367.18

## STATEMENT OF AGREEMENT

After good faith, arms' length negotiations, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Definitions</u>: As used herein, the following terms shall have the meanings given to them below.

   a. "<u>Bankruptcy Code</u>" means title 11 of the United States Code.

   b. "<u>Business Day</u>" means a day (other than a Saturday or Sunday) on which banks are open for general business in New York, New York.

   c. "<u>Confirmation Order</u>" means the order entered by the Bankruptcy Court that confirms the Plan.

   d. "<u>Person</u>" means any individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, or any other legal entity or association.

   e. "<u>Petition Date</u>" means the date on which The Stayton files a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

   f. "<u>Plan Effective Date</u>" means the Effective Date of the Plan as set forth in the Confirmation Order.

2. <u>Schedules and Preliminary Statements</u>. The Schedules attached hereto and Preliminary Statement set forth above are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted by <u>Section 26</u> hereof.

3. <u>Effectiveness of Agreement</u>. Upon the execution of this Plan Support Agreement by the Parties set forth as signatories hereto, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the date first written above (the "<u>Agreement Date</u>").

4. <u>Agreement of the Parties</u>. Subject to the terms and conditions hereof, and for so long as this Plan Support Agreement has not been terminated in accordance with the terms hereof by or as to a Party, each Party agrees to the following:

   a. <u>Plan Term Sheet</u>. Each Party hereby represents and agrees that the terms and conditions set forth in the Plan Term Sheet, in the form attached hereto, are acceptable in all material respects.

b.      <u>2024 Bond Documents</u>.  Each Party hereby represents and agrees that the Trust Indenture and all related documents necessary for the issuance of the Series 2024 Bonds (the "<u>2024 Bond Documents</u>") shall be on the terms set forth in the Plan Term Sheet and that such terms are acceptable in all respects.

c.      <u>Operating Budgets; Cash Collateral; Potential Post-petition Financing</u>. From the Agreement Date until the Membership Substitution Effective Date, The Stayton will operate in accordance with the budget governing that period annexed to the Second Amendment to Forbearance Agreement.  From the Membership Substitution Effective Date through the Petition Date, The Stayton will operate (and the New Forbearance Agreement will so provide) in accordance with the operating model provided by Plan Sponsor to the Trustee (the "<u>Plan Sponsor Model</u>") that is acceptable to the Trustee.  From the Petition Date through the entry of the Confirmation Order, The Stayton shall also operate in accordance with the Plan Sponsor Model. Subject to entry by the Bankruptcy Court of an order approving the use of cash collateral, which shall be in form and substance acceptable to The Stayton, the Plan Sponsor, and the Trustee (the "<u>Cash Collateral Order</u>"), the Trustee hereby consents to the use by The Stayton of cash collateral in the Anticipated Bankruptcy Proceeding subject to the terms and conditions of the Cash Collateral Order.  The Cash Collateral Order shall provide that to the extent Buckner Foundation Inc. makes advances during the Anticipated Bankruptcy Proceeding under the $10 million subordinated note, such advances will be entitled to superpriority pursuant to section 364(c)(1) of the Bankruptcy Code but shall be subordinated to the 2020 Bonds, subject to the terms of this Plan Support Agreement.

5.      <u>Mutual Obligations of the Parties</u>.  So long as no Agreement Termination Event (as defined below) has occurred and not been waived in accordance herewith, and subject to <u>Section 12</u> hereof, each Party agrees that it will not, and, as with respect to each Supporting Holder, it will not direct the Trustee to:

a.      Support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning either The Stayton or its assets other than the Refunding Transaction;

b.      Take any action inconsistent with this Plan Support Agreement or the Plan Term Sheet, the transactions contemplated hereby, or the timing of confirmation and consummation of such transactions as described herein;

c.      Support or encourage any Person to: (a) vote to reject the Plan (or direct any other Person to vote to reject the Plan); (b) "opt out" of, or object to, any releases provided by The Stayton under the Plan that are contemplated by the Plan Term Sheet; (c) otherwise commence any proceeding to oppose the Plan or object to confirmation thereof; or (d) otherwise agree to, consent to, or provide any support to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning either The Stayton or its assets other than the Refunding Transaction; or

d.      Object to or otherwise commence any proceeding to oppose the Plan or alter the Plan (in each case, with respect to provisions that are contemplated by the Plan Term Sheet) or any of the terms of the Refunding Transaction (or any other document filed in furtherance of

the Refunding Transaction which is consistent with the Plan Term Sheet and this Plan Support Agreement) or take any other action that is inconsistent with consummation of the Plan on terms that are contemplated by the Plan Term Sheet and the Refunding Transaction.

6.   Supporting Holder and Trustee Obligations.

a.   Voting on the Plan.   Each Supporting Holder agrees that, subject to the terms and conditions of this Plan Support Agreement and so long as no Agreement Termination Event (as defined below) has occurred and not been waived in accordance herewith, it will:

i.   Take all steps reasonably necessary to support and not interfere or support interference with The Stayton's use of cash collateral pursuant to the Cash Collateral Order;

ii.   Take all steps reasonably necessary to support confirmation of the Plan on terms that are contemplated by the Plan Term Sheet;

iii.   Vote, or cause to be voted, all Claims (as defined below) arising under the Bond Indenture that it holds or as to which it has voting authority to accept the Plan on terms that are contemplated by the Plan Term Sheet by the deadlines set forth in the disclosure statement related to the Plan (the "Disclosure Statement") by delivering a duly executed and completed ballot or ballots, as applicable, accepting the Plan;

iv.   Not "opt out" of, or object to, any releases or exculpations provided under the Plan that are contemplated by the Plan Term Sheet (and, to the extent required by the ballot, affirmatively "opt in" to such releases); and

v.   Not change, withdraw, or revoke such vote (or cause or direct such vote to be changed, withdrawn, or revoked), subject to the terms and conditions of this Plan Support Agreement.

b.   Restrictions on Transfers.   Each Supporting Holder agrees that until this Plan Support Agreement has terminated in accordance with the terms hereof, (the term "it" with respect to Supporting Holders applies to any Supporting Holder regardless of gender, to the extent applicable): (i) it shall not sell, transfer, or assign any of its Bonds or Claims (as defined below) or any option thereon or any right or interest (voting or otherwise) therein unless and until the transferee thereof enters into a joinder in the form annexed as Exhibit A hereto (a "Joinder"), and such Joinder is provided to the Notice parties set forth in Section 39; (ii) any purported sale, transfer, or assignment shall be deemed null and void if a Joinder has not been provided to the Notice parties within five Business Days of such sale, transfer, or assignment; and (iii) to the extent it acquires any additional Bonds or Claims after execution of this Plan Support Agreement, such Bonds and Claims shall in all respects be subject to the terms of this Plan Support Agreement.

92329367.18

c.     Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code. Each Supporting Holder agrees that it has obtained, or will receive prior to its vote on the Plan, adequate information regarding the Plan and that The Stayton has provided all material, relevant information that each Supporting Holder has requested in advance of executing this Plan Support Agreement. Additionally, each Supporting Holder agrees that, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with the requirements of the Bankruptcy Code and that each Supporting Holder was solicited in a manner complying with the requirements of the Bankruptcy Code.

d.     Negotiation and Implementation of Definitive Documents. The Trustee agrees that it shall negotiate in good faith and take all actions reasonably necessary to execute, deliver, and implement the Definitive Documents to which it is required to be a party.

e.     Obtaining Opt-Out Releases. The Trustee and the Supporting Holders agree that they shall take all reasonable actions to ensure that the Plan provides for each Bondholder (collectively, the "Releasing Parties") to provide a conclusive, absolute, unconditional, and irrevocable release of any and all Claims and/or Causes of Action that arise out of, or in connection with or relate in any way to, directly or indirectly, in whole or in part, any fact, event, matter, cause, thing, action or omission in connection with The Stayton that occurred on or prior to the Effective Date (the "Released Claims") against the Trustee, the Supporting Holders, the Plan Sponsor, Lifespace, The Stayton, and each of their respective present and former officers, directors, members, attorneys, managers, and advisors (the "Released Parties"). The parties will seek authorization from the Court to provide that the Plan ballot shall include that, unless a Releasing Party: (1) affirmatively checks a box on the Plan ballot indicating that it does not release the Released Claims against the Released Parties; and (2) timely submits the Plan ballot by the applicable voting deadline, the Releasing Party shall be deemed to have released the Released Claims against the Released Parties. The release set forth in this Section 6(e) shall be referred to in this Agreement as the "Opt-Out Release".

7.     Representation and Warranties of the Supporting Holders. Each Supporting Holder represents and warrants that the following statements are true, correct, and complete as of the date hereof:

a.     It either: (i) is the sole legal or beneficial owner of a principal amount of the Bonds, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such Bonds (collectively, the "Claims"); or (ii) has the power and authority to bind the legal and beneficial owner(s) of such Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Supporting Holder has full power and authority to vote on and consent to such matters concerning such Bond and Claims and to exchange, assign, and transfer such Bonds and Claims;

b.     The amount of its Claim set forth on its signature page to this Plan Support Agreement is true and correct;

c.     It has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations

92329367.18

contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of each such Supporting Holder's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

   d. The execution, delivery, and performance by such Supporting Holder of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

   e. The execution, delivery, and performance by such Supporting Holder of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body; and

   f. This Plan Support Agreement is the legally valid and binding obligation of such Supporting Holder, enforceable in accordance with its terms.

   8. <u>Stayton Obligations</u>.  The Stayton agrees that, consistent with the exercise of its fiduciary duties and subject to <u>Section 12</u> hereof, it will:

   a. Provide the Trustee with drafts of the Plan, the accompanying Disclosure Statement, and the 2024 Bond Documents by no later than two months after the Membership Substitution Effective Date, which Plan, Disclosure Statement, and 2024 Bond Documents shall be reasonably satisfactory in form and substance to the Trustee and Supporting Holders;

   b. Support and take all necessary steps to commence solicitation of the requisite acceptances for the Plan so that such acceptances are obtained prior to the Petition Date (as defined herein);

   c. Support and take all necessary steps to commence the Anticipated Bankruptcy Proceeding, including (i) filing each of the Bankruptcy Documents (as defined below), which shall each be in form and substance reasonably satisfactory to the Trustee and Plan Sponsor, by no later than four months after the Membership Substitution Effective Date (the "<u>Petition Date</u>"); (ii) taking all necessary steps to obtain necessary corporate approvals for the Anticipated Bankruptcy Proceeding as expeditiously as is reasonably practicable under applicable law; and (iii) taking all necessary steps to obtain any and all requisite regulatory or third party approvals necessary to commence the Anticipated Bankruptcy Proceeding as is reasonably practicable;

   d. Support and take all necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan by no later than the date that is 45 days following the Petition Date (the "<u>Confirmation Date</u>");

   e. Provide drafts of the following documents (collectively, the "<u>Bankruptcy Documents</u>"), which shall be in form and substance reasonably satisfactory to the Trustee and Plan Sponsor, no later than ten (10) business days prior to the proposed Petition Date:

i.        Petition with all required documents;

ii.        Declaration in Support of First Day Pleadings;

iii.        Motion to Approve Disclosure Statement and Pre-Petition Solicitation Procedures and Proposed Order;

iv.        Proposed Order Confirming the Plan;

v.        Motion Authorizing Use of Cash Collateral (and Postpetition Financing, if applicable) and Proposed Order;

vi.        Motion Authorizing Debtor to Escrow Certain Entrance Fees and Refund Certain Escrow Fees;

vii.        Motion to Utilize Existing Cash Management System; and

viii.        Any other document reasonably requested by the Supporting Holders.

f.        Support and take all steps necessary to obtain Bankruptcy Court approval of the Plan and Refunding Transaction;

g.        Take all necessary steps so that the effective date of the Plan shall occur not sooner than six months plus one day and not later than seven months after the Membership Substitution Effective Date;

h.        Support and take all steps reasonably requested by Plan Sponsor in obtaining any requisite regulatory or third-party approval for the Plan and Refunding Transaction as expeditiously as is reasonably practicable under applicable law;

i.        Not transfer any assets other than in the ordinary course of its business consistent with prior practice or as authorized by the Bankruptcy Court and in compliance with the cash collateral budget;

j.        Not take any action that would result in entry of an order terminating, whether in whole or in part, The Stayton's exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code;

k.        Use reasonably necessary efforts to respond to written requests for information from the Parties as promptly as reasonably practicable (subject to any confidentiality restrictions or considerations);

l.        Use its best efforts to obtain approval of the release, injunction, and exculpation provisions as contemplated by the Plan Term Sheet to the extent available under applicable law, and, if applicable, under the Plan, including, for the avoidance of doubt, opposing

any effort by any person or entity to eliminate or reduce the scope of such release, injunction, and exculpation provisions;

m.     Use its commercially reasonable efforts to have the Membership Substitution Effective Date occur no later than forty-five (45) days after the Designation Date; and

n.     On the Plan Effective Date, except as otherwise provided herein or in the Plan Term Sheet, assume all material executory contracts of The Stayton pursuant to section 365 of the Bankruptcy Code and pay or cause to be paid all cure amounts thereunder. For the avoidance of doubt, the preceding sentence assumes that The Stayton will owe no obligations to Lifespace as of the Membership Substitution Effective Date, and The Stayton will not assume any obligations to Lifespace under the Plan. To the extent The Stayton determines to reject an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, The Stayton shall pay or cause to be paid all damages arising from such rejection. Notwithstanding anything to the contrary in this Plan Support Agreement, The Stayton shall not be permitted to reject any resident agreements or entrance fee refund obligations.

o.     On the Membership Substitution Effective Date or, if prior to the Membership Substitution Effective Date, upon valid termination of this Agreement by any Party or breach of this Agreement by any Party other than Plan Sponsor, refund the Deposit.

p.     Negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party.

q.     Take all actions reasonably necessary to ensure that the Plan provides for the Opt-Out Release.

9.     <u>Reserved.</u>

10.     <u>Representations and Warranties of The Stayton.</u> The Stayton represents and warrants that the following statements are true, correct, and complete as of the date hereof:

a.     It has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and, subject to <u>Section 12</u> hereof and any necessary Bankruptcy Court approval with respect to the Plan, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

b.     The execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by The Stayton of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

c.      Other than such approval as is necessary to confirm the Plan and consummate the Refunding Transaction, the execution, delivery, and performance by The Stayton of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

d.      The information it has provided in connection with the Refunding Transaction and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

e.      This Plan Support Agreement is the legally valid and binding obligation of The Stayton, enforceable in accordance with its terms.

11.     <u>Plan Sponsor Obligations</u>.  Subject to the terms and conditions of this Plan Support Agreement including, without limitation, <u>Section 12</u> hereof, Plan Sponsor agrees as follows:

a.      Simultaneous with execution of this Plan Support Agreement and as a condition precedent to the effectiveness hereof, The Stayton, Plan Sponsor, and Lifespace, the sole member of The Stayton, shall have entered into the MSA of even date herewith pursuant to which, among other things, the Membership Substitution shall occur on the terms set forth in the MSA.  Further, The Stayton and Plan Sponsor shall each use their commercially reasonable efforts to have the Membership Substitution Effective Date occur no later than forty-five (45) days after the Designation Date.  The Stayton and Plan Sponsor shall file such regulatory applications as are necessary to obtain approval of the transactions contemplated by the MSA no later than three (3) days after the Designation Date.

b.      Within six (6) Business Days following the Agreement Date, Plan Sponsor shall provide the Deposit to The Stayton.  NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS PLAN SUPPORT AGREEMENT, AND SUBJECT TO THE TERMS OF THE ESCROW DEPOSIT AGREEMENT OF EVEN DATE HEREWITH, IN THE EVENT THAT PLAN SPONSOR IS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE BREACHED ANY MATERIAL OBLIGATIONS UNDER THIS AGREEMENT PRIOR TO THE MEMBERSHIP SUBSTITUTION EFFECTIVE DATE, THE DEPOSIT SHALL BE ABSOLUTELY AND IRREVOCABLY FORFEITED TO THE STAYTON, AND PLAN SPONSOR SHALL HAVE NO RIGHT OR INTEREST IN THE DEPOSIT.

c.      Plan Sponsor agrees that it will take all steps reasonably necessary to support confirmation of the Plan on terms that are contemplated by the Plan Term Sheet.  Plan Sponsor shall support and cooperate in the Anticipated Bankruptcy Proceeding and take all actions reasonably necessary to ensure entry of the Confirmation Order. Plan Sponsor shall close on the Refunding Transaction on the Plan Effective Date.

d.      No later than three (3) days after the Designation Date (as defined in <u>Section 12</u> of this Plan Support Agreement), and provided that Plan Sponsor is the Successful Bidder (as

such term is defined in the "<u>Auction Process Letter</u>" attached hereto as <u>Exhibit B</u>), Plan Sponsor shall file all applications and documents that are necessary to obtain any requisite regulatory or third-party approval for the MSA, Plan, and Refunding Transaction (the "<u>Approvals</u>"). Plan Sponsor shall diligently prosecute such applications and take any other actions which are or may be reasonable and appropriate in connection therewith. The Stayton shall cooperate with and provide reasonable assistance to Plan Sponsor in connection with Plan Sponsor obtaining the Approvals. Plan Sponsor shall provide The Stayton and the Trustee with: (i) copies of Plan Sponsor's responses to written requests for additional information from any regulatory authority that in any way relates to the Plan and Refunding Transaction within two (2) Business Days after sending such responses; and (ii) copies of all written correspondence from any government authority that in any way relates to the Plan and Refunding Transaction within two (2) Business Days after receiving such correspondence. The Stayton shall not be responsible for any costs required in connection with Plan Sponsor obtaining the Approvals.

       e.      On the Membership Substitution Effective Date, provided no Agreement Termination Event has occurred, One Million Five-Hundred Thousand Dollars ($1,500,000) (the "<u>Sponsor Expense Contribution</u>") of the Five Million Dollars ($5,000,000) that will be provided to The Stayton by Buckner Foundation, Inc., and Five Hundred Thousand Dollars ($500,000) of funds in the Debt Service Reserve Fund (such amount from the Trustee, plus the dollar-for-dollar match in the next sentence, being the "<u>Trustee Expense Contribution</u>"), shall be used to pay fees and expenses incurred by The Stayton or for which The Stayton is responsible through the Membership Substitution Effective Date (the "<u>Stayton Financing Related Costs</u>") set forth on Schedule 3. If the Stayton Financing Related Costs that are incurred as of the Membership Substitution Effective Date exceed $2,000,000, provided no Agreement Termination Event has occurred, then Plan Sponsor shall increase the amount of the Sponsor Expense Contribution by an amount equal to the lesser of (i) 50% of the amount by which Stayton Financing Related Costs incurred through the Membership Substitution Date exceed $2,000,000, or (ii) $325,000; and in each of the foregoing cases, the Trustee shall match the increase in the Sponsor Expense Contribution dollar-for-dollar. In addition to the foregoing, if the Membership Substitution Effective Date occurs after January 31, 2024, provided no Agreement Termination Event has occurred, the Trustee shall transfer up to $750,000 for each thirty (30) day period thereafter through March 31, 2024 (collectively, the "<u>Trustee Operating Advances</u>"), to fund operating expenses and any Stayton Financing Related Costs incurred as of the Membership Substitution Date, at which point the Trustee's obligation for Trustee Operating Advances (but not the Trustee Expense Contribution) shall terminate. For the avoidance of doubt, the cumulative amount the Trustee has committed to advance from the Trustee Reserve Fund (or otherwise) shall not exceed $2,325,000 (the "Trustee Advance Cap"), inclusive of the Trustee Expense Contribution and the Trustee Operating Advances, including if such amounts are advanced before the Membership Substitution Effective Date. Before The Stayton is paid any of the Sponsor Expense Reimbursement, the Trustee Expense Contribution or the Trustee Operating Advances with respect of the Stayton Financing Related Costs, and to determine amounts that are incurred for such purpose as of Membership Substitution Date, The Stayton must first have exhausted (i) all of the cash on hand at The Stayton immediately prior to the Membership Substitution Effective Date (exclusive of the funds from the Plan Sponsor or the Trustee), and (ii) all of the funded and unfunded liquidity support provided to The Stayton by entities other than Plan Sponsor or Buckner Foundation, Inc. prior to the Membership Substitution Effective Date (all of which shall be

available to The Stayton on or prior to the Membership Substitution Effective Date for such amounts). From the Membership Substitution Effective Date through the Plan Effective Date, the Stayton shall not be responsible for the payment of any fees, expenses, or other charges included in the line items for Indenture Trustee and Bondholder Professionals. Except for (i) the Sponsor Expense Contribution, Plan Sponsor shall not be responsible for any of the Stayton Financing Related Costs; and (ii) the Trustee Expense Contribution and the Trustee Operating Advances, up to the Trustee Advance Cap, the Trustee shall not be responsible for any of the Stayton Financing Related Costs. Amortization of principal of the 2024 Bonds shall be deferred from the earliest amortization payments in the amount of the Sponsor Expense Contribution.

       f.     On the Plan Effective Date, except as otherwise provided herein or in the Plan Term Sheet, Plan Sponsor shall cause The Stayton to assume all material executory contracts of the Stayton pursuant to section 365 of the Bankruptcy Code and shall pay or cause The Stayton to pay all cure amounts thereunder. To the extent The Stayton determines to reject an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, the Plan Sponsor shall pay or cause The Stayton to pay all damages arising from such rejection. For the avoidance of doubt, this provision assumes that The Stayton will not be a party to any executory contracts or other agreements with Lifespace upon the Membership Substitution Effective Date. Notwithstanding anything to the contrary in this Plan Support Agreement, The Stayton shall not reject any resident agreements or entrance fee refund obligations.

       g.     The Plan Sponsor shall negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party.

       h.     The Plan Sponsor shall take all actions reasonably necessary to ensure that the Plan provides for the Opt-Out Release.

    12.     <u>Auction and Bid Protections</u>.

       a.     Plan Sponsor acknowledges and agrees that the consummation of the transactions set forth in this Plan Support Agreement shall be subject to a competitive auction process to enable The Stayton to fulfill its fiduciary obligations to seek a materially higher or superior offer for the benefit of its creditors and other stakeholders, taking into consideration the Breakup Fee. Within five (5) days of execution of this Plan Support Agreement, The Stayton shall announce an overbid process by issuing the Auction Process Letter on the following terms:

       i.     The Stayton, through its advisors, shall contact parties potentially interested in consummating a transaction with The Stayton (each, a "<u>Potential Bidder</u>") and, to the extent such Potential Bidder is interested in submitting an overbid, ensure that the Potential Bidder is subject to a confidentiality agreement.

       ii.     Subject to the confidentiality agreement, a copy of this Plan Support Agreement and other applicable definitive documents shall be provided to each Potential Bidder.

iii.     Each Potential Bidder shall have no more than twenty-eight (28) days to complete any due diligence regarding The Stayton and to submit a binding bid (the "Bid Deadline").  Such binding bid shall include, without limitation the following: (1) a marked copy of this Plan Support Agreement or, if the Potential Bidder proposes an asset purchase structure, a marked copy of the form of Asset Purchase Agreement that has been uploaded by The Stayton to data site; (2) a cash deposit in the amount of 9.7% of the aggregate consideration proposed in the competing bid, which amount shall be placed in an escrow account and held pursuant to an escrow agreement in the form attached as Exhibit D (the "Escrow Account"); (3) cash consideration of at least the amount of the Breakup Fee (defined below), which amount shall be placed in the Escrow Account; and (4) evidence of financial wherewithal and the ability to consummate the transaction that is satisfactory to The Stayton after consultation with the Trustee.

iv.     The Stayton will review all submissions and determine, with the consent of the Trustee, which submissions, if any, have met the standard of a bid that is higher and better than or superior to the transaction proposed by this Agreement (each, if any, a "Qualified Overbid").  For the avoidance of doubt, a Qualified Overbid must include cash consideration of at least the amount of the Breakup Fee, which amount shall be placed in the Escrow Account.

v.     In the event that a Qualified Overbid is received, The Stayton will commence an auction (the "Auction") no later than four Business Days after the Bid Deadline, which Auction shall be conducted in the manner typically conducted by a debtor in possession in a chapter 11 bankruptcy case and in accordance with the Auction Process Letter.  In no event shall the Auction occur later than thirty-five (35) days after the execution date of this Plan Support Agreement.

vi.     At the conclusion of the Auction, The Stayton, with the consent of the Trustee, will select and announce the winning bidder (the "Designation Date", provided however, that if no Qualified Overbid is announced by The Stayton no later than two (2) Business Days after the Bid Deadline, such notice date shall be the Designation Date).

vii.     As consideration for Plan Sponsor serving in the role of Stalking Horse, in the event that an Auction is held and Plan Sponsor is not declared the Successful Bidder, The Stayton shall pay to Plan Sponsor a breakup fee of $2,025,000 (which amount is equal to 2.5% of the amount of the Series 2024 Bonds) as set out in the Auction Process Letter (the "Breakup Fee"), which Breakup Fee shall be payable without the requirement of any notice or demand from Plan Sponsor.  No bid, including a bid that is a plan support agreement that entails a membership substitution and a restructuring of the 2020 Bonds, shall be considered a Qualified Overbid unless such bid includes cash consideration in an amount no less than the Breakup Fee, which amount shall be placed in the Escrow Account.  The Breakup Fee, if payable, shall be paid to Plan Sponsor from the Escrow Account (1) upon the closing of the Transaction (as defined in the Auction Process Letter) by the Successful Bidder or, (2) promptly upon the Successful Bidder's failure to close due to a breach by Successful Bidder, unless Plan Sponsor is the Backup Bidder and The Stayton has notified Plan Sponsor, within thirty-one (31) days of the Designation Date, that the Successful Bidder has failed to close and The Stayton intends to proceed to close the Stalking Horse Transaction Agreement (as defined in the Auction Process Letter).

b.  In the event that an Auction is held and Plan Sponsor is not declared the winning bidder, and unless Plan Sponsor is determined to be the Backup Bidder (as defined in the Auction Process Letter), the Deposit shall be returned to Plan Sponsor within three (3) Business Days of the Designation Date.

13.  <u>Representations and Warranties of Plan Sponsor</u>.  Plan Sponsor represents and warrants that the following statements are true, correct, and complete as of the date hereof:

a.  It has all requisite corporate authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part;

b.  The execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by Plan Sponsor of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

c.  The execution, delivery, and performance by Plan Sponsor of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

d.  The information it has provided in connection with the Refunding Transaction and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

e.  This Plan Support Agreement is the legally valid and binding obligation of Plan Sponsor, enforceable in accordance with its terms.

14.  <u>Termination of Plan Support Agreement</u>.  In the event that this Plan Support Agreement shall be deemed terminated as a result of any of the events set forth in the following <u>Sections 15</u>, <u>16</u>, and <u>17</u> (each, an "<u>Agreement Termination Event</u>"), all Parties shall be immediately relieved of any obligations hereunder with the exception of those obligations that expressly survive termination as set forth in <u>Sections 21 and 30</u> hereof.  If the Anticipated Bankruptcy Proceeding has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; <u>provided, however,</u> that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination.  Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Supporting Holder shall be entitled to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Supporting Holder under this Plan Support Agreement, with prior written notice thereof to The Stayton and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure (a "<u>Withdrawal</u>").

15.   <u>Automatic Termination</u>. This Plan Support Agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events, without any further notice or action required:

a.   The occurrence of the Plan Effective Date;

b.   Execution of a mutual written agreement to terminate this Plan Support Agreement by each of The Stayton, Plan Sponsor, and the requisite number of Supporting Holders entitled to direct the Trustee, in which case, and if prior to Membership Substitution Effective Date, the Deposit shall be returned to Plan Sponsor within three (3) Business Days of such termination;

c.   A Qualified Overbid is received and Plan Sponsor is not determined to be the winner or the Backup Bidder, in which case the Deposit shall be returned to Plan Sponsor within three (3) Business Days of the Designation Date and the Breakup Fee shall be paid to Plan Sponsor from the Escrow Account (i) upon the closing of the Transaction by the Successful Bidder or, (ii) promptly upon the Successful Bidder's failure to close due to a breach by the Successful Bidder; and

d.   If, following the Petition Date, the Bankruptcy Court enters an order dismissing the Anticipated Bankruptcy Proceeding or an order pursuant to section 1112 of the Bankruptcy Code converting the Anticipated Bankruptcy Proceeding to a case under chapter 7 of the Bankruptcy Code.

16.   <u>Termination Upon Notice</u>.   This agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events and provision of notice by the specified Party or Parties:

a.   By Plan Sponsor if Plan Sponsor is not the Successful Bidder or the Backup Bidder at the Auction, provided, however, if Plan Sponsor is determined to be the Backup Bidder at the Auction but The Stayton does not subsequently name Plan Sponsor the Successful Bidder within 31 days of the Designation Date, Plan Sponsor may then terminate this Agreement;

b.   By the Trustee, Supporting Holders collectively holding outstanding Notes representing at least 50% of the aggregate outstanding Notes held by the Supporting Holders (the "<u>Majority Holders</u>"), or Plan Sponsor, in the event The Stayton files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that is inconsistent with the filing or consummation of the Plan or that requests or would result in a modification or amendment of the Plan in a way that materially adversely affects the Party electing termination, provided however, that, following the Membership Substitution Effective Date, Plan Sponsor shall not be eligible to provide notice of such Agreement Termination Event;

c.   By the Trustee or a Supporting Holder that is negatively and directly impacted by the following events, in the event The Stayton files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the Bonds held by any member of the Supporting Holders, Claims, or the liens of any member of the Supporting Holders

or the Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims, or liens of any member of the Supporting Holders or the Trustee, or asserting a claim against the Bond Trustee, the Master Trustee, or any Supporting Holder to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against the Bond Trustee, the Master Trustee, or any Supporting Holder;

d.      By the Trustee, the Majority Holders, or Plan Sponsor, in the event The Stayton files a motion, objection, lawsuit, administrative or adversary proceeding, or otherwise assists in any of the foregoing, which would result in a modification or amendment of the Plan (including in the case of document which is an interim order, by replacement with a final order) that materially adversely affects the party seeking termination, or is otherwise inconsistent with the terms of the Refunding Transaction in a manner that materially adversely affects the party seeking termination, provided however, that, following the Membership Substitution Effective Date, Plan Sponsor shall not be eligible to provide notice of such Agreement Termination Event;

e.      By the Trustee or Majority Holders, in the event that The Stayton files, amends, modifies, executes, or enters into, or files a pleading seeking authority to execute, enter into, amend or modify, any Definitive Documents (as defined in the Plan Term Sheet) that are not in form or substance consistent with this Plan Support Agreement or that are not reasonably satisfactory in form and substance to the Trustee, or publicly announces its intention to take any such action;

f.      By any Party if, following the Petition Date, the Bankruptcy Court:

i.      enters an order denying confirmation of the Plan, unless waived by The Stayton, Plan Sponsor, and the Trustee acting at the direction of a requisite number of Supporting Holders required to direct the Trustee;

ii.      enters an order pursuant to section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage The Stayton's business, unless waived by Plan Sponsor and the Majority Holders; or

iii.      enters an order terminating, whether in whole or in part, The Stayton's exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

17.      <u>Termination Upon Five Days' Notice</u>. This agreement shall be deemed automatically terminated as to all Parties upon the occurrence of any of the following Agreement Termination Events, following five days' notice by the specified Party or Parties and the expiration of any applicable cure period:

a.      By the Trustee, the Majority Holders, or Plan Sponsor, if The Stayton fails to satisfy any of its obligations set forth in <u>Section 8</u> provided however, that, following the

Membership Substitution Effective Date, Plan Sponsor shall not be eligible to provide notice of such Agreement Termination Event;

b.      By the Trustee, the Majority Holders, or The Stayton, if Plan Sponsor fails to satisfy any of its obligations set forth in <u>Section 11</u> herein.

c.      By the Trustee or the Majority Holders, if a cash collateral order in form and substance acceptable to the Trustee, is not entered within 30 days of the Petition Date;

d.      By The Stayton or Plan Sponsor, if the class comprised of members of the Supporting Holders has not voted to accept the Plan by the deadline set forth in the Disclosure Statement, or such vote is no longer effective;

e.      By the Trustee or the Majority Holders, if The Stayton fails to obtain an order confirming the Plan within seven months following the Membership Substitution Effective Date;

f.      By the Trustee or the Majority Holders, if the Plan Effective Date has not occurred by four (4) months following the Petition Date;

g.      By any Party, if any governmental authority, including any regulatory authority or bankruptcy court of competent jurisdiction, issues any ruling or order denying any requisite approval of, or enjoining, the consummation of any portion of the Refunding Transaction and such ruling or order cannot be reversed or annulled despite the diligent efforts of the Parties;

h.      By any Party, if an injunction, judgment, order, decree, ruling, or charge has been entered that prevents consummation of the Refunding Transaction and such injunction, judgment, order, decree, ruling, or charge cannot be reversed or annulled despite the diligent efforts of the Parties;

i.      By any Party, if there is an unequivocal rejection of consent, by a third party or such third party's governing entity, whose consent is required to effectuate the Refunding Transaction;

j.      By either Plan Sponsor, the Trustee, or the Majority Holders if The Stayton fails to comply with any of its obligations in a material respect under this Plan Support Agreement; *provided, however*, that, following the Membership Substitution Effective Date, Plan Sponsor shall not be eligible to provide notice of such Agreement Termination Event;

k.      By the Trustee or the Majority Holders if (i) The Stayton fails to comply with any of its obligations in a material respect under the MSA or (ii) if there is an unwaived Termination Event (as defined in the Forbearance Agreement or New Forbearance Agreement, as applicable) under the Forbearance Agreement or New Forbearance Agreement;

l.      By Plan Sponsor if The Stayton fails to comply with any of its obligations under (1) the Forbearance Agreement or (2) the MSA; *provided, however*, that, following the

Membership Substitution Effective Date, Plan Sponsor shall not be eligible to provide notice of such Agreement Termination Event;

m. By the Plan Sponsor if a condition precedent to the Plan Sponsor's obligation to close the MSA does not occur by the Outside Closing Date (as defined in the MSA);

n. By either The Stayton or Plan Sponsor if any Supporting Holder fails to comply with any of its obligations under this Plan Support Agreement in any material respect, and such failure could materially delay, or is reasonably likely to prevent, entry of the Confirmation Order or closing of the Refunding Transaction; or

o. By the Trustee, the Majority Holders, or The Stayton in the event Plan Sponsor fails to comply with any of its obligations under this Plan Support Agreement, and such failure could materially delay, or is reasonably likely to prevent, entry of the Confirmation Order or closing of the Refunding Transaction.

For the avoidance of doubt and without limitation, any action or failure to act by The Stayton after the Membership Substitution Effective Date shall be considered within Plan Sponsor's control for purposes of any termination right under this Agreement.

18. <u>Reserved</u>.

19. <u>Notices of Termination</u>. Notwithstanding any provision in this Plan Support Agreement to the contrary, the right to provide any notice(s) of an Agreement Termination Event (a "<u>Termination Notice</u>") shall not be available to any Party whose breach of, or failure to fulfill any material obligation under, this Plan Support Agreement has directly caused, or directly resulted in, the occurrence of an Agreement Termination Event. Any Termination Notice shall be sent to all Parties.

20. <u>Rights to Dispute Termination or Withdrawal</u>. All Parties reserve all rights to argue that any alleged Agreement Termination Event did not occur or a Termination Notice or Withdrawal was not permitted under this Plan Support Agreement by serving on the Parties hereto a notice of its intention to object setting forth with specificity the grounds for any such objection within three (3) days of receipt of the Termination Notice. Nothing herein shall be deemed in any way to prejudice any Parties' right to respond to or otherwise oppose such a notice of intention to object or any related document or pleading including by seeking an expedited or emergency hearing thereon or seeking to continue any scheduled confirmation hearing. Notwithstanding anything contained in this Plan Support Agreement, including without limitation a termination pursuant to <u>Sections 15 - 17</u>, all obligations of the Parties hereunder shall be reinstated in the event of a judicial determination that the applicable Agreement Termination Event or Withdrawal was improper or not effective and such Agreement Termination Event or Withdrawal shall be deemed to be null and void *ab initio.* In the event the Bankruptcy Court finds that an Agreement Termination Event has occurred as provided for in this Plan Support Agreement, then any Withdrawal based on such Agreement Termination Event shall be deemed to have been in good faith for purposes of section 1126(c) of the Bankruptcy Code; it being expressly agreed that nothing herein shall prohibit The Stayton from asserting that the applicable Withdrawal was not in good faith on any other basis.

21.     Effect of Termination.  Subject to Section 30 of this Plan Support Agreement, upon termination of this Plan Support Agreement, all obligations hereunder shall terminate and shall be of no force and effect; provided that any claim or causes of action for breach of this Plan Support Agreement shall survive termination and all rights and remedies of the non-breaching Party with respect to such claims or causes of actions shall be fully preserved and not be prejudiced in any way; and provided further that the breach of this Plan Support Agreement by one or more Parties shall not create any rights or remedies against the non-breaching Party.

22.     Reserved.

23.     Appearing in the Bankruptcy Court.  Notwithstanding any provision in this Plan Support Agreement, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Refunding Transaction and are not for the purpose of hindering, delaying or preventing the consummation of the Refunding Transaction.

24.     Cooperation; Further Assurances.  The Parties shall cooperate with each other and one another's advisors and shall coordinate their activities (to the extent practicable) in respect of all actions commercially reasonably necessary to consummate the Refunding Transaction consistent with the terms and provisions of the Plan Term Sheet.  The Parties further agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Refunding Transaction.

25.     Additional Claims.  Nothing herein should be construed to restrict any Supporting Holder's right to acquire additional Claims against The Stayton.  To the extent any Supporting Holder acquires additional Claims, each such Supporting Holder agrees that it shall promptly notify The Stayton regarding any such acquisition and that such Claims shall automatically be subject to this Plan Support Agreement.

26.     Amendments.  This Plan Support Agreement may not be modified, amended, or supplemented except in writing signed by the Parties, provided, however, that any of the deadlines set forth in Section 8(a)-(m) may be waived or extended by written agreement of The Stayton, Plan Sponsor, and the requisite number of Supporting Holders entitled to direct the Trustee.

27.     GOVERNING LAW; JURISDICTION.  THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR

ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN TEXAS HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

28.     WAIVER OF TRIAL BY JURY.  EACH PARTY TO THIS PLAN SUPPORT AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING SOLELY OUT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF, WHETHER SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

29.     Specific Performance; Damages.  It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty.  It is understood that, other than damages specified in this Plan Support Agreement, money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach without the requirement of having to post a bond in connection therewith. Except for the Supporting Holders, against which specific performance and designation of bankruptcy plan voting rights shall be the exclusive remedies, specific performance shall not be deemed to be the exclusive remedy for breach of this Plan Support Agreement by any Party or its representatives, but shall be in addition to all other remedies available at law or in equity.  With respect to the Breakup Fee, it is understood and agreed to by the Parties that in the event that the Breakup Fee is not paid from the Escrow Account when due, Plan Sponsor shall have the right to seek monetary damages, including applicable attorneys' fees, specific performance, injunctive or other equitable relief from either of the Successful Bidder or The Stayton.

30.     Survival.  Notwithstanding (i) any sale of the Bonds or Claims in accordance with Section 6(b) or (ii) the termination of this Plan Support Agreement pursuant to Sections 15 -17, the agreements and obligations (including payment obligations) in Sections 7, 8(o), 10, 12(b), 13, 15-17, 20-23, 25-29, and 31-45 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Supporting Holders and/or Plan Sponsor, as applicable, in accordance with the terms hereof.

92329367.18

31.     Headings.  The headings of the Sections, paragraphs and subsections of this Plan Support Agreement are inserted for convenience only and shall not affect the interpretation hereof.

32.     Successors and Assigns; Severability; Several Obligations.  This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.  The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.  The agreements, representations, and obligations of the Supporting Holders under this Plan Support Agreement are, in all respects, several and not joint.

33.     No Third-Party Beneficiaries.  Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

34.     Consideration.  It is hereby acknowledged by the Parties that no consideration shall be due or paid to the Supporting Holders for their agreement to support the Refunding Transaction and vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than The Stayton's agreement to pursue the Refunding Transaction and file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

35.     Prior Negotiations; Entire Agreement.  This Plan Support Agreement constitutes the entire agreement of the Parties related to the Refunding Transaction and supersedes all other prior negotiations with respect to the subject matter hereof.

36.     Counterparts.  This Plan Support Agreement and any amendments, joinders, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

37.     Construction.  This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, at arm's length and be interpreted without favor to any Party.

38.     Time of the Essence.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

39.     Notices.     All notices, demands, requests, consents, approvals, and other communications ("Notice" or "Notices") hereunder shall be in writing and delivered by: (i) courier or messenger service; (ii) express or overnight mail; (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below); or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

| | |
|---|---|
| Stayton prior to the Membership Substitution Effective Date: | Tarrant County Senior Living Center, Inc. c/o Chad Shandler, Chief Restructuring Officer FTI Consulting, Inc. 1166 Avenue of the Americas, 15th Floor New York, NY 10036 Email: chad.shandler@fticonsulting.com |
| With a simultaneous copy to: | Polsinelli PC 401 Commerce Street, Suite 900 Nashville, TN 37219 Attention: Bobby Guy E-mail: bguy@polsinelli.com |
| Stayton After the Membership Substitution Effective Date: | Tarrant County Senior Living Center, Inc. c/o Jeff Gentry, Senior Vice President of Administration & Chief Financial Officer Buckner International 700 North Pearl Street, Suite 1200 Dallas, Texas 75201 Attention: Jeff Gentry Renee Reimer Email: jgentry@buckner.org rreimer@buckner.org |
| With a simultaneous copy to: | Butler Snow LLP 2911 Turtle Creek Blvd., Suite 1400 Dallas, TX 75219 Attention: Martin A. Sosland Candice M. Carson E-mail: martin.sosland@butlersnow.com candice.carson@butlersnow.com |
| Trustee: | BOK Financial, N.A. 2405 Grand Boulevard, Suite 840 Kansas City, MO 64108 Attention: George Kubin Megan Cuccia Email:gkubin@bokf.com mcuccia@bokf.com |

| With a simultaneous copy to: | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. |
| | One Financial Center |
| | Boston, MA 02111 |
| | |
| | Attention: Daniel S. Bleck |
| | E-mail: DSBleck@mintz.com |
| | |
| Supporting Holders: | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. |
| | One Financial Center |
| | Boston, MA 02111 |
| | |
| | Attention: Daniel S. Bleck |
| | E-mail: DSBleck@mintz.com |

or to such other addresses any Party may hereafter designate. Notice by courier or messenger service or by express or overnight mail, shall be effective upon receipt. Notice by electronic mail shall be effective upon delivery by the recipient of a confirming telephone message or response via electronic mail. Notice by mail, shall be complete at the time of deposit in the U.S. mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

40. <u>Reservation of Rights</u>. Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each Supporting Holder to protect and preserve its rights, remedies, and interests, including its Claims against Stayton. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

41. <u>Fees and Expenses.</u> Should any Party be deemed by final order of a court of competent jurisdiction to have committed a material breach of this Plan Support Agreement, such breaching Party shall pay all fees, charges, and expenses, including reasonable attorneys', accountants', and financial advisors' fees, and all other costs and expenses which may be incurred by other Parties in the enforcement of this Plan Support Agreement, whether or not any action or proceedings is actually commenced against the breaching Party or prosecuted to judgment.

42.     <u>Nature of the Obligations of Each Supporting Holder.</u>  The obligations of each Supporting Holder hereunder shall be several, and not joint with the obligations of any other Supporting Holder herein, and no Supporting Holder shall be responsible in any way for the performance of the obligations of any other Supporting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Supporting Holder pursuant hereto or thereto, shall be deemed to constitute the Supporting Holders as a group, a partnership, an association, a joint venture, or any other kind of entity or create a presumption that the Supporting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Supporting Holder shall be entitled to protect and enforce its rights, including the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Supporting Holder to be joined as an additional party in the proceeding for such purpose.

43.     <u>Press Releases and Third-Party Communications</u>.  Except as expressly contemplated herein, without the prior written consent of the Parties hereto, no Party will (or will permit any of its subsidiaries, affiliates, agents, or representatives to) show this Plan Support Agreement or the schedules attached hereto (or otherwise disclose the existence or all or a portion of the contents hereof) to any third party (other than to the Parties, the Issuer, the Trustee, and the respective officers, directors, employees, accountants, attorneys, and financial advisors of each the Parties, the Issuer, and the Trustee); provided, that The Stayton shall be permitted to issue any press release with respect to this Plan Support Agreement with the consent of the other Parties hereto, which consent shall not be unreasonably withheld, and to discuss the content of such press releases and the transactions described in this Plan Support Agreement with the residents of The Stayton following either: (i) issuance of such press releases or (ii) 5:00 p.m, eastern on the day immediately prior to the date that the EMMA notice referenced at the end of this <u>Section 43</u> is anticipated to be posted; and provided further, that each Party hereto shall be permitted to issue a press release, make a public statement or disclose the contents of the Plan Support Agreement as may be required by law, regulation, or court or administrative order, in which case the Party making the disclosure shall use all reasonable efforts to consult with, and provide a copy of all proposed written disclosure to, the other Parties hereto prior to such disclosure.  Notwithstanding the foregoing, the Parties acknowledge that the Trustee has certain notice obligations under the Bond Indenture and the Master Trustee has certain notice obligations under the Master Indenture and nothing herein is intended to prohibit the Trustee or the Master Trustee, as applicable, from providing any notices as the Trustee or Master Trustee deems necessary therein.  It is agreed by the parties that a notice or notices shall be posted on the MSRB Electronic Municipal Market Access (EMMA) website promptly upon execution of this Plan Support Agreement that, at a minimum, will disclose the material terms of this Plan Support Agreement and the Plan Term Sheet, including without limitation the anticipated Membership Substitution and the material terms of the Refunding Transaction, including the bond exchange associated therewith, as well as the approximate aggregate percentage of the principal amount of the Bonds held by the Supporting Holders.

44.     <u>Automatic Stay.</u>  The Stayton acknowledges that after the commencement of the Anticipated Bankruptcy Proceeding, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code, and The Stayton agrees that it shall not challenge or object to the giving of such notice of termination or Withdrawal.

45.     <u>Agreement Not a Plan.</u>  This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

**[Signature Pages Follow]**

In witness whereof, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

THE STAYTON:

TARRANT COUNTY SENIOR LIVING CENTER, INC. D/B/A THE STAYTON AT MUSEUM WAY

DocuSigned by:

EFD8F61330O543B...

By: Chad Shandler
Its: Chief Restructuring Officer

In witness whereof, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**PLAN SPONSOR:**

**BUCKNER RETIREMENT SERVICES, INC.**

Charlie Wilson (Feb 6, 2024 10:22 CST)

By: Charlie Wilson
Its: President

In witness whereof, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**TRUSTEE:**

**BOKF, N.A., AS SUCCESSOR TRUSTEE**

By: George Kubin
Its: Senior Vice President



In witness whereof, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**SUPPORTING HOLDERS:**



*[signatures continue below]*





In witness whereof, the Parties hereto have executed this Plan Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

**SUPPORTING HOLDERS:**





### Exhibit A – Form of Joinder

This Joinder to the Plan Support Agreement (including all schedules and exhibits, as amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof), the "Plan Support Agreement"), dated as of February 7, 2024, is entered into by and among: (i) Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way, (ii) BOKF, N.A., as trustee, (iii) each Supporting Holder signatory (or that executes a Joinder) thereto, and (iv) Buckner Retirement Services, Inc. is executed and delivered by [        ] (the "Joining Supporting Creditor").

Each capitalized term used herein but not defined herein shall have the meaning set forth in the Plan Support Agreement.

1.      Agreement to be Bound.  The Joining Supporting Creditor hereby agrees to be bound by all of the terms of the Plan Support Agreement. The Joining Supporting Creditor shall hereafter be deemed to be a "Supporting Holder" and a Party for all purposes under the Plan Support Agreement.

2.      Representations and Warranties.  With respect to the aggregate principal amount of 2020 Bonds held by the Joining Supporting Creditor, the Joining Supporting Creditor hereby makes, as of the date hereof, the representations and warranties of the Supporting Holders set forth in Sections 7(a) through 7(f) of the Plan Support Agreement to each of the other Parties to the Plan Support Agreement.

3. Governing Law.  Section 27 of the Plan Support Agreement is incorporated by reference as if set forth fully herein, except that any references to "Plan Support Agreement" shall be replaced with references to "Joinder".

\* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Supporting Creditor has caused this Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Supporting Creditor


Authorized Signatory:


By:_____
Name:
Title:

Address:


Principal amount of Bonds beneficially owned by Joining Supporting Creditor, or beneficially owned by accounts for which Joining Supporting Creditor has investment management responsibility:


$_____

**Exhibit B – Auction Process Letter**

**TARRANT COUNTY SENIOR LIVING CENTER, INC. D/B/A THE STAYTON AT MUSEUM WAY**

**AUCTION PROCESS LETTER**

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to a transaction relating to substantially all of the assets (the "Assets") of Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way (the "Company" or "The Stayton").

The Stayton proposes to sell, transfer, or otherwise consummate an alternative form of transaction regarding the Assets as a going concern (the "Transaction"). The Transaction will be based on a competitive bidding process, as set forth herein, as would be commonly conducted by a debtor in possession pursuant to a bankruptcy process.

### Due Diligence Participation Requirements

Parties interested in conducting due diligence should contact the Company's investment banker Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as follows:

<u>Houlihan Lokey</u>

Andrew Turnbull - 312-456-4719 or aturnbull@hl.com, or
Steven Balash - 312-462-6455 or sbalash@hl.com

Any person desiring to conduct due diligence that may lead to a bid for The Stayton will be required to deliver to the Company an executed confidentiality agreement in form and substance satisfactory to the Company. The Company and its advisors will afford parties who execute a confidentiality agreement (a "Potential Bidder") such due diligence access or additional information as the Company, in its business judgment, determines to be reasonable and appropriate; *provided*, *however*, that the same access will be made available to all Potential Bidders. Notwithstanding the foregoing, the Company shall have the right, in its sole discretion, to require satisfactory evidence of any Potential Bidder's available funds or firm commitment for sufficient financing to consummate an acquisition prior to granting said Potential Bidder access to conduct due diligence. Additional due diligence will not be provided after the Bid Deadline (as defined below).

Notwithstanding the foregoing, neither the Company nor its advisors are required to provide confidential, business-sensitive, or proprietary information to any Potential Bidder if the Company reasonably believes that (i) such disclosure would be detrimental to the interests of the Company, or (ii) such potential bidder does not intend in good faith, or have the capacity, to consummate its bid.

### Selection of a Stalking Horse Bidder

Pursuant to the marketing process that the Company has conducted to date, the Company has entered into a definitive transaction agreement (the "Stalking Horse Transaction Agreement") with Buckner Retirement Services, Inc. to serve as the stalking horse bidder (the "Stalking Horse"). The Stalking Horse Transaction Agreement is posted in the data room.

As a component of the Stalking Horse Transaction Agreement, the Company is providing certain buyer protections (collectively, the "Bid Protections") requested by the Stalking Horse, including a breakup fee in the amount of $2,025,000 if the Stalking Horse is not declared the Successful Bidder at the conclusion of the Auction (both as defined below).

## Bid Deadline

The deadline for Potential Bidders to submit bids intending to compete with the Stalking Horse Transaction Agreement, shall be **March 1, 2024 at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline"). Such bids must be received on or before the Bid Deadline by the following parties (collectively, the "Notice Parties"):

1.  Counsel for the Company, Polsinelli, Attn: David Gordon (dgordon@polsinlelli.com) and Robert Dempsey (rdempsey@polsinelli.com); and

2.  the Company's investment banker, Houlihan Lokey Capital, Inc., Attn: Andrew Turnbull (aturnbull@hl.com) and Steve Balash (sbalash@hl.com).

## Participation Requirements

To be eligible to participate in the Auction, each bid and each Potential Bidder submitting a bid must conform to the following requirements (collectively, the "Participation Requirements"):

1.  Offer to consummate the transaction on terms no less favorable to the Company than those set forth in the Stalking Horse Transaction Agreement, taking into account the overall structure and value of the Stalking Horse Transaction Agreement, including the capital commitments provided by the Stalking Horse, and also taking into consideration the Bid Protections that must be paid in cash, such that the initial minimum overbid over the value of the Stalking Horse Transaction Agreement shall be at least $2,525,000;

2.  Include a (a) redlined copy of each of the Stalking Horse Transaction Agreement and the Stalking Horse Member Substitution Agreement (the "Stalking Horse MSA") contained in the data room to show any proposed amendments thereto (the "Modified Transaction Agreement" and "Modified MSA", respectively, and collectively the "Modified Agreements") and (b) clean, executed copies of the Modified Agreements. To the extent that the structure of the bid is different from the Stalking Horse transaction, the Potential Bidder shall submit the applicable Modified Agreement(s) in both a Word format and an executed copy;

3.  Include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement, including that (a) there are no financing contingencies to the bid, (b) there are no due diligence contingencies to the bid, and (c) all necessary internal and shareholder approvals have been obtained prior to submitting the bid;

4. State that such offer is binding and irrevocable until the announcement of the Successful Bid by the Company unless such offer is designated as the Backup Bid (both as defined below);

5. Disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

6. Include the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer, including any advisors and related parties;

7. Provide information on the operational and financial capabilities of the Potential Bidder sufficient to allow the Company and interested parties to determine such bidder's ability to assume each Assumed Contract (as defined below);

8. Include a good-faith deposit in immediately available funds in an amount equal to at least 9.7% of the purchase price ("Earnest Money Deposit"), which amount shall be held in escrow and of which $2,025,000 of the Successful Bidder Earnest Money Deposit will be held for the benefit of the Stalking Horse to be used to pay the breakup fee owed to the Stalking Horse upon: (a) the closing of the Transaction by the Successful Bidder in the event the Stalking Horse is not the Successful Bidder or (b) the forfeiture of the Successful Bidder's deposit in the event the Successful Bidder breaches and fails to close and the Stalking Horse is not designated the Backup Bidder;

9. Include a cash component in an amount no less than $2,025,000, which may come from the escrow account described above, for payment of the breakup fee to the Stalking Horse upon the closing of the Transaction by the Successful Bidder;

10. Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Transaction;

11. Provide information on the Potential Bidder's ability to continue to operate The Stayton;

12. Represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Company's business and the Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and / or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Company's business or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified Agreements, if ultimately accepted and executed by the Company; and

13.     Acknowledge that the Potential Bidder is subject, but not entitled to any of the Bid Protections.

14.     Acknowledge that the Potential Bidder may be designated the Backup Bid (as defined herein) and that, in that event, the Potential Bidder's bid shall remain open and irrevocable until thirty (30) days after the Designation Date.

The Company, following consultation with the Bond Trustee, shall determine whether bids submitted by Potential Bidders meet the Participation Requirements.

The Company reserves the right to request additional information from a Potential Bidder in connection with its bid.

Bids are not required to adopt the business structure set forth in the Stalking Horse Transaction Agreement or Stalking Horse MSA and may provide for, among other things, (i) a for-profit or not-for-profit entity as the purchaser(s) and / or operator(s) of The Stayton; or (ii) a debt restructuring or a cash purchase price for the Assets.

## Qualified Bidders and Bids

Potential Bidders who have satisfied the Participation Requirements in the Company's judgment will be deemed "Qualified Bidders." Bids that satisfy all bid requirements, as determined by the Company, will be deemed "Qualified Bids." The Stalking Horse shall be entitled to credit bid the amount of its breakup fee.

After the Bid Deadline, the Company will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether its bid is a Qualified Bid before the Auction. The Stalking Horse is deemed a Qualified Bidder and the Stalking Horse Transaction Agreement is a Qualified Bid in all respects.

The Company reserves the right to waive noncompliance with any one or more of the Participation Requirements, other than numbers 8 and 9 of the Participation Requirements, and deem any bid a Qualified Bid if it reasonably determines, in its business judgment, that such waiver is consistent with its fiduciary duties.

## Auction Participation

Unless otherwise agreed to by the Company, only the Company, Qualified Bidders, the Bond Trustee, and each of the foregoing's legal and financial advisors are eligible to attend or participate at the Auction. Subject to the other provisions of this Auction Process Letter, if the Company does not receive any Qualified Bids other than Stalking Horse Bid or if no Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Company will not hold an Auction and the Stalking Horse will be named the Successful Bidder (as defined below).

**Auction**

If more than one Qualified Bid is received, the Company will conduct an auction (the "Auction") for the sale of substantially all its Assets. Each Qualified Bidder participating at the Auction will be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or the sale.

The Auction shall take place at 10:00 a.m. (prevailing Central Time) on March 5, 2024 at the offices of Polsinelli at 2950 N. Harwood, Suite 2100, Dallas, Texas 75201 or such alternate venue as the Company designates. No later than twenty-four (24) hours prior to the Auction, the Company shall provide notice of the Auction location and, if via a virtual platform, the credentials required to access such platform, to all Qualified Bidders and the Bond Trustee. At the Auction, the Stalking Horse and other Qualified Bidders will be permitted to increase their bids; provided that any subsequent bid must exceed the then highest bid by at least $500,000 (and in the case of the Stalking Horse, taking into account its ability to credit bid the amount of the breakup fee). The Company may conduct the Auction in the manner it reasonably determines, in its business judgment, after consultation with the Bond Trustee, will attempt to achieve the maximum value for its Assets.

**Closing the Auction**

The Auction shall continue until there is one offer that the Company determines, with the consent of the Bond Trustee, is the highest and best offer from among the Qualified Bidders (including the Stalking Horse) submitted at the Auction (the "Successful Bid(s)"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of a purchaser, as set forth in the Stalking Horse Transaction Agreement, Modified MSA or other applicable definitive agreements, as applicable. Immediately prior to the conclusion of the Auction, the Company shall notify all Qualified Bidders at the Auction of the name or names of the Successful Bidder(s) and the amount and other material terms of the Successful Bid(s) (the "Designation Date").

The Company shall also, with the consent of the Bond Trustee, select a backup bid (the "Backup Bid"), which shall remain open and irrevocable until thirty (30) days after the Designation Date. If the Stalking Horse is not determined to be the Successful Bidder, the Breakup Fee shall be paid to the Stalking Horse from the escrow holding the Earnest Money Deposit of the Successful Bidder (i) upon the closing of the Transaction by the Successful Bidder or, (ii) promptly upon the Successful Bidder's failure to close due to a breach by the Successful Bidder, unless Plan Sponsor is the Backup Bidder and the Company has notified Plan Sponsor, within thirty (30) days of the Designation Date, that the Successful Bidder has failed to close and the Company intends to proceed to close the Stalking Horse Transaction Agreement. In the event that the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, for any reason, the Company may, following consultation with the Bond Trustee, elect to regard the Backup Bid as the highest and best bid for the Assets, and to consummate the transaction contemplated by the Backup Bid.

### Assumption of Executory Contracts and Unexpired Leases

Each Modified Transaction Agreement must designate which executory contracts and unexpired leases are to be assumed or assumed and assigned (the "Assumed Contracts"). The Stalking Horse Transaction Agreement designates all residency agreements as Assumed Contracts. A Modified Transaction Agreement which also designates all residency agreements as Assumed Contracts and assumes all resident obligations will be preferred by the Company.

### Reservation of Rights

THE COMPANY RESERVES ITS RIGHTS TO MODIFY THESE BIDDING PROCEDURES, WITH THE CONSENT OF THE BOND TRUSTEE, IN ANY MANNER, THAT WILL BEST PROMOTE THE GOALS OF THE BIDDING PROCESS AND TO IMPOSE, WITH THE CONSENT OF THE BOND TRUSTEE, AT OR PRIOR TO THE AUCTION, ADDITIONAL OR DIFFERENT TERMS AND CONDITIONS ON THE TRANSACTION RELATING TO THE ASSETS, INCLUDING, WITHOUT LIMITATION, MODIFYING THE REQUIREMENTS FOR A QUALIFIED BID, EXTENDING THE DEADLINES SET FORTH IN THESE BIDDING PROCEDURES, ADJOURNING THE AUCTION AT OR PRIOR TO THE AUCTION, AND REJECTING ANY OR ALL BIDS IF, IN THE COMPANY'S REASONABLE, GOOD-FAITH BUSINESS JUDGMENT IT DETERMINES THAT SUCH QUALIFIED BID IS (I) INADEQUATE OR INSUFFICIENT, (II) NOT IN CONFORMITY WITH THE REQUIREMENTS OF THE RELATED RULES OR THE TERMS SET FORTH HEREIN, OR (III) CONTRARY TO THE BEST INTERESTS OF THE COMPANY. EXCEPT AS PROVIDED IN THAT CERTAIN PLAN SUPPORT AGREEMENT BETWEEN THE COMPANY, THE BOND TRUSTEE, THE STALKING HORSE AND OTHER PARTIES THERETO, THE COMPANY RESERVES THE RIGHT, AT ANY TIME, FOR ANY REASON AND IN ITS REASONABLE, GOOD-FAITH BUSINESS JUDGMENT, TO DECLINE TO PURSUE THE TRANSACTION. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IN ORDER FOR A BID TO BE TO BE DEEMED A QUALIFIED BID, SUCH BID MUST INCLUDE A CASH COMPONENT AT CLOSING IN AN AMOUNT OF NO LESS THAN $2.025 MILLION WHICH AMOUNT SHALL BE PAID TO THE STALKING HORSE BIDDER FOR PAYMENT OF THE BREAKUP FEE.

**Exhibit C – New Forbearance Agreement**

# FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT**, dated as of [●], 2024 (this "Agreement"), is by, between and among Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way, a not-for-profit corporation organized under the laws of Texas (the "Company") and BOKF, N.A., as successor trustee (the "Master Trustee" under the Master Indenture, as defined below, the "Bond Trustee" under the Bond Indenture, also as defined below and the "Trustee" for purposes of this Agreement), acting at the direction of certain beneficial holders or investment managers or advisors for such beneficial holders (collectively, the "Supporting Holders" and together with the Trustee, the "Creditor Parties") of the majority of outstanding Series 2020 Bonds (collectively, the "Bonds") issued pursuant to that certain Indenture of Trust by and between Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and the Bond Trustee, dated as of January 1, 2020 (the "Bond Indenture"), whose terms of repayment are governed by that certain Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement, dated as of January 1, 2020 (as further amended, restated, supplemented or otherwise modified from time to time thereafter, the "Master Indenture," and together with the Bond Indenture and other agreements the Company entered into with respect to the Series 2020 Bonds, the "Transaction Documents") between the Company, as initial obligated group member, and the Master Trustee.[1]

**WHEREAS**, at the request of the Company, the Issuer issued the Bonds pursuant to the Bond Indenture as a refinancing and exchange of certain bond indebtedness previously incurred by the Company to finance the facility;

**WHEREAS**, the Issuer and the Company entered into that certain Loan Agreement, dated as of January 1, 2020 (the "Loan Agreement"), and the rights of the Issuer under the Loan Agreement were assigned to the Trustee pursuant to the Bond Indenture as security for the Bonds. In addition, as security for its obligations with respect to the Bonds, the Company entered into the Master Indenture pursuant to which the Company granted the Trustee a security interest against substantially all of the Company's assets (all such collateral so granted under the Transaction Documents, the "Collateral");

**WHEREAS**, certain events have occurred, including the Company's failure to meet the required Historical *Pro Forma* Debt Service Coverage Ratio pursuant to Section 4.11 of the Master Indenture, the Company's failure to comply with certain cash-management obligations pursuant to Sections 3.05 and 4.24(c) of the Master Indenture (such failure, the "Cash Management Default"), and the other events set forth on Schedule 1 attached hereto (collectively, the "Specified Defaults"), that constitute Events of Default or Defaults under the Master Indenture and the Bond Indenture;

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Master Indenture.

**WHEREAS**, as a result of the Specified Defaults, the Trustee has the right to exercise certain rights and remedies (collectively, the "Rights and Remedies") under the Transaction Documents;

**WHEREAS**, on January [●], 2024, the Company, Buckner Retirement Services, Inc. (the "Plan Sponsor"), the Trustee, acting at the direction of the Majority Supporting Holders, and certain Supporting Holders party thereto (together, with the Majority Supporting Holders, the "Requisite Holders"), in each case, executed that certain Plan Support Agreement (the "Plan Support Agreement") attached hereto as **Exhibit A** in furtherance of consummating a sale of the Company or its assets (a "Strategic Transaction");

**WHEREAS**, the Plan Support Agreement contemplates, among other things, the substitution of the Plan Sponsor as sole member of the Company for Lifespace Communities, Inc. ("Lifespace") (as described more fully in the Plan Support Agreement, the "Membership Substitution"), followed by the filing of a chapter 11 proceeding of the Company in accordance with the Plan Support Agreement (the "Anticipated Bankruptcy Proceeding") before the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") seeking approval and consummation of a plan of reorganization (as described more fully in the Plan Support Agreement, the "Plan") supported by [the Requisite Holders]; and

**WHEREAS**, on [●], 2024, Membership Substitution occurred (the "Membership Substitution Effective Date").

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## SECTION I ACKNOWLEDGMENTS

1.01 The Company hereby acknowledges and agrees, upon execution and delivery of this Agreement, but subject to the terms of this Agreement, that:

(a) The recital of facts set forth in this Agreement is true and correct in all material respects;

(b) The aggregate principal amount owed by the Company under the Bonds is $[112,261,464.00]. This amount and all accrued and unpaid interest thereon (which, as of [July 1][2], 2023 is $[●]) with respect thereto, together with any other outstanding obligations, including fees, expenses and other charges, is validly owing and not subject to any right of setoff, offset, deduction, claim or counterclaim in favor of the Company;

(c) The Specified Defaults (i) have occurred and are continuing, (ii) constitute a Default or an Event of Default under both the Master Indenture and the

[2] NTD: to be updated.

Bond Indenture, without need of any further notice to the Company, and (iii) have not been cured or are incapable of being cured by the Company, and as a consequence thereof, the Supporting Holders are free to direct the Trustee to exercise the Rights and Remedies;

(d)     The Company ratifies and affirms that the Master Indenture and the Bond Indenture remain in full force and effect and constitute valid and binding obligations and agreements enforceable by the Trustee at the direction of the Supporting Holders against the Company in accordance with their respective terms and conditions;

(e)     The Company also ratifies and affirms that the Trustee has been granted a first-priority security interest in, among other things, the Collateral in accordance with the Master Indenture, the Bond Indenture and the other Transaction Documents, as applicable;

(f)     The Trustee has not waived, released or compromised, does not hereby waive, release or compromise, and may never waive, release or compromise any events, occurrences, acts or omissions that may constitute or give rise to any Defaults or Events of Default, including without limitation the Specified Defaults, that existed or may have existed, exist or may presently exist, or may arise in the future, nor does the Trustee waive any Rights and Remedies, including without limitation, foreclosure as to the Collateral pledged in connection with the Master Indenture and the Bond Indenture;

(g)     The Company has received proper notice with respect to the Cash Management Default and the other Specified Defaults.

## SECTION II  FORBEARANCE

2.01     _Forbearance_.  In consideration of the Company's agreement of timely and strict compliance with the terms of this Agreement, and in reliance upon the representations, warranties, agreements and covenants of the Company set forth herein, including, without limitation, under Section IV below, subject to the satisfaction of each of the conditions precedent to the effectiveness of this Agreement, from the Effective Date (as defined herein) until the Termination Date (as defined herein), the Trustee, acting at the direction of the Supporting Holders, agrees to forbear (the "_Forbearance_") from exercising any available Rights and Remedies under the Transaction Documents or applicable law solely with respect to the Specified Defaults and the anticipated defaults set forth on Schedule 1 attached hereto (the "_Anticipated Defaults_").

2.02     _Forbearance Period_.  The Forbearance shall commence on the Membership Substitution Effective Date and continue until the earlier of (a) seven months following the Membership Substitution Effective Date, and (b) the date on which any Termination Event (as defined below) shall have occurred (the earlier of (a) and (b), the "_Termination Date_," and the period commencing on the Effective Date and ending on the Termination Date, the "_Forbearance Period_").  Notwithstanding anything to the contrary herein, on the Termination Date, the Forbearance shall immediately and automatically terminate and have no further force or effect, and the Creditor Parties shall be released from any and all obligations and agreements under this Agreement and shall

be entitled to exercise any of the Rights and Remedies as if this Agreement had never existed, and all of the Rights and Remedies under the Transaction Documents and in law and in equity shall be available without restriction or modification, as if the Forbearance had not occurred.

2.03    Limited Forbearance.  The Forbearance is limited in nature and nothing contained herein is intended, or shall be deemed or construed (a) to impair the ability of the Trustee, including at the direction of the Supporting Holders, to exercise any of the Rights and Remedies during the Forbearance Period for Defaults or Events of Default other than the Specified Defaults and the Anticipated Defaults or after the Forbearance Period for any reason, (b) to constitute a waiver of the Specified Defaults or Anticipated Defaults or any future Defaults or Events of Default or of compliance with any term or provision of the Master Indenture, the Bond Indenture or applicable law or (c) to establish a custom or course of dealing between the Company, on the one hand, and the Trustee or the Supporting Holders, on the other.

2.04    Further Acknowledgments.  The Company understands and accepts the temporary nature of the Forbearance provided hereby and agrees that the Trustee and the Supporting Holders have provided no assurances of any extension or modification of the Forbearance or the approval of any consents, waivers or amendments to the Master Indenture or the Bond Indenture.

## SECTION III EVENTS OF TERMINATION

3.01    Termination Events.  The Forbearance Period shall automatically terminate upon the occurrence of any of the following events (each, a "Termination Event"):

(a)    the failure of the Company to comply with any term, condition, covenant or Milestone (as defined herein) set forth in this Agreement;

(b)    other than the Specified Defaults or the Anticipated Defaults, the occurrence of any Default or Event of Default under the Master Indenture or the Bond Indenture;

(c)    the occurrence of an Agreement Termination Event, under and as defined in the Plan Support Agreement;

(d)    other than the Anticipated Bankruptcy Proceeding, the Company's commencement of a case under title 11 of the United States Code or any similar reorganization, liquidation, insolvency or receivership proceeding under applicable law;

(e)    any change in the ownership of the Company occurs, other than as contemplated by the Plan Support Agreement; or

(f)    the Company files, amends, modifies, executes, or enters into, or files a pleading seeking authority to execute, enter into, amend or modify, any Definitive Documents (as defined in the Plan Term Sheet attached to the Plan Support

Agreement) that are not in form or substance consistent with the Plan Support Agreement or that are not reasonably satisfactory in form and substance to the Trustee, or publicly announces its intention to take any such action.

## SECTION IV OTHER AGREEMENTS

4.01    Accrued Interest.  The Company agrees that during the Forbearance Period interest on the Bonds shall continue to accrue as provided under the Transaction Documents.

4.02    Trustee Reserve Fund.  The Company ratifies and affirms that all amounts on deposit with the Trustee in the Reserve Fund (as described in Section 3.09 of the Bond Indenture) (such funds, the "Trustee Reserve Fund"), together with any other funds held by the Trustee, including without limitation those in the Revenue Fund, Cost of Issuance Fund and Bond Fund (all as defined in the Transaction Documents) (collectively, the "Trustee Funds") (a) are held in trust for the benefit of the holders of the Bonds and that the Company has no right, title or interest in the Trustee Funds and expressly disclaims any residual interest therein, and (b) do not, in the event of a bankruptcy proceeding involving the Company, constitute "property of the debtor's estate" under 11 U.S.C. § 541, are not protected by the automatic stay pursuant to 11 U.S.C. § 362, and will not be "cash collateral" under 11 U.S.C. § 363.

4.03    Agreement to Pursue.  The Company shall take all actions necessary to diligently pursue the consummation of a Strategic Transaction as contemplated by the Plan Support Agreement, including within the Milestones (as defined below).

4.04    Strategic Transaction Milestones.  The Company shall comply with the following milestones related to a Strategic Transaction (the "Milestones"), as may be extended or waived in the sole discretion of the Creditor Parties (as may be indicated via e-mail):

(a)    By no later than [●], 2024 (i.e., two months after the Membership Substitution Effective Date), the Company shall provide drafts of the Plan and the disclosure statement to the Plan (the "Proposed Bankruptcy Documents").

(b)    By no later than [●], 2024, the Proposed Bankruptcy Documents shall be in agreed form, as agreed by the Company and the Trustee, acting at the direction of the Majority Supporting Holders.

(c)    By no later than [●], 2024 (i.e., four months after the Membership Substitution Effective Date), the Company shall commence the Anticipated Bankruptcy Proceeding.

(d)    By no later than [●], 2024 (i.e., seven months after the Membership Substitution Effective Date), the Plan shall have become effective; provided, however, that the Plan shall not become effective sooner than the date that is six months plus one day after the Membership Substitution has occurred.

4.05    Negative Covenants.    The Company covenants that during the Forbearance Period, it shall not:

(a)    Negotiate or otherwise pursue or cooperate with any party to negotiate or otherwise pursue, any Strategic Transaction or other disposition of the Company or substantially all its assets outside the scope of this Agreement or the Plan Support Agreement, including the requirements of Section 4.07 hereof.

(b)    Make any payment, dividend, distribution or transfer, or provide any other consideration to any holder of, or on account of, any membership interest in the Company other than reimbursements for allocated costs to the extent consistent with the Plan Support Agreement and permissible under the Master Indenture.

(c)    Use, sell or lease, other than in the ordinary course of business, any property or assets of the Company, or enter into any agreements to use, sell or lease, other than in the ordinary course of business, any property or assets of the Company.

(d)    Purchase, redeem, defease, exchange, repay or otherwise acquire for value any debt of the Company owed to Plan Sponsor or any of its affiliates, other than in the ordinary course of business.

(e)    Incur, directly or indirectly, any Additional Indebtedness (as defined in the Master Indenture) without the prior written consent of those Supporting Holders holding, at the time of such requested consent, not less than a majority of the principal of Bonds then outstanding held by the Supporting Holders (such majority, the "Majority Supporting Holders") or grant any Lien (also as defined in the Master Indenture) upon any of its property or assets or income or profits therefrom, or collaterally assign or convey as collateral any right to receive income therefrom.  For the avoidance of doubt, any obligation incurred pursuant to the Plan Support Agreement, including, but not limited to, the Company's incurrence of an obligation under the $10,000,000 subordinated debt, to the extent the Buckner Foundation Inc. makes advances thereunder, shall not constitute Additional Indebtedness.

4.06    Payment of Professionals.    Notwithstanding anything to the contrary in the Master Trust Indenture, the Company shall not be responsible for any fees incurred by the Trustee and/or the Supporting Holders in connection with this Agreement and the Strategic Transaction contemplated by the Plan Support Agreement, including the fees of Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. as counsel to the Trustee and/or the Supporting Holders, local counsel retained by the Trustee and/or Supporting Holders, and Miller Buckfire & Co., LLC.  For the Avoidance of doubt, the Company's failure to meet any requirement to pay such fees under the Master Trust Indenture during the Forbearance Period shall not constitute a Default or an Event of Default under the Master Trust Indenture.

4.07    <u>Information and Reporting Requirements</u>.

(a)    The Company has provided the Creditor Parties with a financial operating model (the "<u>Plan Sponsor Model</u>") covering the Forbearance Period, attached hereto as [==Exhibit X==].  From Membership Substitution Effective Date through the Anticipated Bankruptcy Proceeding, the Company shall operate in accordance with the Plan Sponsor Model.

(b)    By the forty-fifth (45th) day following the end of each month (the "<u>Monthly Reporting Date</u>"), the Company shall provide the Creditor Parties with the following information:

(i)    balance sheet, statement of operations, statement of cash flows and occupancy reports for the prior monthly period;

(ii)    occupancy reports designated by units, as well as a monthly sales and marketing update and any capital expenditures made during the prior month; and

(iii)    information and supporting documentation as any Creditor Party may from time-to-time reasonably request.

(c)    Commencing with the first Monthly Reporting Date after March 31, 2024, the Company shall provide the Creditor Parties with a quarterly comparison between projected cash receipts and disbursements set forth on the Plan Sponsor Model and actual cash receipts and disbursements incurred during such prior period.

(d)    The Company shall, and/or shall cause its advisors and/or representatives to:

(i)    promptly upon written request of the Advisors, provide any additional information that is reasonably necessary to consummate the Strategic Transaction, any underlying financial information necessary to evaluate the Strategic Transaction, and to verify the Company's compliance with the terms of this Agreement, the Plan Support Agreement and the Transaction Documents; and

(ii)    no later than the dates set forth in Section 4.15 of the Master Indenture, provide all reports described therein.

(e)    The Company shall provide to the Creditor Parties and the Advisors promptly and in any event within one (1) business day of the occurrence thereof, written notice regarding the occurrence of (i) any Termination Event or (ii) any other event which could reasonably be expected to have a material adverse effect on the Company or its businesses or assets.

The foregoing financial and other documents shall be in addition to any reporting requirements required under the Transaction Documents or as set forth herein.

92694421.3

4.08    Performance Covenants.  The Company covenants that occupancy shall be no less than 78% with respect to(i) independent living units and (ii) all units, tested on each Monthly Reporting Date.

4.09    Release.  The Company, together with its successors, assigns, heirs and representatives (collectively, the "Releasors") does hereby fully, finally, unconditionally and irrevocably release, waive and forever discharge each of the Trustee and the Supporting Holders, together with each of their respective affiliates, and each of the directors, officers, members, shareholders, employees, agents, attorneys, advisors and consultants of each of the foregoing (collectively, the "Released Parties"), from any and all debts, claims, allegations, obligations, damages, costs, attorneys' fees, suits, demands, liabilities, actions, proceedings and causes of action, in each case, whether known or unknown, contingent or fixed, direct or indirect, and of whatever nature or description, and whether in law or in equity, under contract, tort, statute or otherwise, which any Releasor has heretofore had or now or hereafter can, shall or may have against any Released Party by reason of any act, omission or thing whatsoever done or omitted to be done, in each case, on or prior to the date hereof arising out of, connected with or related to this Agreement, the Plan Support Agreement, any Transaction Document or any act, event or transaction related or attendant hereto or thereto; provided, however, that nothing in this Section 4.09 shall release the Parties from the obligations under this Agreement or the Plan Support Agreement.  The Company represents and warrants that it has no knowledge of any claim of any Releasor against any Released Party or of any facts or acts or omissions of any Released Party which on the date hereof would be the basis of a claim by any Releasor against any Released Party which would not be released hereby.

The Company represents and warrants that it is the sole and lawful owner of all right, title and interest in and to all of the claims released hereby and it has not heretofore voluntarily, by operation of law or otherwise, assigned or transferred or purported to assign or transfer to any person any such claim or any portion thereof.  The Company hereby indemnifies and holds harmless each of the Released Parties from and against any claim, demand, damage, cost, liability (including payment of reasonable attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or arising out of any assignment or transfer of any released claims made by the Releasors hereunder.

4.10    Ordinary Course Operation of the Businesses.  During the Forbearance Period, the Company shall operate its businesses in the ordinary course of business and in otherwise in compliance with the covenants set forth herein, in the Plan Support Agreement and in the Transaction Documents.

4.11    Further Assurances.  The Company shall take such other reasonable actions as (a) the Trustee or the Supporting Holders may reasonably request from time to time to perfect or continue the Trustee's security interests in the Collateral and (b) the Trustee or the Supporting Holders may reasonably request to accomplish the objectives of this Agreement, the Plan Support Agreement and the Transaction Documents.

4.12    Confidentiality.  The Creditor Parties and the Company agree that all information  provided hereunder, including the identity of and amount of the Bonds held

by each Supporting Holder, the Plan Sponsor Model, all periodic reporting provided by the Company hereunder and all documents and information related to the Strategic Transaction which is not otherwise public will be maintained in confidence and will not be disclosed publicly or to third parties (other than to the Company's or the Creditor Parties' advisors and agents), except as may be required by law or regulatory examination. This Agreement shall be publicly filed only in connection with the Anticipated Bankruptcy Proceeding; provided, however, the Company shall file publicly on EMMA a summary of this Agreement, and such summary shall be approved by the Creditor Parties.

4.13    Notices.    The Company hereby agrees to notify the Trustee in writing (which may be done by e-mail to Mintz) promptly, and in any event within three (3) business days of (a) any failure by any of the Company to comply with its obligations set forth in this Agreement, (b) the occurrence of (i) any Termination Event or (ii) any other event which could reasonably be expected to have a material adverse effect on the Company or its business or assets, or (c) the receipt by the Company of any material complaint or demand by any person against the Company, which seeks an amount greater than $1,000,000.00.  All notices, requests and demands to or upon the respective Parties hereto to be effective shall be in writing (including by e-mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given when delivered by hand, or when sent by e-mail or facsimile transmission, or on the first business day after delivery to any overnight delivery service, freight prepaid, or three (3) business days after being sent by certified or registered mail, return receipt requested, postage prepaid, and addressed as follows, or to such other address as may be hereafter notified by the respective Parties hereto:

If to the Trustee, then to:

BOK Financial, N.A.
2405 Grand Boulevard, Suite 840
Kansas City, MO 64108
Attention:        George Kubin
                         Megan Cuccia
E-mail:            gkubin@bokf.com
                         mcuccia@bokf.com

with a copy to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Attention:        Daniel S. Bleck
E-mail:            DSBleck@mintz.com
If to the Company, then to:

Tarrant County Senior Living Center, Inc.
2501 Museum Way

Fort Worth, Texas 76107
Attention: [●]
E-mail: [●]

with a copy to:

[●]
[●]
[●]
Attention: [●]
E-mail: [●]

## SECTION V REPRESENTATIONS AND WARRANTIES

In consideration of the foregoing agreements, each of the Company and the Trustee hereby represents and warrants to the other, as follows:

5.01    Such Party is duly organized, is validly existing and is not in violation in any respect of any term of its charter, bylaws or other constitutive documents; the execution, delivery and performance of this Agreement are within such Party's power and have been duly authorized by all necessary action; and such Party is voluntarily entering into this Agreement.

5.02    This Agreement constitutes a valid and legally binding agreement, enforceable against such Party in accordance with its terms.

5.03    No consent or authorization of, filing with, notice to or other act by or in respect of, any governmental or regulatory authority or any other person is required in connection with such Party's entry into, and performance of, this Agreement, except for consents, authorizations, filings and notices which have been obtained or made and are in full force and effect or which are immaterial in nature; and the entry into and performance of this Agreement by such Party does and will not conflict with, or result in the default under, any material agreement or document of such Party, its constituent documents or any applicable law, regulation or court order, consent or ruling.

5.04    The Company represents, as of the date of this Agreement that there are no Events of Default that have occurred and are continuing under the Transaction Documents other than the Specified Defaults.

5.05    The Parties acknowledge that nothing in this Agreement, including the presentation of drafts from one Party to another, constitutes the making of an offer to sell or the solicitation of an offer to buy securities or loans of any kind or the solicitation of a consent or waiver of any rights under any of the Transaction Documents and the entry into this Agreement shall not constitute, directly or indirectly, an incurrence, a refinancing, an extension or a modification in any way of any debt or a recapitalization or restructuring in any way of the obligations of the Company.

10

5.06    Other than in the Plan Support Agreement, the Trustee and Supporting Holders have not made any assurances concerning any additional forbearance, waiver, restructuring or other accommodations.

## SECTION VI  RATIFICATION OF EXISTING AGREEMENTS

6.01    The Company and the Trustee hereby acknowledge and agree that:

(a)    the relationships between the Company, on the one hand, and the Trustee and Supporting Holders, on the other, are governed by the Master Indenture, the Bond Indenture, this Agreement and the other Transaction Documents, as applicable, that may be executed by the Company, the Trustee and the Supporting Holders from time to time;

(b)    no fiduciary duty or special relationship is or will be created by any discussions regarding any possible amendment, waiver, forbearance or other transaction;

(c)    no Supporting Holder has made to the Company, and the Company has not made to any Supporting Holder, any promise, commitment or representation of any kind or character with respect to any forbearance as of the date of this Agreement, other than as set forth in this Agreement or the Plan Support Agreement;

(d)    this Agreement has no effect or bearing on any rights or remedies the Supporting Holders may have available to themselves or the Trustee under the Transaction Documents, other than as expressly provided for herein;

(e)    no Party has any obligation to engage in discussions with any other Party after the date hereof regarding any further forbearance; and

(f)    other than as set forth in the Plan Support Agreement, no Supporting Holder has any obligation to amend, waive, supplement or otherwise modify the terms of the Transaction Documents, offer any discounted payoff of the Bonds, refinance or exchange the Bonds, vote or refrain from voting or otherwise acting with respect to its Bonds, extend the forbearance period, grant any other forbearance, agree to any amendment, supplement, waiver or other modification or any Strategic Transaction, enter into any definitive documentation in connection with a Strategic Transaction, or extend any other accommodation, financial or otherwise, to the Company.

## SECTION VII MISCELLANEOUS

7.01    Conditions Precedent to the Effectiveness of this Agreement.  This Agreement and the Forbearance shall become effective only upon satisfaction in full of the following conditions precedent, unless waived in writing by the Trustee at the direction of the Supporting Holders (the date on which such conditions are satisfied or waived, the "Effective Date"):

(a)    The Membership Substitution shall have occurred;

(b) The Parties shall have received counterparts of this Agreement duly executed by the Company and the Trustee;

(c) The Plan Support Agreement shall have been executed; andSupporting Holders who hold at least a majority of Bonds outstanding shall have executed a letter directing the Trustee to enter into this Agreement.

7.02    More Favorable Agreements.  If the Company has entered into or at any time on or after the date hereof enters into a forbearance or similar agreement with any other holder of indebtedness that contains terms more favorable to such holder than those contained in this Agreement (each such agreement, a "More Favorable Agreement"), such terms shall automatically be incorporated herein unless the Majority Supporting Holders, in their sole discretion, direct the Trustee not to seek inclusion of any such terms.  The Company shall (a) promptly notify the Supporting Holders of its entry into a More Favorable Agreement, including the identity of the other party to such More Favorable Agreement, and (b) promptly provide a copy of such More Favorable Agreement to the Trustee.

7.03    Counterparts.  This Agreement may be executed and delivered in any number of counterparts with the same effect as if the signatures on each counterpart were upon the same instrument.  Any counterpart delivered by facsimile or by other electronic method of transmission shall be deemed an original signature thereto.

7.04    Interpretive Matters.

(a) Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the term "including" is not limiting.  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Section, subsection and clause references herein are to this Agreement unless otherwise specified.

(b) The term "person" as used in this Agreement shall be broadly interpreted to include, without limitation, any individual, corporation, company, partnership or other entity.

(c) All references in this Agreement to the Trustee's agreement, consent, acknowledgment or any like action by the Trustee shall refer to such entity having been directed so to agree, consent, acknowledge or take like action pursuant to a direction from the Majority Supporting Holders.

7.05    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.  Each Party hereto hereby irrevocably and unconditionally consents to submit to the non-exclusive jurisdiction of the federal and state courts in Tarrant County, Texas for any action, suit or proceeding arising out of or relating to this Agreement and the transactions contemplated by this Agreement.  Each Party hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in any such

court and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

7.06    Successors and Assigns.  This Agreement shall be binding upon the Company, the Trustee and their respective permitted successors and assigns, and shall inure to the benefit of each such person, the Supporting Holders and their permitted successors and assigns.

7.07    Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

7.08    Integration.  This Agreement contains the entire understanding of the Parties hereto with regard to the subject matter contained herein.  This Agreement supersedes all prior or contemporaneous negotiations, promises, covenants, agreements and representations of every nature whatsoever with respect to the matters referred to in this Agreement, all of which have become merged and finally integrated into this Agreement.  Each of the Parties hereto understands that in the event of any subsequent litigation, controversy or dispute concerning any of the terms, conditions or provisions of this Agreement, no Party shall be entitled to offer or introduce into evidence any oral promises or oral agreements between the Parties relating to the subject matter of this Agreement not included or referred to herein and not reflected by a writing included or referred to herein.

7.09    Jury Trial Waiver.  The Company and the Trustee, by acceptance of this Agreement, mutually hereby knowingly, voluntarily and intentionally waive the right to a trial by jury in respect of any litigation based herein, arising out of, under or in connection with this Agreement or any other documents contemplated to be executed in connection herewith, or any course of conduct, course of dealings, statements (whether verbal or written) or actions of any Party, including, without limitation, any course of conduct, course of dealings, statements or actions of any Party relating to the administration of the Bonds or enforcement of the Transaction Documents or Plan Support Agreement arising out of tort, strict liability, contract or any other law, and agree that no Party will seek to consolidate any such action with any other action in which a jury trial cannot be or has not been waived.

7.10    Amendment.  This Agreement may only be amended or modified in writing by the Company and the Trustee, acting at the direction of the Majority Supporting Holders.

[*Remainder of page intentionally left blank; signature pages follow*]

92694421.3

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TARRANT COUNTY SENIOR LIVING CENTER, INC.

By: _____

████████████

████████████████

██████████████████████

██████████████

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BOKF, N.A. as Trustee

By:_____

Name:

Title:

<u>**Schedule 1**</u>[3]

**Specified and Anticipated Defaults**


<u>**Defined Terms:**</u>

All capitalized terms used herein shall have the meaning set forth below or, if not defined herein, the meanings ascribed to them in the Master Indenture.

"**Bond Indenture**" means the Indenture of Trust dated as of January 1, 2020 between the Issuer and the Bond Trustee.

"**Bond Trustee**" means BOKF, N.A.

"**Bonds**" means the Retirement Facility Revenue Bonds (The Stayton at Museum Way Project) Series 2020 issued by the Issuer on January 3, 2020.

"**Coverage Ratio**" means the Historical Pro Forma Debt Service Coverage Ratio (as such term is defined in the Master Indenture).

"**DCOH**" means the Days Cash on Hand (as such term is defined in the Master Indenture).

"**Issuer**" means the Tarrant County Cultural Education Facilities Finance Corporation.

"**Loan Agreement**" means the Loan Agreement dated as of January 1, 2020 between the Issuer and the Obligor.

"**Master Indenture**" means the Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of January 1, 2020, as supplemented and amended to date, between the Obligor and the Master Trustee.

"**Master Trustee**" means BOKF, N.A.

"**Note**" means the Tarrant County Senior Living Center Inc. Series 2020 Note dated January 3, 2020.

"**Obligor**" means Tarrant County Senior Living Center Inc.

"**Potential Default**" means the occurrence of an event that, with the passage of time and/or the giving of notice (or both) would result in an Event of Default.

"**Scheduled Termination Date**" means the date the Forbearance Period is scheduled to expire in accordance with the terms of the Forbearance Agreement, absent the occurrence of any Termination Event that triggers a Termination Date that is earlier than the Scheduled Termination Date.

"**Testing Date**" means each June 30 and December 31.

---

[3]     [NTD: Company to update.]

## Loan Payments/Payments on the Bonds

| | |
|---|---|
| **Section 5.2** of the **Loan Agreement** requires the Obligor to make monthly payments into the Bond Fund for the payment of the principal and interest coming due on the Bonds. | Specified Defaults: |
| | The Obligor **has failed to pay or provide for the payment of the required monthly payments** when due on the 15th day of June 2022 and the 15th day of each month thereafter through December 15, 2022. |
| | Anticipated Defaults: |
| Failure to comply is a Potential Default under Section 9.1 of the Loan Agreement, 8.01(c) of the Bond Indenture and Section 7.01(c) of the Master Indenture. | The Obligor **anticipates that it will be unable to pay or provide for the payment** of the required monthly payments when due on January 15, 2023 and on the 15th day of each month thereafter through the Scheduled Termination Date. |
| **Section 4.02** of the **Bond Indenture** requires the Issuer to promptly pay or cause to be paid the principal of, premium, if any and interest on the Bonds when due. | Specified Defaults: |
| | The **interest due on the Bonds** (and pursuant to the Obligations) on December 1, 2022 **has not been paid.** |
| **Section 4.04** of the **Master Indenture** requires the Obligor to pay principal of (and premium, if any) and interest on the Obligations when due. | Anticipated Defaults: |
| Failure to comply is an Event of Default under Section 9.1 of the Loan Agreement, Section 8.01(a) of the Bond Indenture and 7.01(a) of the Master Indenture. | The Obligor **anticipates that the interest due on the Bonds** (and pursuant to the Obligation) on January 1, 2023 [and any other interest payment date occurring on or prior to the Scheduled Termination Date] **will not been paid when due.** |

## Required Deposits and Other Payments

| | |
|---|---|
| **Section 4.24(c)** of the **Master Indenture** requires that upon the occurrence and during the continuance of an Event of Default, each Obligated Group Member shall upon receipt deposit with the Master Trustee all Gross Revenues of such Obligated Group Member for deposit to the Revenue Fund to be applied in accordance with Section 3.05 thereof.<br><br>Failure to comply is an Event of Default under Section 7.01(b) of the Master Indenture, since more than 45 days have passed from the date of delivery of the Default Notice, resulting in an Event of Default under Section 8.01(c) of the Bond Indenture and Section 7.01(b) of the Master Indenture. | The Obligor has **failed to deposit its Gross Revenues with the Master Trustee for deposit into the Revenue Fund** (which makes the Master Trustee unable to comply with the requirements of Section 3.05 of the Master Indenture) following the receipt from the Bond Trustee of the "Notice of Certain Defaults and Events of Default" dated May 25, 2022 (the "Default Notice"), and anticipates that such failure will continue through the Scheduled Termination Date. |

**Reporting/Delivery Obligations**

| | |
|---|---|
| **Section 4.11(c)** of the **Master Indenture** requires that if the Coverage Ratio is less than Target Coverage Ratio for two consecutive Testing Dates, Obligor must deliver an Officer's Certificate, within 30 days of the delivery of the calculation, detailing cause for failure and proposed remediation plan. | Specified Defaults: |
| | Obligor **has failed to deliver** the required Officer's Certificate following the failure to maintain the Target Coverage Ratio for the two consecutive Testing Dates (June 1, 2021 and December 1, 2021). |
| | Anticipated Defaults: |
| | Obligor **does not expect to deliver** such Officer's Certificate relating to the failure to maintain the Target Coverage Ratio on any Testing Date through the Scheduled Termination Date. |
| Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | |
| **Section 4.11(e)** of the **Master Indenture** requires the delivery of the Consultant's report within 60 days of engagement. | Specified Defaults: |
| | Obligor timely retained FTI Consulting, Inc. as its Consultant, but Obligor **has failed to deliver the required report** following the failure to maintain the Coverage Ratio for the three consecutive Testing Dates (June 1, 2021, December 1, 2021 and June 1, 2022). |
| | Anticipated Defaults: |
| | Obligor **does not expect to deliver** such Consultant's Report on any date through the Scheduled Termination Date. |
| Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | |

| **Section 4.15(b)** of the **Master Indenture** requires delivery of the following: | <u>Specified Defaults:</u> |
|---|---|
|         (ii) quarterly unaudited financial information, within 45 days after the completion of each fiscal quarter;<br><br>        (iii) audited financials within 150 days of Fiscal Year end and an auditor's statement as to compliance with the Master Indenture;<br><br>        (iv) concurrently with the audit, a certificate regarding compliance with the Master Indenture and a summary and copy of annual operating and capital budget for the next year, as well as a management's discussion and analysis for the year;<br><br>        (v) board approved revisions to budgets and IRS correspondence re 501(c)(3) status or the bonds, promptly upon receipt;<br><br><br><br><br><br><br><br><br><br><br>        Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. |         Obligor **has failed to deliver the following items when required**:<br><br>• the annual audited financial statements for the Fiscal Year ended December 31, 2021 (the "2021 Audit") within 150-days of the end of such Fiscal Year.<br><br>• the quarterly unaudited financial information for each fiscal quarter, commencing with the fiscal quarter ended March 31, 2020[4]<br><br>• the annual operating and capital budgets (or any board approved revisions thereto) for (a) its Fiscal Year that commenced on January 1, 2022.<br><br>• the Officer's Certificate required by Section 4.15(b)(iv) concurrently with the delivery of the 2021 Audit, including the delivery of the annual operating and capital budgets (or any board approved revisions thereto) for its Fiscal Year commencing on January 1, 2023.<br><br>• certified statements of the balances for each fund and account required to be established under the Bond Indenture or under the Liquidity Support Agreement for each month. |

---

[4]    The Obligor has not been delivering the quarterly financial information described in Section 4.15(b)(ii) since it has delivered the monthly financial information described in Section 4.15(b)(i). In the abundance of caution, the Obligor has included the failure to deliver this information in a "quarterly" format.

| | |
|---|---|
| | <u>Anticipated Defaults:</u> |
| | Obligor **does not expect to deliver** certified statements of the balances for each fund and account required to be established under the Bond Indenture or under the Liquidity Support Agreement through the Scheduled Termination Date. |
| **Section 4.15(e)** of the **Master Indenture** requires bondholder calls within 15 days following the delivery of the required monthly, quarterly or annual information, as applicable. | <u>Specified Default:</u> |
| | Obligor **has failed to conduct the required quarterly call** following the quarterly period ended September 30, 2022.<br><br>Obligor has failed to conduct monthly telephone calls with bondholders for each month.[5] |
| Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | <u>Anticipated Default:</u> |
| | Obligor **does not expect to host monthly telephone calls with bondholders** through the Scheduled Termination Date. |
| **Section 4.20(b)** of the **Master Indenture** requires that if the DCOH is less than 120 for two consecutive Testing Dates, Obligor must deliver Officer's certificate, within 30 days of the delivery of the calculation, detailing cause for failure and proposed remediation plan.<br><br>Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | <u>Anticipated Default:</u> |
| | Obligor **does not expect to deliver such Officer's Certificate** if the DCOH is less than 120 on December 31, 2022. |
| **Section 4.22** of the **Master Indenture** provides that if the Percentage of Units Occupied for two consecutive Occupancy Quarters is less than the Occupancy Requirement (each as defined in the Master Indenture), Obligor must deliver Officer's certificate, within 30 days of the delivery of the calculation, detailing cause for failure and proposed corrective plan.<br><br>Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | <u>Anticipated Default:</u> |
| | Obligor anticipate that **the Percentage of Units Occupied for two consecutive Occupancy Quarters may be less than the Occupancy Requirement** prior to the Scheduled Termination Date. |

---

[5]  The Obligor has been conducting quarterly telephone calls with bondholders, and intends to continue such practice on a quarterly basis through the Scheduled Termination Date.  Section 4.15(e) references monthly calls in addition to the quarterly calls, but the Obligor's understanding is that such calls were intended to be only quarterly calls.

## Financial and Operating Covenants

| | |
|---|---|
| **Section 4.11(f)** of the **Master Indenture** provides that if the Obligated Group fails to achieve a Coverage Ratio of at least 1.00:1 as of any Testing Date, such failure shall constitute an Event of Default under the Master Indenture. | Specified Default: |
| | Obligor has failed to achieve a Coverage Ratio of at least 1:00:1 as of June 30, 2021, December 31, 2021 and June 1, 2022. |
| | Anticipated Default: |
| Failure to comply is an Event of Default under Section 7.01(g) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | Obligor anticipates **that it will fail to achieve a Coverage Ratio of at least 1:00:1** as of December 31, 2022. |
| **Section 4.20(b)** of the **Master Indenture** requires that if the DCOH is less than 120 for two consecutive Testing Dates, Obligor must deliver an Officer's Certificate, within 30 days of the delivery of the calculation, detailing cause for failure and proposed remediation plan. | Anticipated Default: |
| | Obligor anticipates that it **will not deliver this required certificate** if the DCOH is less than 120 at December 31, 2022. |
| Failure to comply is a Potential Default under Section 7.01(b) of the Master Indenture and Section 8.01(c) of the Bond Indenture. | |
| **Section 4.22** of the **Master Indenture** requires that if the occupancy for all Independent Living Units is less than 88% for two consecutive Occupancy Quarters, the Obligated Group Representative must deliver an Officer's Certificate, within 30 days of the delivery of the calculation, detailing cause for failure and proposed remediation plan. If the occupancy for all Independent Living Units is less than 88% for three consecutive Occupancy Quarters, the Obligated Group Representative must select a Consultant within 30 days of the delivery of the calculation, to make recommendations for remediation. The Obligated Group Representative must deliver a summary or copy of the Consultant's Report within 60 days if the engagement of the Consultant. | Anticipated Default: |
| | Obligor anticipates that occupancy may fall below 88% and **that it will not deliver the required certificate at the end of a fiscal quarter during the Forbearance Period (as defined in the Forbearance Agreement).** |
| Failure to comply with the procedures for preparing a Corrective Occupancy Plan and for obtaining a Consultant's report may constitute an Event of Default under [Section 7.01(b)] of the Master Indenture and [Section 8.01(c)] of the Bond Indenture.[6] | |

---

[6] NTD: Paul Weiss Team please confirm applicable provisions.

**Exhibit D – Form of Escrow Agreement**

Escrow Number: _____ Date: February 6, 2024

## ESCROW AGREEMENT

Purchaser: Buckner Retirement Services, Inc. ("**Buyer**" or "**Purchaser**")
Seller: Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way, a Texas not-for-profit corporation ("**Seller**")
(together, the "**Parties**", and each individually a "**Party**").

## RECITALS

WHEREAS, Seller and Buyer have or intend to enter into a Plan Support Agreement ("**PSA**") and a Membership Substitution Agreement (the "**MSA**") which includes the substitution of Buyer as the sole corporate member of Seller;

WHEREAS, the MSA provides or shall provide that Buyer shall make a deposit into escrow to be held and distributed by the Escrow Agent in accordance with the terms of the PSA and this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties do hereby agree as follows:

1) <u>Deposit(s):</u>  A wire in the amount of:

Eight million and No/100 Dollars ($8,000,000.00) (the "**Deposit**")

is hereby deposited with Chicago Title Insurance Company., as Escrow Agent ("**Escrow Agent**") under this Escrow Agreement (this "**Agreement**") and shall be released and delivered by Escrow Agent pursuant to the joint written direction of the Parties.

2) Escrow Agent is hereby expressly authorized and directed to disregard any and all unilateral directions, notices or warnings given by any Party, or by any other person or entity, regarding this Agreement or the money deposited pursuant to this Agreement. Notwithstanding the foregoing, Escrow Agent is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court of competent  (each, a "**Court Order**"), and Escrow Agent shall not be liable to any Party or any other person or entity by reason of compliance with or obedience to any such Court Order, notwithstanding any such Court Order being subsequently reversed, modified, annulled, set aside or vacated.

3) If conflicting demands are made upon Escrow Agent or legal action is threatened or commenced in connection with this Agreement, Escrow Agent may, in Escrow Agent's sole discretion, (a) withhold and stop all further proceedings without liability therefor, or (b) file suit for interpleader or declaratory relief. If (a) Escrow Agent is required to respond to any legal summons or proceedings, (b) any action of interpleader or declaratory relief is brought by Escrow Agent, or (c) conflicting demands by notices from the Parties or any other person or entity are served upon Escrow Agent, the Parties jointly and severally agree to hold Escrow Agent harmless from and to pay any and all costs, expenses and attorneys'

fees, whether such attorneys shall be regularly retained or specially employed, and any other expenses which Escrow Agent may incur or become liable for as a result of any of the above described events (except to the extent caused by the negligence or willful misconduct of Escrow Agent).

4)      The Parties hereby direct that all amounts due to Escrow Agent pursuant to this Agreement be deducted from the money held pursuant to this Agreement prior to the disbursement of said money. To the extent said money is not sufficient to pay all amounts due Escrow Agent under this Agreement, the Parties jointly and severally agree to pay the fees of Escrow Agent and reimburse Escrow Agent for all expenses incurred in connection with this Agreement. The Parties hereby grant Escrow Agent a security interest in and to any and all money, accounts, deposit accounts, instruments or investment property established or held pursuant to this Agreement to secure all amounts due Escrow Agent under this Agreement.

5)      The Escrow Fee of $750 for this Escrow Agreement will be waived should this transaction close with Chicago Title Insurance Company.

6)      In no case shall the money held pursuant to this Agreement be surrendered to any Party or other person or entity other than Escrow Agent except (a) in accordance with a joint written direction executed by the Parties, or their respective legal representatives or assigns, pursuant to Section 1 above, provided that Escrow Agent shall have received prior written authorization for such legal representative or assign to act on behalf of such Party under this Agreement, or (b) in compliance with a Court Order.

7)      Any notice required or permitted to be given hereunder shall be given by a Party (or its attorney) or Escrow Agent in writing and served (i) by personal delivery, (ii) by overnight delivery service providing proof of receipt, or (iii) by electronic mail, at the addresses set forth below, unless different addresses are given by a Party or Escrow Agent; a copy of any notice sent hereunder shall also being sent simultaneously to the Bond Trustee:

| | |
|---|---|
| Seller: | Tarrant County Senior Living Center, Inc.<br>c/o Chad Shandler, Chief Restructuring Officer<br>FTI Consulting, Inc.<br>1166 Avenue of the Americas, 15th Floor<br>New York, NY 10036<br>Email: chad.shandler@fticonsulting.com |
| With simultaneous copies to (which shall not constitute notice): | Polsinelli PC<br>501 Commerce St., Suite 1300<br>Nashville, TN 37203<br>Attention:  Bobby Guy<br>Email: BGuy@Polsinelli.com |
| Buyer: | Buckner Retirement Services, Inc.<br>700 North Pearl Street, Suite 1200<br>Dallas, TX 75201<br>Attention:  Office of the General Counsel |
| With a simultaneous copy to (which shall not constitute notice): | Butler Snow LLP<br><br>2911 Turtle Creek Blvd., Suite 1400 |

Dallas, TX 75219
Attention: Martin Sosland

Bond Trustee:                           Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Attention:      Daniel S. Bleck
E-mail:          DSBleck@mintz.com

or, in each case, such other address as may be specified in writing to the other Party. All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.

8)         This Agreement is not intended to cancel, supersede or modify the terms of the PSA or MSA. The duties and responsibilities of Escrow Agent are limited to this Agreement. For the foregoing purposes, amendments to this Agreement shall be considered the same as this Agreement.

9)         This Agreement may be signed in any number of counterparts each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

10)       <u>Investment Direction</u>: Money deposited pursuant to this Agreement may be invested on behalf of both Parties. Any direction to Escrow Agent for such investment shall be expressed in a writing by both Parties and be accompanied by the requisite taxpayer identification number and investment forms. Escrow Agent will, upon request, furnish information concerning Escrow Agent's procedures and fee schedules for investment. Any and all additional money deposited with Escrow Agent shall be governed by this Agreement as if the money were deposited at the execution of this Agreement without requirement for any additional investment instructions.

        (a)    In the absence of express written direction concerning investment, the Parties agree Escrow Agent shall be under no duty to invest or reinvest any money at any time held by Escrow Agent hereunder. Escrow Agent shall have the full right, power and authority to commingle any and all money, or portion thereof, deposited under this Agreement with Escrow Agent's other accounts and all income, if any, derived from any use which Escrow Agent may make of any such money shall belong to Escrow Agent.

        (b)    In the event Escrow Agent is requested to invest money deposited hereunder, Escrow Agent is not responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of this Agreement.

*[SIGNATURES ON THE FOLLOWING PAGE]*

PURCHASER:

                    _____

| | |
|---|---|
| Signed By: | Charlie Wilson, President |
| Address: | c/o Charlie Wilson, President |
| | Buckner Retirement Services, Inc. |
| | 700 North Pearl Street, Suite 1200 |
| | Dallas, TX 75201 |
| Phone: | 214-758-8032 |
| E-mail: | cwilson@buckner.org |

SELLER:

                    _____

| | |
|---|---|
| Signed By: | Chad Shandler, Chief Restructuring Officer |
| Address: | c/o Chad Shandler, Chief Restructuring Officer |
| | FTI Consulting, Inc. |
| | 1166 Avenue of the Americas, 15th Floor |
| | New York, NY 10036 |
| Phone: | 212-841-9349 |
| E-mail: | chad.shandler@fticonsulting.com |

ACCEPTED:

ESCROW AGENT:  Chicago Title Insurance Company

By:  _____

Title: _____

**Schedule 1**

(Plan Term Sheet)

**Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way**

**Plan Term Sheet**

**February 7, 2024**

THIS TERM SHEET (THE "TERM SHEET") IS ATTACHED AS **SCHEDULE 1** TO THE PLAN SUPPORT AGREEMENT, DATED AS OF FEBRUARY 7, 2024 (AS THE SAME MAY BE SUPPLEMENTED AND AMENDED, THE "PLAN SUPPORT AGREEMENT"), BY AND AMONG: (1) TARRANT COUNTY SENIOR LIVING CENTER, INC. D/B/A THE STAYTON AT MUSEUM WAY ("THE STAYTON"), (2) BOKF, N.A., AS SUCCESSOR TRUSTEE (THE "MASTER TRUSTEE" UNDER THE MASTER INDENTURE, AS DEFINED BELOW, THE "BOND TRUSTEE" UNDER THE BOND INDENTURE, ALSO DEFINED BELOW, AND THE "TRUSTEE" FOR PURPOSES OF THIS TERM SHEET); (3) EACH (A) BENEFICIAL HOLDER OR INVESTMENT MANAGER OR ADVISOR FOR SUCH BENEFICIAL HOLDERS, COLLECTIVELY WITH THE OTHER BENEFICIAL HOLDERS CURRENTLY HOLDING AT LEAST SIXTY SEVEN PERCENT (67%) OF THE AGGREGATE PRINCIPAL AMOUNT OF THE 2020 BONDS OUTSTANDING THAT ARE SIGNATORIES THERETO AND (B) HOLDER OF THE SERIES 2020 BONDS THAT EXECUTES A JOINDER TO THE PLAN SUPPORT AGREEMENT PURSUANT TO SECTION 6(b) THEREOF (EACH REFERRED TO HEREIN AS A "SUPPORTING HOLDER" AND, COLLECTIVELY, AS THE "SUPPORTING HOLDERS"), AND (4) BUCKNER RETIREMENT SERVICES, INC. ("PLAN SPONSOR"). CAPITALIZED TERMS USED IN THIS TERM SHEET THAT ARE NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN SUPPORT AGREEMENT.

THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL REFUNDING TRANSACTION. THE TRANSACTIONS CONTEMPLATED BY THIS TERM SHEET ARE SUBJECT TO NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE SATISFACTORY TO THE STAYTON, THE SUPPORTING HOLDERS, THE TRUSTEE, AND PLAN SPONSOR.

THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE STATUTES AND DOCTRINES PROHIBITING THE DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES, AND DEFENSES OF THE STAYTON, THE TRUSTEE, THE SUPPORTING HOLDERS, PLAN SPONSOR, AND ALL OTHER PARTIES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE STAYTON.

This Term Sheet sets forth the principal terms of a refinancing of the Series 2020 Bonds and certain other obligations of The Stayton (the "Refunding Transaction") to be implemented through a chapter 11 plan (including any supplement thereto, together with any exhibits, schedules, attachments, or appendices thereto, in each case as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan Support Agreement, the "Plan"). The Refunding Transaction contemplates solicitation of acceptances of the Plan from the Bondholders (defined below) through a prepackaged solicitation and the commencement of a reorganization case (the "Chapter 11 Case") by The Stayton in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") to obtain Bankruptcy Court approval of, and to effectuate, the Refunding Transaction through the Plan.

| | |
|---|---|
| **Overview of Refunding Transaction:** | The purpose of the Refunding Transaction is, among other things, to restructure the Series 2020 Bonds. |
| | The Stayton, with the consent of Plan Sponsor and the Trustee, will prepare a Plan and disclosure statement that will implement the Refunding Transaction, including the: (i) classification and treatment of existing claims and interests in accordance with title 11 of the United States Code (the "Bankruptcy Code"), applicable law, and this Term Sheet; and (ii) exchange of the Series 2020 Bonds for new Series 2024 Bonds (defined below). The Plan will also include customary provisions and conditions precedent to confirmation and the effective date that are in all respects consistent with this Term Sheet. |
| | On the Membership Substitution Effective Date, Lifespace Communities, Inc. shall withdraw as the sole member of The Stayton and Plan Sponsor shall have become the sole member of The Stayton. |
| | Other than the class of holders of claims related to the Series 2020 Bonds, all other classes of claims and interests will be unimpaired and deemed to accept the Plan. |
| **Borrower:** | The Stayton which, following confirmation of the Plan and the occurrence of the effective date thereunder is referred to herein as the "Reorganized Company". |
| **Plan Sponsor:** | Buckner Retirement Services, Inc. shall serve as the sponsor for the Plan. |
| **Bondholders:** | The owners (the "Bondholders") of the Series 2020 Bonds (as defined below). |
| **Bond Indenture:** | Refers to that certain Indenture of Trust dated as of January 1, 2020 (the "Bond Indenture"), between the Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer") and UMB Bank, National Association, as the initial bond trustee. |

| | |
|---|---|
| **Master Indenture:** | Refers to that certain Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement dated as of January 1, 2020, as supplemented and amended (the "Master Indenture"), between The Stayton and UMB Bank, National Association, as the initial master trustee. |
| **Bonds:** | Pursuant to the Bond Indenture, the Issuer has previously issued $112,261,464 of Revenue Bonds and $112,261,464 plus accrued interest and unliquidated fees and expenses is outstanding as of the date hereof (the "Series 2020 Bonds"), for the benefit of The Stayton. |
| **Supporting Holders:** | The Supporting Holders refers to Bondholders that consent to the Refunding Transaction by executing the Plan Support Agreement. |
| **Tax Exempt Status:** | The Reorganized Company will maintain the tax-exempt status of the Series 2024 Bonds for so long as such Series 2024 Bonds remain outstanding. On or before the Member Substitution Effective Date and the date of execution of the New Forbearance Agreement, The Stayton will provide the Trustee with an Opinion of Bond Counsel in a form and substance satisfactory to the Trustee that the Membership Substitution, the New Forbearance Agreement and the other transactions occurring contemporaneously therewith and contemplated by the Term Sheet will not have an adverse effect on the exclusion from federal income taxation afforded to the Series 2020 Bonds. Upon issuance of the Series 2024 Bonds, the Reorganized Company will provide the Trustee with an Opinion of Bond Counsel in a form and substance satisfactory to the Trustee that interest on the Series 2024 Bonds is exempt from federal income tax. |
| **Treatment of Series 2020 Bonds:** | The Plan shall provide that, on the effective date thereunder, the Series 2020 Bonds shall be cancelled and each Bondholder shall receive in respect of its claims under the Series 2020 Bonds its pro rata allocation of the Series 2024 Bonds in exchange therefor. This class shall be deemed impaired. |
| **Material Terms of Series 2024 Bonds:** | See attached Schedule 1. |
| **Treatment of General Unsecured Creditors:** | The Plan shall provide that, on the effective date thereunder, each holder of a general unsecured or trade claim shall: (i) receive cash equal to the full allowed amount of its claim; (ii) otherwise be left unimpaired; or (iii) be paid in the ordinary course of business, unless otherwise agreed to by such holder. This class shall be deemed unimpaired. |
| **Treatment of Administrative Expense Claims** | The Plan shall provide that, on the effective date thereunder, each holder of an allowed administrative expense claim or other priority claim of the Company shall: (i) receive cash equal to the full allowed amount of its |

| | |
|---|---|
| **and Other Priority Claims:** | claim; (ii) otherwise be left unimpaired; or (iii) be paid in the ordinary course of business, unless otherwise agreed to by such holder. |
| **Treatment of Priority Tax Claims:** | On or as soon as practicable after the effective date under the Plan, each holder of a priority tax claim will be treated in accordance with Bankruptcy Code section 1129(a)(9)(C). |
| **Entrance Fees and Resident Contracts:** | The Reorganized Company will assume all existing resident contracts and existing entrance fee and related contractual obligations without modification pursuant to Bankruptcy Code section 365. |
| **Other Unexpired Leases and Executory Contracts:** | Except as otherwise provided herein, the Reorganized Company will assume all of The Stayton's remaining material unexpired leases and executory contracts and pay any related cure amounts pursuant to Bankruptcy Code section 365, other than contracts with The Stayton's affiliates. To the extent The Stayton determines to reject an executory contract or unexpired lease, the Plan Sponsor shall pay or cause The Stayton to pay all damages arising from such rejection. For the avoidance of doubt, this provision assumes that The Stayton will not be a party to any executory contracts or other agreements with Lifespace upon the Membership Substitution Effective Date. Notwithstanding anything to the contrary herein, The Stayton shall not reject any residency agreements or entrance fee refund obligations. |
| **Charter; Bylaws:** | The charter, bylaws, limited liability company agreement, and other organizational documents of the Reorganized Company will (i) be amended or amended and restated by the Reorganized Company consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in accordance with the Plan and the Plan Support Agreement and (ii) be in form and substance reasonably acceptable to The Stayton, the Trustee, and Plan Sponsor. |
| **Employee Matters:** | See detailed discussion in Plan Sponsor's letter dated June 2, 2023. |

| | |
|---|---|
| **Cash Collateral:** | The Stayton will operate during the chapter 11 process by using cash collateral subject to the terms and conditions of an order approving the use of cash collateral, which shall be in form and substance acceptable to The Stayton, the Plan Sponsor, and the Trustee. |
| **Conditions Precedent to Effective Date:** | Unless waived in writing by each of The Stayton, the Trustee, and Plan Sponsor, the occurrence of the effective date under the Plan shall be subject to reasonable and customary conditions precedent, including:<br><br>1. The Bankruptcy Court shall have entered an order confirming the Plan that is final and not subject to stay or pending appeal;<br><br>2. The Plan Support Agreement shall not have been terminated and otherwise shall remain in full force and effect;<br><br>3. On the occurrence of the effective date under the Plan, the conditions to effectiveness of the Series 2024 Bonds and any documents required therefor shall have been satisfied or waived and the Refunding Transaction shall have closed pursuant to the terms of the Plan Support Agreement;<br><br>4. The Definitive Documents (as defined herein) and necessary opinions shall have been negotiated, executed, and delivered; and<br><br>5. All requisite governmental authorities and third parties shall have approved or consented to the Refunding Transaction, to the extent so required. |
| **Definitive Documents:** | The Definitive Documents[2] will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein and consistent with the terms of this Term Sheet in accordance with the Plan Support Agreement. |
| **Releases:** | The Plan will include a release on the effective date of any and all claims and causes of action by The Stayton against (i) any present or former |

---

[2] The "Definitive Documents" are the definitive documents and agreements governing the Plan and the transactions contemplated thereunder (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including: (i) the motion seeking authority to use cash collateral and grant adequate protection and the interim and final orders to be entered by the Bankruptcy Court approving such motion and all security documents and other loan documents in connection therewith; (ii) the Plan (including all exhibits and supplements thereto); (iii) the Disclosure Statement and the other solicitation materials in respect of the Plan; (iv) the confirmation order and pleadings in support of entry of the confirmation order; (v) the Series 2024 Bonds and all related documentation, any other exit financing contemplated by this Term Sheet, and all security documents and related loan documents; (vi) those motions and proposed orders of

| | |
|---|---|
| | partner, member, director, officer, employee, attorney, consultant, or advisor of The Stayton, the Trustee, and Plan Sponsor; and (ii) the Supporting Holders and their advisors, including (if applicable) any claims and causes of action under Chapter 5 of the Bankruptcy Code, which The Stayton has, may have, or could potentially assert against such parties. The Plan shall also provide for the Opt Out Release Notwithstanding the foregoing, the released claims and causes of action shall not include claims or liabilities arising out of or relating to any act or omission that constitutes gross negligence, willful misconduct, fraud, or criminal activity. |
| **Exculpation:** | The Plan will contain a provision exculpating the parties who participated in the plan to the extent permissible under Fifth Circuit law. |
| **Vesting of Assets:** | On the effective date of the Plan, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all assets of The Stayton's estate will vest in the Reorganized Company free and clear of all claims, liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan, which Plan shall expressly provide that the obligations related to the Series 2024 Bonds as evidenced by a note (the "Series 2024 Note") are secured by a first priority lien against all of the Reorganized Company's assets whose terms are reasonably acceptable to the Trustee. |
| **Reservation of Rights:** | Nothing herein is intended to, or does, in any manner waiver, limit, impair, or restrict the ability of each of The Stayton and the Bondholders to protect and fully preserve all of their rights, remedies, and interests, including its claims against The Stayton or any other party in interest. Nothing herein shall be deemed an admission of any kind. If the Refunding Transaction is not consummated, The Stayton and the Bondholders fully reserve any and all of their respective rights. |
| **Disclaimer of Duties:** | Notwithstanding anything to the contrary herein, nothing in this Term Sheet shall require Plan Sponsor, The Stayton, or the Bondholders to take any action or to refrain from taking any action, to the extent required |

---

the Bankruptcy Court that The Stayton files on or after the petition date and seek to have heard on an expedited basis at the "first day" hearing; (vii) the documents or agreements for the governance of the Reorganized Company, including any membership agreements and certificates of incorporation; (viii) all management or consulting agreements of the Reorganized Company; (ix) all agreements relating to warrants or other interests exercisable into shares of the Reorganized Company, if applicable; (x) the Member Substitution Agreement; and (xi) such other documents, pleadings, agreements, or supplements as may be reasonably necessary or advisable to implement the Refunding Transaction, and in the case of all such documents described in clauses (i) through (xi) consistent in all respects with all other terms and provisions of this Term Sheet, and, except as otherwise set forth herein, reasonably acceptable in form and substance to the Trustee, Plan Sponsor, and The Stayton.

| | to comply with its or their obligations under applicable law, including the U.S. Bankruptcy Code. |
|---|---|

**Schedule 1**

**Summary of Terms of New Series 2024 Notes for the Reorganized Company**

| | |
|---|---|
| **Issuer:** | Tarrant County Cultural Education Facilities Finance Corporation |
| **Obligor:** | Tarrant County Senior Living Center, Inc. d/b/a The Stayton at Museum Way ("The Stayton" and, following confirmation of the Plan and the occurrence of the effective date thereunder, the "Reorganized Company"). |
| **Principal Amount:** | $81,000,000 |
| **Interest:** | Interest shall accrue at 5.75% per annum. |
| **Maturity:** | December 1, 2054 |
| **Amortization:** | The Series 2024 Bonds shall amortize pursuant to Addendum A attached hereto. |
| **Collateral:** | The collateral package shall be identical to the collateral provided under the Series 2020 Bonds. |
| **Cash Consideration:** | Upon the Membership Substitution Effective Date, Plan Sponsor shall cause Buckner Foundation, Inc. to provide (a) $5 million to be used to fund (i) administrative expenses and costs of issuance, (ii) the Stayton Financing Related Costs not to exceed $1,825,000, as provided in Section 11(e) of the Plan Support Agreement, and (iii) with any amount in excess of (i) and (ii) to be used as working capital, and (b) $10,000,000 of delayed draw subordinated debt new capital (the "SDNC Loan") to fund future capital expenditures and to provide additional liquidity support to The Stayton. The Plan Sponsor shall transfer funds from the SDNC Loan to the Stayton in the following amounts on the following dates: (a) $3,333,333.33 on the Membership Substitution Effective Date; (b) $3,333,333.33 no later than the earlier of (i) July 1, 2024 and (ii) the date that is one Business Day prior to the Petition Date; and (c) the remainder ($3,333,333.34) as set forth in the "Liquidity Covenant" section of Schedule 2 to the Plan Support Agreement. |

| | |
|---|---|
| | Prior to the effective date of the Plan, The Stayton will have access to the final tranche of the SDNC Loan to ensure adequate liquidity to continue operations and make any required capital expenditure. |
| **Capital Expenditures:** | The Reorganized Company will fund capital expenditures from its Operating Accounts and, to the extent necessary, from proceeds of the SDNC Loan. |
| **Debt Service Reserve Fund:** | The Reorganized Company will fund a portion of a debt service reserve fund (the "2024 Debt Service Reserve Fund") to be held by the Bond Trustee, consistent with the Series 2020 Bonds, in the amount equal to one year of maximum annual debt service on the Series 2024 Bonds (the "2024 Debt Service Reserve Requirement"). The 2024 Debt Service Reserve Fund shall be funded: (i) on the effective date of the Plan via the transfer of the remaining portion of the existing debt service reserve fund under the Series 2020 Bonds, which shall be no less than $3 million, to the 2024 Debt Service Reserve Fund; and (ii) subsequently, on a quarterly basis, from Excess Cash as set forth in the Distribution Waterfall below. The Reorganized Company may request use of the amounts held in the Debt Service Reserve Fund.<br><br>Until the 2024 Debt Service Reserve Fund is fully funded to 2024 Debt Service Reserve Requirement from Excess Cash, a draw on the 2024 Debt Service Reserve Fund shall require the prior written consent of the Majority of Holders.<br><br>After the 2024 Debt Service Reserve Fund is fully funded to 2024 Debt Service Reserve Requirement from Excess Cash[3], any draw on the 2024 Debt Service Reserve Fund shall be replenish in six equal installments, commencing the month after the draw on the first day of the month; provided that any draw which will reduce the 2024 Debt Service Reserve Fund below $2 million will require the prior written consent of the Majority of Holders. |
| **Distribution Waterfall:** | On the first (1st) day of each month, the Borrower shall transfer to the Trustee the following amounts:<br><br>1. One-sixth of interest due on the Series 2024 Bonds on the next interest payment date;<br><br>2. One-twelfth of principal due on the Series 2024 Bonds on the next principal payment date; |

---

[3] Excess Cash means 75% of all cash on hand in the Operating Accounts in excess of 90 Days Cash on Hand; provided however, that 100% of the funds received from the sale or resale of Independent Living Units in The Stayton, including the disbursement of the funds escrowed pursuant to the Resident Option Agreements shall not be included in Excess Cash so long as there is a resident refund queue.

|  | |
|---|---|
|  | 3. Excess Cash for deposit in the 2024 Debt Service Reserve Fund until the balance therein equals the 2024 Debt Service Reserve Fund Requirement (this shall not apply for replenishment in the event of draw on the Debt Service Reserve Fund). |
| **Other Covenants:** | The Reorganized Company will be subject to operating and financial covenants set forth in Schedule 2 to the Term Sheet. Additionally, the Series 2024 Bonds will contain additional covenants substantially similar to those set forth in the Series 2020 Bonds, provided, however, that the following covenants will be altered as follows: <br><br> • the monthly telephone call with beneficial holders in section 4.15(e) of the Master Trust Indenture will be changed to quarterly. |
| **Customary Provisions:** | The Series 2024 Bonds will contain customary material terms and provisions that are found in tax-exempt financing. |

**Schedule 2**

**Operating and Financial Covenants for the Reorganized Company
To be Reflected in the Amended and Restated Master Trust Indenture**

**Effective July 1, 2024 (estimated)**

Rates and Charges.

(a)     Each Obligated Group Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence, including obtaining payment for services provided, as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by it hereunder to the extent permitted by law.  Each Obligated Group Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

The Obligated Group Members covenant and agree that the Obligated Group Representative will calculate the Historical Debt Service Coverage Ratio of the Obligated Group for each Fiscal Year, commencing with the Fiscal Year ended December 31, 2024, and will deliver a copy of such calculation to the Persons to whom such report is required to be delivered under [Section 4.15] herein.  The Obligated Group Members covenant and agree that the Obligated Group Representative will maintain a Historical Debt Service Coverage Ratio of the Obligated Group for each Fiscal Year, commencing with December 31, 2026, of no less than 1.10x and commencing December 31, 2027, of no less than 1.20x (each the "Coverage Requirement").

"Historical Debt Service Coverage Ratio" means, for any period of time, the ratio consisting of a numerator equal to the amount determined by dividing Income Available for Debt Service for that period by the Debt Service Requirements for such period and a denominator of one; provided, however, that in calculating the Debt Service Requirements for such period, (a) the principal amount of any Indebtedness included in such calculation which is paid during such period shall be excluded to the extent such principal amount is paid from the proceeds of other Indebtedness incurred in accordance with the provisions of this Master Indenture, (b) to the extent an Interest Rate Agreement has been entered into in connection with any particular Indebtedness, the actual debt service paid after the effect of payments made to or received from the provider of the Interest Rate Agreement shall be used in the calculation, (c) any Subordinate Obligation or other Subordinated Indebtedness shall be excluded except when making such calculation for the purpose of determining whether payments on such Subordinate Obligation or Subordinated Indebtedness can be made pursuant to [Section 3.09] hereof and (d) any amounts drawn from the SDNC Loan or an Unrestricted Contribution can only be included in Income Available For Debt Service to the extent that amounts were actually transferred to the Borrower's Operating Accounts and available during the calculation period.

"Initial Testing Period" means the Fiscal Year starting immediately after the Fiscal Year ending December 31, 2026.

(b)     If the Historical Debt Service Coverage Ratio of the Obligated Group for any Testing Date, commencing December 31, 2026, is less than Coverage Requirement, the Obligated Group Representative, at the Obligated Group's expense, shall select a Consultant within 30 days following the calculation described herein (or, if the selection of a Consultant is denied pursuant to [Section 4.27(b)] hereof, within 30 days of such denial) to make recommendations with respect to the rates, fees and charges of the Obligated Group Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase such Historical Debt Service Coverage Ratio to at least the Coverage Requirement.

(c)     Within 60 days of retaining any such Consultant, the Obligated Group Representative shall cause a copy of the Consultant's report and recommendations, if any, to be filed with each Obligated Group Member and each Required Information Recipient. Each Obligated Group Member shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined by the Governing Body of such Obligated Group Member) and permitted by law. This Section shall not be construed to prohibit any Obligated Group Member from serving indigent residents to the extent required for such Obligated Group Member to continue its qualification as a Tax Exempt Organization or from serving any other class or classes of residents without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

(d)     Within 180 days of the delivery of the aforementioned described Consultant's report, the Obligated Group Representative shall provide to each Required Information Recipient and conduct a conference call to discuss impact of the recommendations made by the Consultant and implemented by the Obligated Group Representative. The Obligated Group Representative shall post a notice to EMMA of the time and telephone number information relating to the conference call at least seven Business Days prior to the date of the conference call.

(e)     The Obligated Group shall not be required to cause the Consultant's report referred to in the preceding paragraph to be prepared more frequently than once every two Fiscal Years if at the end of the first of such two Fiscal Years the Obligated Group provides to the Master Trustee (who shall provide a copy to each Related Bond Trustee) an opinion of Independent Counsel to the effect that the applicable laws and regulations underlying the Consultant's report delivered in respect of the previous Fiscal Year have not changed in any material way.

(f)     If the Obligated Group fails to achieve a Historical Debt Service Coverage Ratio of 1.20:1 for any Fiscal Year (or, in the case of the Initial Testing Period, a Historical Debt Service Coverage Ratio of 1.10:1), such failure shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a report and adopting a plan and follows each recommendation contained in such report to the extent feasible (as determined by the Governing Body of such Obligated Group Member) and permitted by law.

If the Obligated Group fails to achieve a Historical Debt Service Coverage Ratio of at least 1.00:1 for any Fiscal Year commencing December 31, 2026, such failure shall constitute an Event of Default under this Master Indenture.

**Liquidity Covenant**

The Obligated Group covenants that it will calculate the Days Cash on Hand of the Obligated Group as of June 30 and December 31 of each Fiscal Year, commencing December 31, 2024 (each such date being a "Testing Date"). The Obligated Group Representative shall deliver an Officer's Certificate setting forth such calculation as of each Testing Date to the Master Trustee not less than 45 days after such Testing Date, and include such calculation in the Officer's Certificate delivered pursuant to [Section 4.15] hereof. "Days Cash on Hand" means all unrestricted cash and investments on deposit in the Borrower's operating accounts and shall include any amounts drawn upon the SDNC Loan and on deposit in the Borrower's operating accounts at the time of such calculation.

Each Obligated Group Member is required to conduct its business so that on the Testing Dates set forth immediately below, the Obligated Group shall have not less than the Days Cash on Hand set forth below (the "Liquidity Requirement"):

| December 31, 2024 | 40 Days Cash on Hand |
| June 30, 2025 | 27 Days Cash on Hand |
| December 31, 2025 | 15 Days Cash on Hand |
| June 30, 2026 | 41 Days Cash on Hand |
| December 31, 2026 | 68 Days Cash on Hand |
| June 30, 2027 | 77 Days Cash on Hand |
| December 31, 2027 | 86 Days Cash on Hand |
| June 30, 2028 | 103 Days Cash on Hand |
| December 31, 2028, and thereafter | 120 Days Cash on Hand |

If the number of Days Cash on Hand as of any Testing Date is less than the Liquidity Requirement, the Obligated Group Representative shall, within 30 days after delivery of the Officer's Certificate disclosing such deficiency, (i) transfer such funds from the SDNC to increase the amount of Days Cash on Hand to meet the Liquidity Requirement so long as such transfer would not result in the balance of the SDNC Loan to exceed $10,000,000; and, (ii) deliver an Officer's Certificate approved by a resolution of the Governing Body of the Obligated Group Representative to the Master Trustee setting forth in reasonable detail the reasons for such deficiency and adopting a specific plan setting forth steps to be taken designed to raise the level of Days Cash on Hand to the Liquidity Requirement for future Testing Dates.

If the Obligated Group has not raised the level of Days Cash on Hand to the Liquidity Requirement by the next Testing Date immediately subsequent to delivery of the Officer's Certificate required in the preceding paragraph, the Obligated Group Representative shall, within 30 days after delivery of the Officer's Certificate disclosing such deficiency (or, if the selection of a Consultant is denied pursuant to [Section 4.27(b)] hereof, within 30 days of such denial), select a Consultant to make recommendations with respect to the rates, fees and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase Days Cash on Hand to the Liquidity Requirement for future Testing Dates. A copy of the Consultant's report and recommendations, if any, shall be filed with each Obligated Group Member and each Required Information Recipient within 60 days after the date such Consultant is actually engaged. Each Obligated Group Member shall follow each recommendation of the Consultant applicable to it to the extent feasible (as determined by the Governing Body of such Obligated Group Member) and permitted by law.

Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the required Liquidity Requirement for any Testing Date shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for adopting a plan and follows each recommendation contained in such plan or Consultant's report to the extent feasible (as determined by the Governing Body of such Obligated Group Member) and permitted by law.

**Approval of Consultants**

(a)     If at any time the Obligated Group Members are required to engage a Consultant under the provisions of this Master Indenture (other than with respect to the calculations required by Sections 4.16 (relating to Additional Indebtedness) and 4.18 (relating to Sale or Lease of Property) hereof and any determination of the Projected Rate hereunder, to which the provisions of this [Section 4.27] shall not apply), such Consultant shall be engaged in the manner set forth in this [Section 4.27].

(b)     Upon selecting a Consultant as required under the provisions of this Master Indenture, the Obligated Group Representative will notify the Master Trustee and the Required Information Recipient of such selection.  The Master Trustee shall, as soon as practicable but in no case longer than five Business Days after receipt of notice, notify the Holders of all Obligations Outstanding under this Master Indenture of such selection.  Such notice (which shall be provided by the Obligated Group Representative) shall (i) include the name of the Consultant and a brief description of the Consultant, (ii) state the reason that the Consultant is being engaged including a description of the covenant(s) of this Master Indenture that require the Consultant to be engaged, (iii) state the date of a conference call (the "Consultant Conference Call"), to be held no later than five Business Days thereafter, between the Obligated Group Representative and Holders of all Obligations Outstanding wherein the Obligated Group Representative shall describe the process that was undertaken for the selection of the Consultant and the reasons for the selection of that particular Consultant and (iv) state that the Holder of the Obligations will be deemed to have consented to the selection of the Consultant named in such notice and discussed on the Consultant Conference Call unless such Holder submits an objection to the selected Consultant in writing (in a manner acceptable to the Master Trustee) to the Master Trustee within fourteen Business Days of the date of the Consultant Conference Call (the "Consultant Response Period").  No later than two Business Days after the end of the Consultant Response Period, the Master Trustee shall notify the Obligated Group Representative of the number of objections.  If the Majority Holders have been deemed to have consented to the selection of the Consultant or have not responded to the request for consent, the Obligated Group Representative shall engage the Consultant within three Business Days after the end of the Consultant Response Period.  If the Majority Holders have objected to the Consultant selected, the Obligated Group Representative shall select another Consultant which may be engaged upon compliance with the procedures of this [Section 4.27].

(c)     When the Master Trustee notifies the Holders of Obligations of such selection, the Master Trustee will also request any Related Bond Trustee to send a notice containing the information required by subparagraph (b) above to the registered owners of all of the Related Bonds outstanding.  Such Related Bond Trustee shall, as the Holder of an Obligation securing such Related Bonds, consent or object to the selection of the Consultant in accordance with the response of the registered owners of such Related Bonds. If the registered owners of a majority in aggregate principal amount of the Related Bonds have been deemed to have consented to the selection of the Consultant or have not responded to the request for consent, the Related Bond Trustee shall notify the Master Trustee that it consents to the selection of the Consultant.  If the registered owners of a majority in aggregate principal amount of the Related Bonds outstanding have objected to the Consultant selected, the Related Bond Trustee shall notify the Master Trustee that it objects to the Consultant selected.

The Consultant Response Period described in (b) above may be extended by the Master Trustee in order to permit each Related Bond Trustee to give the owners of the Related Bonds fourteen Business Days to respond to the notice given by the Related Bond Trustee.  By acceptance of an Obligation securing any Related Bonds, the Related Bond Trustee agrees to comply with the provisions of this [Section 4.27].

**Payment of Subordinated Indebtedness**

(a)     An Obligated Group Member will not make payments on Subordinated Indebtedness unless the following condition is satisfied:

(i)     (A) if the proposed payment had occurred as of the last day of the most recent fiscal quarter for which financial statements have been delivered under [Section 4.15] hereof or otherwise posted to EMMA, the Obligated Group would have had at least 220 Days Cash on Hand, after giving effect to such payment, as of such date; and

(B) if the proposed payment had occurred during the most recent Fiscal Year for which financial statements have been delivered under [Section 4.15] hereof or otherwise posted to EMMA, the Historical Debt Service Coverage Ratio calculated as of the end of the last two Fiscal Years would have been not less than 1.90:1.

(b)     Notwithstanding the satisfaction of the conditions set forth in [Section 3.09(a)] hereof, an Obligated Group Member will not make payments on Subordinated Indebtedness unless:

(i)     there is no deficiency in the bond fund or the debt service reserve fund with respect to any Outstanding Obligations or Related Bonds;

(iii)     all principal and interest due on all Senior Obligations have been paid in full; and

(iv)     and there is no event existing that constitutes, or with the giving of notice or the passing of time or both would constitute, an Event of Default under this Master Indenture.

(c)     All payments on Subordinated Indebtedness in a fiscal period shall be subordinated to all payments due on any Senior Obligations Outstanding in such period.

(d)     Payments of principal and interest on Subordinated Indebtedness which are not permitted to be paid pursuant to the foregoing requirements shall be deferred but, unless otherwise provided in a Supplement governing such Subordinated Indebtedness, shall be subject to accrual of interest during the period of deferral.  Subordinated Indebtedness may not be accelerated without the prior written consent of each Holder of Senior Obligations and holders of Subordinated Indebtedness shall agree to subordination provisions in form and substance acceptable to the Trustee.

**Admission into the Buckner Obligated Group**

The Obligor shall use its best efforts to become a member of the Obligated Group (as defined in the Master Trust Indenture dated as of July 1, 2007 (the "Buckner MTI"), as supplemented, between Buckner and UMB Bank, National Association, as master trustee) from and after the date on which the Obligated Group Representative which demonstrates that (a) the Historical Debt Service Coverage Ratio of the Obligated Group for the two most recent Fiscal Years was not less than 1.90:1, (b) the Obligated Group had at least 220 Days Cash on Hand as of December 31 of the most recent Fiscal Year and (c) the Obligated Group is then in compliance with the terms and conditions of the Master Trust Indenture.

**Financial Statements, Etc.**

(a) The Obligor covenants that they will keep or cause to be kept proper books of records and accounts in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Obligated Group in accordance with generally accepted accounting principles consistently applied except as may be disclosed in the notes to the audited financial statements referred to in subparagraph (b) below. To the extent that generally accepted accounting principles would require consolidation of certain financial information of entities which are not Members of the Obligated Group with financial information of one or more Members, consolidated financial statements prepared in accordance with generally accepted accounting principles which include information with respect to entities which are not Members of the Obligated Group may be delivered in satisfaction of the requirements of this [Section 4.15] so long as: (i) supplemental information in sufficient detail to separately identify the information with respect to the Members of the Obligated Group is delivered to the Required Information Recipients with the audited financial statements; (ii) such supplemental information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements delivered to the Required Information Recipients and is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole; and (iii) such supplemental information is used for the purposes hereof or for any agreement, document or certificate executed and delivered in connection or pursuant to this Master Indenture.

(b) The Obligated Group Representative will furnish or cause to be furnished to each Required Information Recipient (and the Master Trustee shall have no duty or obligation to review or examine the contents thereof), the information described below along with any appropriate cover letter, explanation or disclaimer as the Obligated Group Representative may deem to be appropriate to the information provided.

(i) Monthly Reporting. A monthly statement of the Obligated Group as soon as practicable after the information is available but in no event more than 45 days after the completion of such month describing: (1) occupancy levels of the Project as of the end of such month including the number of Entrance Fee Units that were Occupied and vacated during that month and on an aggregate basis; (2) a report on the number of internal transfers and direct admit residents to the assisted living and memory support units; and, (3) an unaudited statement of revenues and expenses and statement of cash flows of the Obligated Group for such month compared to the approved budget for that month and an unaudited balance sheet of the Obligated Group as of the end of such month all in reasonable detail and certified by an officer of the Obligated Group Representative. The Obligated Group Representative does not need to deliver any monthly statement of the Obligated Group described in this subsection at any time that the Debt Service Coverage Ratio was greater than 1.30:1.0.

(ii) Quarterly Reporting. Within 45 days of the end of each fiscal quarter the following items will be prepared in reasonable detail, certified (subject to year-end adjustment) in an Officer's Certificate of the Obligated Group Representative, and shall be accompanied by a comparison to the Annual Budget for such fiscal quarter and a management's discussion and analysis of results, if applicable:

(A) quarterly unaudited financial statements of the Obligated Group, including a combined or combining statement of revenues and expenses and statement of cash flows of the Obligated Group during such period, and a combined or combining balance sheet as of the end of each such fiscal quarter;

(B)     calculation of the Days Cash on Hand;

(C)     calculation of the Historical Debt Service Coverage Ratio;

(D)     statistics for marketing and occupancy for all units by level of care and, if applicable, payor mix for any health center containing nursing beds for such fiscal quarter (similar, in the sole opinion of the Obligated Group Representative, to the statistics typically provided in offering documents or disclosure for debt financing of facilities similar to the Facilities of the Obligated Group's Members from time to time).

(iii)    <u>Annual Reporting</u>.

(A)     Within 150 days of the end of each Fiscal Year, commencing with the Fiscal Year in which the Initial Occupancy Date occurs, the following items:

(1)     an annual audited financial report of the Obligated Group prepared by Accountants, including a combined and an unaudited combining balance sheet as of the end of such Fiscal Year, a combined and an unaudited combining statement of cash flows for such Fiscal Year, and a combined and an unaudited combining statement of revenues and expenses for such Fiscal Year, showing in each case in comparative form the financial figures for the preceding Fiscal Year;

(2)     a separate written statement of the Accountants preparing the report in (A) above (or another firm of Accountants), containing calculations based on the annual audited financial report referenced in (A) above of the Obligated Group's Historical Debt Service Coverage Ratio and the Days Cash on Hand at the end of such Fiscal Year and a statement that such Accountants have no knowledge of any Event of Default under this Master Indenture insofar as it relates to accounting matters or the Obligated Group's Historical Debt Service Coverage Ratio or the Liquidity Requirement, or if such Accountants shall have obtained knowledge of any such Event of Default, they shall disclose in such statement the Event of Default and the nature thereof;

(3)     an Officer's Certificate of the Obligated Group Representative (1) stating that the Obligated Group is in compliance with all of the terms, provisions, and conditions of this Master Indenture, any Related Loan Agreement, and any Related Bond Indenture, or, if not, specifying all such defaults and the nature thereof, and (2) calculating and certifying the Days Cash on Hand, the Historical Debt Service Coverage Ratio and the marketing and occupancy statistics (similar to the statistics typically provided in offering documents or disclosure for debt financing such Facilities from time to time), as of the end of such Fiscal Year;

(4)     a management's discussion and analysis of results for such Fiscal Year;

(5)     a comparison of the audited financial reports with the Annual Budget for the preceding Fiscal Year; and

(6)     a report which sets forth the payor mix and the number of stars awarded to the Obligated Group pursuant to the Centers of Medicare and Medicaid Services Five-Star Quality Rating System, if applicable, with respect to any skilled nursing beds at the Facilities.

(B)      At least 60 days prior to the end of each Fiscal Year, commencing with the Fiscal Year beginning January 1, 2025, a summary of the Obligated Group's annual operating and capital budget for the coming Fiscal Year, including a schedule that shows Entrance Fees and monthly service fees for each type of Independent Living Unit;

(iv)      <u>Periodic Reporting</u>.  Upon occurrence of the following events the items described below:

(A)      at least 15 days prior to the first day of each Fiscal Year, the Annual Budget for the following Fiscal Year; provided, however, (1) if the Obligated Group Representative fails to prepare and deliver the Annual Budget for any Fiscal Year, the Annual Budget for the preceding Fiscal Year will continue until the Annual Budget is prepared and delivered for the remainder of the applicable Fiscal Year and (2) any material revision to the Annual Budget shall also be delivered;

(B)      notification that the Obligor has received correspondence from the Internal Revenue Service concerning the commencement or conclusion of an audit relating to either the status of the Obligor as an organization described in section 501(c)(3) of the Code or to the tax-exempt status of any Related Bonds, promptly upon receipt of such correspondence;

(C)      to the extent that any Obligated Group Member incurs permitted Additional Indebtedness of a form for which there is not a CUSIP number (the "non-Public Debt"), the Obligated Group Representative will provide a copy of the financing document (with non-material information redacted in the sole discretion of the Obligated Group Representative) relating to such non-Public Debt and a debt service schedule showing the principal and interest associated with each series of Related Bonds then outstanding as well as the non-Public Debt and the aggregate debt service of the Obligated Group; provided, however, to the extent that the non-Public Debt is used to construct additional units at the Facilities, the Obligated Group Representative will provide monthly reports (1) regarding whether the construction of additional units is within the construction budget and if not, a brief explanation and a copy of any revised budget, and on schedule with the construction timetable and if not, a brief explanation and a copy of any revised timetable and (2) reconciling the amount of construction contingency remaining and the uses of contingency funds to date;

(D)      within 10 days after its receipt thereof, the Obligated Group Representative will file with the Required Information Recipients a copy of each Consultant's final report or counsel's opinion required to be prepared under the terms of this Master Indenture; and

(E)      such additional information as the Master Trustee or any Related Bond Trustee may reasonably request concerning any Member in order to enable the Master Trustee or such Related Bond Trustee to determine whether the covenants, terms and provisions of this Master Indenture have been complied with by the Members.

(c)      If any Related Bonds are then rated by a Rating Agency, the Obligated Group Representative shall give notice to such Rating Agency promptly after the occurrence of any of the following events:  (i) any Event of Default hereunder; (ii) the incurrence by any Obligated Group Member of any Funded Indebtedness (however, notice need not be provided for Finance Leases where the net present value of the minimum Finance Lease payment is less than $100,000); (iii) any addition to or withdrawal from the

Obligated Group; and (iv) the execution of any Interest Rate Agreement entered into by any Obligated Group Member.

(d)        The Obligated Group Representative shall give prompt written notice of a change of Accountants by the Obligated Group to the Master Trustee and each Related Bond Trustee.  The notice shall state (i) the effective date of such change; (ii) whether there were any unresolved disagreements with the former Accountants on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which the Accountants claimed would have caused them to refer to the disagreement in a report on the disputed matter, if it was not resolved to their satisfaction; and (iii) such additional information relating thereto as such Related Bond Trustee or the Master Trustee may reasonably request.

(e)        Without limiting the foregoing, each Member will permit, upon reasonable notice, the Master Trustee or any such Related Bond Trustee (or such persons as they may designate) to visit and inspect, at the expense of such Person, its Property and to discuss the affairs, finances and accounts of the Obligated Group with its officers and independent Accountants, all at such reasonable times and locations and as often as the Master Trustee or such Related Bond Trustee may reasonably desire.

(f)        The Obligated Group Representative may designate a different Fiscal Year for the Members of the Obligated Group by delivering a notice to the Master Trustee designating the first and last day of such new Fiscal Year and whether or not there will be any interim fiscal period (the "Interim Period") of a duration of greater than or less than 12 months preceding such new Fiscal Year.  The Members covenant that they will furnish to the Master Trustee and each Related Bond Trustee, as soon as practicable after they are available, but in no event more than 150 days after the last day of such Interim Period, a financial report for such Interim Period certified by Accountants selected by the Obligated Group Representative covering the operations of the Obligated Group for such Interim Period and containing a combined balance sheet as of the end of such Interim Period and a combined statement of changes in fund balances and changes in financial position for such Interim Period and a combined statement of revenues and expenses for such Interim Period, showing in each case in comparative form the financial figures for the comparable period in the preceding Fiscal Year, together with a separate written statement of the Accountants preparing such report containing a calculation of the Obligated Group's Historical Debt Service Coverage Ratio for the Interim Period and a statement that such Accountants have obtained no knowledge of any default by any Member in the fulfillment of any of the terms, covenants, provisions or conditions of this Master Indenture, or if such Accountants shall have obtained knowledge of any such default or defaults, they shall disclose in such statement the default or defaults and the nature thereof (but such Accountants shall not be liable directly or indirectly to anyone for failure to obtain knowledge of any default).

(g)        With the exception of the Officer's Certificates provided pursuant to [Sections 4.15(b)(ii) and (b)(iii)(C)] hereof, delivery of the reports, information and documents described in this [Section 4.15] to the Master Trustee is for informational purposes only, and the Master Trustee's receipt thereof shall not constitute notice to it of any information contained therein or determinable from information contained therein, including compliance by the Obligated Group or the Members with any of its or their covenants hereunder.

**<u>Permitted Additional Indebtedness</u>**

So long as any Obligations are outstanding, the Obligated Group will not incur any Additional Indebtedness (whether or not incurred through the issuance of Additional Obligations) other than:

(a)        Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of this [Section 4.16] and any Member wishes to have such

Indebtedness classified as having been issued under this subsection (a), prior to such classification, there is delivered to the Master Trustee:

(i)     an Officer's Certificate to the effect that for the most recent Fiscal Year for which audited financial statements have been filed with the Master Trustee as required by this Master Indenture, the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group was not less than 1.35:1; or

(ii)     (A) an Officer's Certificate to the effect that for the most recent Fiscal Year or four consecutive quarters for which audited financial statements have been filed with the Master Trustee as required by this Master Indenture, the Historical Debt Service Coverage Ratio of the Obligated Group was not less than 1.20:1; and (B) a written report of a Consultant (prepared in accordance with industry standards) to the effect that the estimated Projected Debt Service Coverage Ratio of the Obligated Group will be not less 1.25:1 for the first full Fiscal Year following the later of (1) the estimated completion of the development, marketing, acquisition, construction, renovation or replacement being paid for with the proceeds of such additional Funded Indebtedness or (2) the first full Fiscal Year following the attainment of Stable Occupancy in the case of construction, renovation or replacement of senior living facilities being financed with the proceeds of such additional Funded Indebtedness, provided that the attainment of Stable Occupancy is projected to occur no later than during the fifth full Fiscal Year following the incurrence of such Funded Indebtedness, or (3) following the incurrence of Funded Indebtedness for other purposes; provided that such report shall include forecast balance sheets, statements of revenues and expenses and statements of changes in financial position for such Fiscal Year and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing facilities and the debt service on the Obligated Group's other existing Indebtedness during such Fiscal Year.

(b)     Funded Indebtedness for the purpose of refunding (whether in advance or otherwise, including without limitation refunding through the issuance of Crossover Refunding Indebtedness) any outstanding Funded Indebtedness if prior to the incurrence thereof an Officer's Certificate of a Member is delivered to the Master Trustee stating that, taking into account the issuance of the proposed Funded Indebtedness and the application of the proceeds thereof and any other funds available to be applied to such refunding, the Maximum Annual Debt Service Requirement of the Obligated Group will not be increased by more than 10%, provided that if only a portion of any outstanding Funded Indebtedness is being refunded, such Officer's Certificate shall state that under such assumptions the Maximum Annual Debt Service Requirement of the Obligated Group will not be increased.

(c)     Short Term Indebtedness (other than accounts payable under subsection (h) hereof), in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short Term Indebtedness of the Obligated Group then outstanding under this subsection (d) but excluding the principal payable on all Funded Indebtedness during the next succeeding 12 months and also excluding such principal to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increments to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal, exceed 10% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported upon by independent certified public Accountants are available; provided, however, that for a

period of 20 consecutive calendar days in each Fiscal Year the total amount of such Short Term Indebtedness of the Obligated Group outstanding under this subsection (d) shall be not more than 5% of the Revenues of the Obligated Group during the preceding Fiscal Year plus such additional amount as the Obligated Group Representative certifies in an Officer's Certificate is (A) attributable to Short Term Indebtedness incurred to offset a temporary delay in the receipt of funds due from third party payors and (B) in the minimum amount reasonably practicable taking into account such delay. For the purposes of this subsection, Short Term Indebtedness shall not include overdrafts to banks to the extent there are immediately available funds of the Obligated Group sufficient to pay such overdrafts and such overdrafts are incurred and corrected in the normal course of business.

(d)     Liabilities for contributions to self insurance or shared or pooled risk insurance programs required or permitted to be maintained under this Master Indenture.

(e)     Indebtedness consisting of accounts payable incurred in the ordinary course of business or other Indebtedness not incurred or assumed primarily to assure the repayment of money borrowed or credit extended which Indebtedness is incurred in the ordinary course of business, including but not limited to deferred obligations for the refund or repayment of Entrance Fees.

(f)     Indebtedness incurred in connection with a sale or pledge of accounts receivable with or without recourse by any Member consisting of an obligation to repurchase all or a portion of such accounts receivable upon certain conditions, provided that the principal amount of such Indebtedness permitted hereby shall not exceed the aggregate sale price of such accounts receivable received by such Member, with Holder Consent.

(g)     Non-Recourse Indebtedness, without limit.

(h)     Subordinated Indebtedness, provided that the lender is [Buckner], the maximum outstanding amount not to exceed $10 million, without prior consent of the Majority of the Holders, and the lender agrees to subordination provisions in form and substance acceptable to the Master Trustee.

(i)     Commitment Indebtedness, without limit.

(j)     Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then outstanding which was issued pursuant to the provisions of this subsection [(n)] and which has not been subsequently reclassified as having been issued under another subsection of this [Section 4.16], does not exceed 10% of the Revenues of the Obligated Group for the latest preceding Fiscal Year for which financial statements reported upon by independent certified public Accountants are available; provided, however, that the total amount of all Indebtedness outstanding which was issued pursuant to the provisions of subsection [(d)] and this subsection [(n)] shall not exceed 15% of the Revenues of the Obligated Group for the most recent Fiscal Year for which financial statements reported on by independent certified public Accountants are available.

It is agreed and understood by the parties hereto that various types of Indebtedness may be incurred under any of the above referenced subsections with respect to which the tests set forth in such subsection are met and need not be incurred under only a subsection specifically referring to such type of Indebtedness (e.g., Balloon Indebtedness and Put Indebtedness may be incurred under subsection (a) above if the tests therein are satisfied).

Each Member covenants that Indebtedness of the type permitted to be incurred under subsection (h) above will not be allowed to become overdue for a period in excess of that which is ordinary for similar institutions without being contested in good faith and by appropriate proceedings.

Each Member covenants that prior to, or as soon as reasonably practicable after, the incurrence of Indebtedness by such Member for money borrowed or credit extended, or the equivalent thereof, after the date of issuance of the Series 2024 Notes, it will deliver to the Master Trustee an Officer's Certificate which identifies the Indebtedness incurred, identifies the subsection of this [Section 4.16] pursuant to which such Indebtedness was incurred, demonstrates compliance with the provisions of such subsection and attaches a copy of the instrument evidencing such Indebtedness; provided, however, that this requirement shall not apply to Indebtedness incurred pursuant to subsection (g) or (h) of this [Section 4.16].

Each Member agrees that, prior to incurring Additional Indebtedness for money borrowed from or credit extended by entities other than issuers of Related Bonds, sellers of real or personal property for purchase money debt, lessors of such property or banks or other institutional lenders, it will provide the Master Trustee with an opinion of Independent Counsel to the effect that, to such Counsel's knowledge, such Member has complied in all material respects with all applicable state and federal laws regarding the sale of securities in connection with the incurrence of such Additional Indebtedness (including the issuance of any securities or other evidences of indebtedness in connection therewith) and such Counsel has no reason to believe that a right of rescission under such laws exists on the part of the entities to which such Additional Indebtedness is to be incurred.

The provisions of this Master Indenture notwithstanding, the Members of the Obligated Group may not incur any Additional Indebtedness the proceeds of which will be used for the acquisition of real Property or the construction of any Facilities unless the right, title and interest in any assets to be financed or refinanced with the proceeds of such Additional Indebtedness and the real estate upon which such assets will be located have been mortgaged and assigned to the Master Trustee pursuant to this Master Indenture or the Deeds of Trust and such assets and real estate are not subject to any other Lien except for Permitted Encumbrances.


## Occupancy Covenant

The Obligated Group covenants that (A) for each fiscal quarter commencing with the first fiscal quarter subsequent to the [Membership Substitution Date] until December 31, 2024, the Obligated Group have Occupied the percentage of the total number of all Independent Living Units (the "Percentage of Units Occupied") at or above 78%, (B) for each fiscal quarter commencing with the first fiscal quarter thereafter until December 31, 2025, the Obligated Group will have the Percentage of Units Occupied at or above 80%, and (C) for each fiscal quarter commencing with the first fiscal quarter thereafter, the Obligated Group will have the Percentage of Units Occupied at or above 84%, in each case which level shall be measured as of the last day of the applicable Occupancy Quarter (the "Occupancy Requirements"):

If the Percentage of Units Occupied for any Occupancy Quarter is less than the Occupancy Requirement set forth above for two consecutive Occupancy Quarters, the Obligated Group Representative shall within 30 days thereafter submit an Officer's Certificate to the Master Trustee setting forth in detail the reasons therefor and the plan to increase the Percentage of Units Occupied to at least the Occupancy Requirement set forth above for future periods (a "Corrective Occupancy Action Plan").

If the Percentage of Units Occupied for any three consecutive fiscal quarters is less than the Occupancy Requirement set forth above for those fiscal quarters, the Obligated Group Representative shall select a Consultant in accordance with [Section 4.27] hereof within 30 days thereafter to prepare a report which addresses the information identified in the Corrective Occupancy Action Plan described above and to make recommendations regarding the actions to be taken to increase the Percentage of Units Occupied

to at least the Occupancy Requirement set forth above for future periods. Within 60 days of the actual engagement of any such Consultant, the Obligated Group Representative shall cause a copy of the Consultant's report and recommendations, if any, to be filed with each Member and each Required Information Recipient [or otherwise posted on EMMA]. Each Member shall follow each recommendation of the Consultant to the extent permitted by law. The Obligated Group shall not be required to obtain a Consultant's report for failing to meet an Occupancy Requirement if such failure occurs within three fiscal quarters of the failure that triggered the delivery of a prior Consultant's report addressing the information identified in the Corrective Occupancy Action Plan described above.

Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Occupancy Requirement for any Occupancy Quarter shall not constitute an Event of Default under this Master Indenture if the Obligated Group takes all action necessary to comply with the procedures set forth above for preparing a Corrective Occupancy Action Plan and for obtaining a Consultant's report and adopting a plan and follows each recommendation contained in such Corrective Occupancy Action Plan or Consultant's report to the extent permitted by law.

The Occupancy Covenant will terminate upon the Obligated Group submitting annual financial statements demonstrating a Debt Service Coverage Ratio of at least 1.25:1.0 for two consecutive Fiscal Years.

## **CAPEX Covenant**

Until the Obligor is admitted into the Obligated Group, Obligated Group Members shall give prior written notice to the Trustee and Bondholders of any capital expenditures of $2,000,000 or more on any particular project.

## **No Sale/Transfer of Property**

The following shall apply in lieu of Section 4.18 of the Master Indenture.

Sale or Lease of Property. Each Member agrees that it will not sell, lease, donate, transfer or otherwise dispose (including without limitation any involuntary disposition) of Property (either real or personal property, including Cash and Investments) unless the Obligated Group Representative determines that the Property has been sold, leased, donated, transferred or otherwise disposed of in one or more of the following transfers or other dispositions of Property:

1. Cash in the ordinary course of business in an arm's length transaction;

2. Tangible personal property to any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

3. To any Person if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations.

For avoidance of doubt, it is understood that this Section [4.18] does not prohibit any transfer of cash by a Member in payment of any of its obligations, indebtedness and liabilities, the incurrence of which obligation, indebtedness or liability did not or would not, either immediately or with the giving of notice, the passage of time or both, result in the occurrence of an Event of Default.

For purposes of this Section [4.18], payments by the Obligated Group of any development, marketing, operating, or other subordinated fees that have been deferred from the year in which they were originally due as a result of subordination will not be treated as a disposition of Property.

Upon Request of the Obligated Group Representative accompanied by an Officer's Certificate and an Opinion of Counsel to the effect that the conditions precedent for the disposition of such property set forth in this Section [4.18] have been satisfied, the rights, title, liens, security interests and assignments herein granted shall cease, determine and be void as to such property only and the lien of this Indenture shall be released by the Master Trustee as to such property in due form at the expense of the Obligated Group Members.

The following shall apply in lieu of Section 5.01 of the Master Indenture.

<u>Merger, Consolidation, Sale or Conveyance; Change of Control</u>.  (a) Each Member agrees that it will not merge into, or consolidate with, one or more corporations which are not Members, or allow one or more of such corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, without the prior written consent of the Majority of Holders.

(b) Each Member covenants that it will not enter into any agreement or take or permit to be taken any action that results in a change in control of such Member without receiving the prior consent of the Holders of not less than 66% in aggregate principal amount of the Obligations.  For purposes of this definition, "change in control" when used with respect to any Member means any change in the membership interests of such Member or change whereby another Person or entity has rights to appoint or remove members of the board of directors or trustees of such Member or any other ownership or parent interest in the Member; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.
Sections 6.01 and 6.03 of the Master Indenture shall be amended such that no Member may enter or withdraw from the Obligated Group without consent of the Majority of Holders, except that the Obligor may become a member of the Buckner Obligated Group under the Buckner MTI.

# **Addendum A**

(Amortization Schedule)

**SOURCES AND USES OF FUNDS**

**Stayton**
**Series 2024 Membership Substitution**

Dated Date            12/01/2024
Delivery Date         12/01/2024

| Sources of Funds | Par Amount | Plus: Accrued | Less: Discount | Total |
|---|---|---|---|---|
| Bond Proceeds: | | | | |
| 2024 Member Substitution | 81,000,000.00 | | | 81,000,000.00 |
| | 81,000,000.00 | 0.00 | 0.00 | 81,000,000.00 |

| Uses of Funds | Par Amount | Plus: Accrued | Less: Discount | Total |
|---|---|---|---|---|
| Project Fund Deposits: | | | | |
| Project Fund | 81,000,000.00 | | | 81,000,000.00 |
| | 81,000,000.00 | 0.00 | 0.00 | 81,000,000.00 |

**BOND DEBT SERVICE**

**Stayton**
**Series 2024 Membership Substitution**

| Period Ending | Principal | Coupon | Interest | Debt Service |
|---|---|---|---|---|
| 12/01/2025 | | | 4,657,500.00 | 4,657,500.00 |
| 12/01/2026 | | | 4,657,500.00 | 4,657,500.00 |
| 12/01/2027 | 800,000 | 5.750% | 4,657,500.00 | 5,457,500.00 |
| 12/01/2028 | 1,310,000 | 5.750% | 4,611,500.00 | 5,921,500.00 |
| 12/01/2029 | 1,385,000 | 5.750% | 4,536,175.00 | 5,921,175.00 |
| 12/01/2030 | 1,465,000 | 5.750% | 4,456,537.50 | 5,921,537.50 |
| 12/01/2031 | 1,550,000 | 5.750% | 4,372,300.00 | 5,922,300.00 |
| 12/01/2032 | 1,635,000 | 5.750% | 4,283,175.00 | 5,918,175.00 |
| 12/01/2033 | 1,730,000 | 5.750% | 4,189,162.50 | 5,919,162.50 |
| 12/01/2034 | 1,830,000 | 5.750% | 4,089,687.50 | 5,919,687.50 |
| 12/01/2035 | 1,935,000 | 5.750% | 3,984,462.50 | 5,919,462.50 |
| 12/01/2036 | 2,045,000 | 5.750% | 3,873,200.00 | 5,918,200.00 |
| 12/01/2037 | 2,165,000 | 5.750% | 3,755,612.50 | 5,920,612.50 |
| 12/01/2038 | 2,290,000 | 5.750% | 3,631,125.00 | 5,921,125.00 |
| 12/01/2039 | 2,420,000 | 5.750% | 3,499,450.00 | 5,919,450.00 |
| 12/01/2040 | 2,560,000 | 5.750% | 3,360,300.00 | 5,920,300.00 |
| 12/01/2041 | 2,705,000 | 5.750% | 3,213,100.00 | 5,918,100.00 |
| 12/01/2042 | 2,860,000 | 5.750% | 3,057,562.50 | 5,917,562.50 |
| 12/01/2043 | 3,025,000 | 5.750% | 2,893,112.50 | 5,918,112.50 |
| 12/01/2044 | 3,200,000 | 5.750% | 2,719,175.00 | 5,919,175.00 |
| 12/01/2045 | 3,385,000 | 5.750% | 2,535,175.00 | 5,920,175.00 |
| 12/01/2046 | 3,580,000 | 5.750% | 2,340,537.50 | 5,920,537.50 |
| 12/01/2047 | 3,785,000 | 5.750% | 2,134,687.50 | 5,919,687.50 |
| 12/01/2048 | 4,000,000 | 5.750% | 1,917,050.00 | 5,917,050.00 |
| 12/01/2049 | 4,230,000 | 5.750% | 1,687,050.00 | 5,917,050.00 |
| 12/01/2050 | 4,475,000 | 5.750% | 1,443,825.00 | 5,918,825.00 |
| 12/01/2051 | 4,735,000 | 5.750% | 1,186,512.50 | 5,921,512.50 |
| 12/01/2052 | 5,005,000 | 5.750% | 914,250.00 | 5,919,250.00 |
| 12/01/2053 | 5,295,000 | 5.750% | 626,462.50 | 5,921,462.50 |
| 12/01/2054 | 5,600,000 | 5.750% | 322,000.00 | 5,922,000.00 |
| | 81,000,000 | | 93,605,687.50 | 174,605,687.50 |

**BOND DEBT SERVICE**

**Stayton**
**Series 2024 Membership Substitution**

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|
| 12/01/2024 | | | | | |
| 06/01/2025 | | | 2,328,750.00 | 2,328,750.00 | |
| 12/01/2025 | | | 2,328,750.00 | 2,328,750.00 | 4,657,500.00 |
| 06/01/2026 | | | 2,328,750.00 | 2,328,750.00 | |
| 12/01/2026 | | | 2,328,750.00 | 2,328,750.00 | 4,657,500.00 |
| 06/01/2027 | | | 2,328,750.00 | 2,328,750.00 | |
| 12/01/2027 | 800,000 | 5.750% | 2,328,750.00 | 3,128,750.00 | 5,457,500.00 |
| 06/01/2028 | | | 2,305,750.00 | 2,305,750.00 | |
| 12/01/2028 | 1,310,000 | 5.750% | 2,305,750.00 | 3,615,750.00 | 5,921,500.00 |
| 06/01/2029 | | | 2,268,087.50 | 2,268,087.50 | |
| 12/01/2029 | 1,385,000 | 5.750% | 2,268,087.50 | 3,653,087.50 | 5,921,175.00 |
| 06/01/2030 | | | 2,228,268.75 | 2,228,268.75 | |
| 12/01/2030 | 1,465,000 | 5.750% | 2,228,268.75 | 3,693,268.75 | 5,921,537.50 |
| 06/01/2031 | | | 2,186,150.00 | 2,186,150.00 | |
| 12/01/2031 | 1,550,000 | 5.750% | 2,186,150.00 | 3,736,150.00 | 5,922,300.00 |
| 06/01/2032 | | | 2,141,587.50 | 2,141,587.50 | |
| 12/01/2032 | 1,635,000 | 5.750% | 2,141,587.50 | 3,776,587.50 | 5,918,175.00 |
| 06/01/2033 | | | 2,094,581.25 | 2,094,581.25 | |
| 12/01/2033 | 1,730,000 | 5.750% | 2,094,581.25 | 3,824,581.25 | 5,919,162.50 |
| 06/01/2034 | | | 2,044,843.75 | 2,044,843.75 | |
| 12/01/2034 | 1,830,000 | 5.750% | 2,044,843.75 | 3,874,843.75 | 5,919,687.50 |
| 06/01/2035 | | | 1,992,231.25 | 1,992,231.25 | |
| 12/01/2035 | 1,935,000 | 5.750% | 1,992,231.25 | 3,927,231.25 | 5,919,462.50 |
| 06/01/2036 | | | 1,936,600.00 | 1,936,600.00 | |
| 12/01/2036 | 2,045,000 | 5.750% | 1,936,600.00 | 3,981,600.00 | 5,918,200.00 |
| 06/01/2037 | | | 1,877,806.25 | 1,877,806.25 | |
| 12/01/2037 | 2,165,000 | 5.750% | 1,877,806.25 | 4,042,806.25 | 5,920,612.50 |
| 06/01/2038 | | | 1,815,562.50 | 1,815,562.50 | |
| 12/01/2038 | 2,290,000 | 5.750% | 1,815,562.50 | 4,105,562.50 | 5,921,125.00 |
| 06/01/2039 | | | 1,749,725.00 | 1,749,725.00 | |
| 12/01/2039 | 2,420,000 | 5.750% | 1,749,725.00 | 4,169,725.00 | 5,919,450.00 |
| 06/01/2040 | | | 1,680,150.00 | 1,680,150.00 | |
| 12/01/2040 | 2,560,000 | 5.750% | 1,680,150.00 | 4,240,150.00 | 5,920,300.00 |
| 06/01/2041 | | | 1,606,550.00 | 1,606,550.00 | |
| 12/01/2041 | 2,705,000 | 5.750% | 1,606,550.00 | 4,311,550.00 | 5,918,100.00 |
| 06/01/2042 | | | 1,528,781.25 | 1,528,781.25 | |
| 12/01/2042 | 2,860,000 | 5.750% | 1,528,781.25 | 4,388,781.25 | 5,917,562.50 |
| 06/01/2043 | | | 1,446,556.25 | 1,446,556.25 | |
| 12/01/2043 | 3,025,000 | 5.750% | 1,446,556.25 | 4,471,556.25 | 5,918,112.50 |
| 06/01/2044 | | | 1,359,587.50 | 1,359,587.50 | |
| 12/01/2044 | 3,200,000 | 5.750% | 1,359,587.50 | 4,559,587.50 | 5,919,175.00 |
| 06/01/2045 | | | 1,267,587.50 | 1,267,587.50 | |
| 12/01/2045 | 3,385,000 | 5.750% | 1,267,587.50 | 4,652,587.50 | 5,920,175.00 |
| 06/01/2046 | | | 1,170,268.75 | 1,170,268.75 | |
| 12/01/2046 | 3,580,000 | 5.750% | 1,170,268.75 | 4,750,268.75 | 5,920,537.50 |
| 06/01/2047 | | | 1,067,343.75 | 1,067,343.75 | |
| 12/01/2047 | 3,785,000 | 5.750% | 1,067,343.75 | 4,852,343.75 | 5,919,687.50 |
| 06/01/2048 | | | 958,525.00 | 958,525.00 | |
| 12/01/2048 | 4,000,000 | 5.750% | 958,525.00 | 4,958,525.00 | 5,917,050.00 |
| 06/01/2049 | | | 843,525.00 | 843,525.00 | |
| 12/01/2049 | 4,230,000 | 5.750% | 843,525.00 | 5,073,525.00 | 5,917,050.00 |
| 06/01/2050 | | | 721,912.50 | 721,912.50 | |
| 12/01/2050 | 4,475,000 | 5.750% | 721,912.50 | 5,196,912.50 | 5,918,825.00 |
| 06/01/2051 | | | 593,256.25 | 593,256.25 | |
| 12/01/2051 | 4,735,000 | 5.750% | 593,256.25 | 5,328,256.25 | 5,921,512.50 |
| 06/01/2052 | | | 457,125.00 | 457,125.00 | |
| 12/01/2052 | 5,005,000 | 5.750% | 457,125.00 | 5,462,125.00 | 5,919,250.00 |
| 06/01/2053 | | | 313,231.25 | 313,231.25 | |
| 12/01/2053 | 5,295,000 | 5.750% | 313,231.25 | 5,608,231.25 | 5,921,462.50 |
| 06/01/2054 | | | 161,000.00 | 161,000.00 | |
| 12/01/2054 | 5,600,000 | 5.750% | 161,000.00 | 5,761,000.00 | 5,922,000.00 |
| | 81,000,000 | | 93,605,687.50 | 174,605,687.50 | 174,605,687.50 |

## Schedule 3

Stayton Financing Related Costs

**The Stayton at Museum Way**
**Projected Fund Needs January 2024 through MSA Closing (March 31, 2024)**

| | Funding Need | Cummulative | Bondholder | Buckner | Total |
|---|---|---|---|---|---|
| **Total Funding Commitment** | | | | | |
| Initial Commitment at Closing | | | $ 500 | $ 1,500 | $ 2,000 |
| Traunch 2 | | | 325 | 325 | 650 |
| First 30 days after January 31, 2024 | | | 750 | - | 750 |
| Second 30 days after January 31, 2024 | | | 750 | - | 750 |
| | | | $ 2,325 | $ 1,825 | $ 4,150 |
| | | | | | |
| **Funding Needs** | | | | | |
| Jan-24 | $ 700 | $ 700 | $ 700 | | $ 700 |
| Feb-24 | 600 | 1,300 | 600 | | 600 |
| Mar-24 | 600 | 1,900 | 600 | | 600 |
| At Closing | 1,845 | 3,745 | 20 | 1,825 | 1,845 |
| Total Funding Need at Closing | $ 3,745 | | $ 1,920 | $ 1,825 | $ 3,745 |