**Butler Snow LLP**

Martin A. Sosland (TX Bar No.18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Tel:  (469) 680-5500
Fax:  (469) 680-5501
E-mail:   martin.sosland@butlersnow.com
          candice.carson@butlersnow.com


PROPOSED COUNSEL FOR THE

DEBTOR

**Butler Snow LLP**

Adam M. Langley (*pro hac vice* pending)
Kenneth Groce (*pro hac vice* pending)
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Tel:  (901) 680-7200
Fax:  (901) 680-7201
E-mail:   adam.langley@butlersnow.com
          kenneth.groce@butlersnow.com

**Butler Snow LLP**

Xan Flowers (*pro hac vice* pending)
1819 Fifth Avenue North, Suite 1000
Birmingham AL 35203
Tel:  (205) 297-2200
Fax:  (205) 297-2201
E-mail: xan.flowers@butlersnow.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **TARRANT COUNTY SENIOR LIVING** | § | **Case No. 24-80068-swe11** |
| **CENTER, INC., D/B/A THE STAYTON AT** | § | |
| **MUSEUM WAY,** | § | |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |

### AMENDED DECLARATION OF JEFF GENTRY IN SUPPORT
### OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Jeff Gentry, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.       I am the Senior Vice President and Chief Financial Officer of Tarrant County
Senior Living Center, Inc. (d/b/a The Stayton at Museum Way), the debtor and debtor-in-
possession ("**Stayton**" or the "**Debtor**") in the above-captioned case (the "**Chapter 11 Case**") and
a member of the Debtor's board of directors.  In addition to my role at the Debtor, I also serve as
the Executive Vice President and Chief Operating Officer for Buckner International.  Buckner

International serves as the parent entity of its controlled affiliates, including Buckner Retirement Services, Inc., the sole corporate member of Stayton. Buckner International is a faith-based, nonprofit entity with a mission of protecting vulnerable children, strengthening families, transforming generations, and serving seniors.

2.      I hold a bachelor's degree in Psychology from Millsaps College and a master's degree in Accounting with an emphasis in Tax from the University of Mississippi. I have nearly thirty (30) years of experience in nonprofit management of which fifteen (15) years has been in the healthcare sector. I have served as a part of Buckner International since 2017 and helped lead Buckner Retirement Services, Inc. ("*Buckner*" or the "*Plan Sponsor*") in its acquisition of the Debtor.

3.      In my capacity as a Director, Senior Vice President, and Chief Financial Officer of the Debtor, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor. Except as otherwise indicated, the facts set forth in this declaration (the "*Declaration*") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Debtor's other officers, directors, and advisors, including professionals at Butler Snow LLP ("*Butler Snow*"). I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtor. If called to testify, I would testify competently to the facts set forth in this Declaration.

4.      On the date hereof, (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United

States Bankruptcy Court for the Northern District of Texas (the "***Court***").  The Debtor has filed

various motions and pleadings seeking certain "first day" relief (collectively, the "***First Day***

***Pleadings***") to minimize any disruption that filing these chapter 11 cases may have on its

operations.  I submit this Declaration to assist the Court and parties in interest in understanding

the circumstances that led to the commencement of this Chapter 11 Case and in support of the

Debtor's chapter 11 petition and First Day Pleadings.

5.     Contemporaneously herewith, the Debtor has filed the (i) *Disclosure Statement for*

*Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*

(as amended, modified, altered, revised, or supplemented from time to time, the "***Disclosure***

***Statement***"); (ii) *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the*

*Bankruptcy Code* (as amended, modified, altered, revised, or supplemented from time to time,

the "***Plan***"); (iii) the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC*

*Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtor's Prepackaged*

*Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*  (the "***Voting Affidavit***");

and (iv)  the following motions and application (collectively, the "***First Day Pleadings***"):[1]

i.    *Motion of the Debtor for Entry of an Order (I) Extending Time for Debtor
to File Its Schedules and Statements and (II) Permanently Waiving Same
Upon Confirmation of Debtor's Prepackaged Plan of Reorganization*
(the "***Schedules Extension Motion***");

ii.    *Emergency Application of the Debtor for an Order Authorizing the
Employment and Retention of Kroll Restructuring Administration LLC as
Claims, Noticing, and Solicitation Agent Nunc Pro Tunc to the Petition
Date* (the "***Kroll Retention Application***");

iii.    *Emergency Motion of the Debtor for Entry of an Order Authorizing the
Implementation of (I) Procedures to Maintain and Protect Confidential
Resident and Patient Information, (II) Procedures to Protect Other*

---

[1] All capitalized terms not defined in this Declaration shall have the meanings ascribed to the term in the Plan or the
relevant First Day Pleading.

        *Individual Information, and (III) Authorizing Service by Email on Parties in Interest* (the "***Confidentiality and Email Service Motion***");

iv.    *Emergency Motion of the Debtor for Entry of an Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) the Waiver of the 11 U.S.C. § 345(b) Deposit and Investment Requirements* (the "***Cash Management Motion***");

v.    *Emergency Motion of the Debtor for Entry of an Order (I) Authorizing the Debtor to (A) Pay Certain Prepetition Salaries, Wages, and Compensation and (B) Continue Employee Benefit Programs and (II) Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations* (the "***Wage Motion***");

vi.    *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Taxes* (the "***Tax Motion***");

vii.    *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (the "***Utilities Motion***");

viii.    *Emergency Motion of the Debtor for Entry of Final Order (I) Authorizing the Debtor to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief* (the "***Insurance Motion***");

ix.    *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Continue Its Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis* (the "***Ordinary Course Creditors Motion***");

x.    *Emergency Motion of the Debtor for Interim and Final Orders (I) Authorizing the Debtor to Use the Cash Collateral of BOKF, N.A., as Trustee; (II) Providing BOKF, N.A., as Trustee, Adequate Protection; (II) Providing Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "***Cash Collateral Motion***"); and

xi.    *Emergency Motion of the Debtor for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan of Reorganization; (II) Fixing Related Objection Deadlines and Approving Notice Procedures;*

*(III) Approving Prepetition Solicitation Procedures; (IV) Conditionally Directing the United States Trustee Not To Convene Section 341(a) Meeting of Creditors; and (V) Granting Related Relief* (the "**Combined Hearing Motion**"); and

xii.    *Motion of the Debtor for Entry of an Order Relieving Debtor of Requirement to Appoint a Patient Care Ombudsman Pursuant to 11 U.S.C. § 333* (the "**Ombudsman Motion**").

6.      I am generally familiar with the contents of each First Day Pleading and believe that the relief sought therein allows the Debtor to, among other things, fulfill its duties as debtor-in-possession and minimize the disruption to the Debtor's business operations that may be caused by the commencement of this Chapter 11 Case.  Additionally, I believe that the relief requested in the First Day Pleadings is important to ensure that the Debtor can continue to deliver necessary care and services to its residents as further described herein.

7.      To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into three sections.  Section I provides an overview of the Debtor's operations and capital structure.  Section II describes the events that have led to this "prepackaged" bankruptcy filing and an overview of the Plan.  Section III sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case, which the Debtor believes are critical to administering this Chapter 11 Case and preserving and maximizing the value of the Debtor's Estate.

## PRELIMINARY STATEMENT[2]

8.      Incorporated in 2006, Stayton owns and operates a best-in-class continuing care retirement community ("**CCRC**") in Fort Worth, Texas dedicated to giving its residents a vibrant, active, and independent lifestyle.  Stayton offers its senior residents a continuum of care in a luxury

---

[2] All capitalized terms contained in this Preliminary Statement and not otherwise defined therein shall have the meanings ascribed to them below.

campus-style setting, providing living accommodations and related health care and support services to a market of seniors aged sixty-two (62) and older.  Upon entering the CCRC, residents are provided spacious apartments and a broad range of social and recreational activities creating an unmatched quality of life.  As residents require additional assistance with everyday activities or health care services, they have access to assisted living, memory support, skilled nursing facilities, and rehabilitation located on the same campus.  As their new home, the residents of Stayton have entrusted their health, safety, and well-being to Stayton for the duration of their lives.

9.      As discussed in greater detail herein, Stayton relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations, and honor its resident refund obligations.  In recent years, Stayton has faced challenges that have threatened its ability to pay principal and interest on the Bonds and maintain its operational stability.

10.      To address its financial condition, Stayton engaged in extensive, arm's length negotiations with (i) Lifespace Communities, Inc, Stayton's former not-for-profit sole corporate member ("*Lifespace*"), (ii) Buckner, Stayton's current not-for-profit sole corporate member, (iii) BOKF, N.A., as successor bond trustee and successor master trustee (in either capacity, as applicable, the "*Trustee*"), and (iv) the holders of at least sixty-seven percent (67%) of outstanding aggregate principal amount of all Bonds issued (the "*Supporting Holders*") with a goal of achieving a consensual restructuring, centered on a refinancing of its existing tax-free municipal bond debt (the "*Bond Refinancing*").  This consensual restructuring is being accomplished through various agreements including a Member Substitution Agreement, Forbearance Agreement, a Subordinated Note, and Plan Support Agreement that collectively provide for the following (the "*Refinancing Transaction*"):

     i.       the substitution of Buckner as the sole member of Stayton through a Membership Substitution Agreement, dated May 31, 2024 (the "***Membership Substitution Effective Date***");

     ii.      an agreement by the Trustee to forbear from exercising remedies under the Original Bond Documents while Stayton pursues the Bond Refinancing;

     iii.     an agreement by Buckner Foundation, Inc. (the "***Buckner Foundation***") to provide $15,000,000 in additional liquidity to support the Refinancing Transaction; and

     iv.     the commencement of a pre-packaged chapter 11 bankruptcy proceeding to implement the Bond Refinancing.

11.     Pursuant to the Plan and the First Day Pleadings, the Debtor seeks to, among other things, (i) implement the Bond Refinancing; (ii) pay all other Claims in the ordinary course of business as if the Chapter 11 Case had not commenced; and (iii) assume all Executory Contracts, including the Residency Agreements.

12.     Given the Supporting Holder's support of the Refinancing Transaction in which Holders of all Claims other than Bond Claims remain Unimpaired, the Debtor elected to pursue a prepackaged restructuring to, among other things, minimize the costs of the Chapter 11 Case and the impact on the Debtor's business.  Therefore, on August 30, 2024, the Debtor commenced solicitation of votes accepting or rejecting the Plan from Holders of Bond Claims, the only Impaired Class entitled to vote under the Plan.  As reflected in the Voting Affidavit, 94.69% in number and 99.87% in amount of the Holders of Bonds Claims have voted in favor of the Plan.

13.     As discussed in greater detail in the Disclosure Statement, the Debtor submits that the Plan is in the best interests of the Debtor's Estate, Creditors, and all other interested parties because it will provide the Debtor with the relief it needs to ensure its long-term ability to service its debt obligations, fulfill its charitable mission, and honor its commitments to the residents of Stayton.

## I.   OVERVIEW OF THE DEBTOR'S BUSINESS

### A.   Description of Stayton's Continuing Care Retirement Community

14.    Stayton operates a "lifecare" entrance-fee model CCRC that offers its senior residents a continuum of care in a luxury campus-style setting, providing living accommodations and related health care and support services to a market of seniors aged sixty-two (62) and older. Stayton consists of approximately 188 independent living ("*IL*") apartment-style residences in one-, two- and three-bedroom configurations within three towers, each of which is eleven stories. Stayton also houses 42 residential-style assisted living ("*AL*") suites, 20 memory support ("*MS*") assisted living suites and a skilled nursing facility ("*SNF*") with 46 skilled nursing beds, all located on a 574,000 square foot, 2.8 acre campus (the "*Facility*").  As of the September 30, 2024, the community, known as The Stayton at Museum Way, was home to approximately 240 residents (the "*Residents*").

15.    Stayton is known for its exceptional service and quality.  It has received a five-star overall rating and four-star health inspection rating from the Centers for Medicare and Medicaid Services and a Silver Achievement in Quality Award from the American Health Care Association and National Center for Assisted Living.

16.    As is common practice in the CCRC industry, Stayton primarily receives its revenue from entrance fees, monthly service fees, and other fees charged by Stayton (collectively, the "*Fees*") pursuant to Residency Agreements (defined below).  A resident interested in occupying an IL unit in the Facility must enter into a continuing care contract (a "*Continuing Care Contract*") with Stayton.  As part of a Continuing Care Contract, each resident in an IL unit receives priority access to AL and/or SNF units should additional care ever be required.  In addition, IL residents receive basic assisted living or nursing care upon permanent transfer to AL or the SNF, should the need for such services arise.  Unlike a pure rental retirement community,

whereby a resident pays monthly fees for services, the Continuing Care Contract is a life care residency contract whereby a resident will pay an Entrance Fee and Monthly Fees (each as defined below) for Stayton's commitment to provide (i) priority access to AL and/or SNF units should additional care ever be required and (ii) basic assisted living or nursing care upon permanent transfer to AL or the SNF, should the need for such services arise (the "*Life Care Benefit*"). Residents receive these Life Care Benefits for the duration of the resident's life, regardless of whether the resident's needs change over time which may require additional services to be provided by Stayton. Significantly, Stayton's commitment to provide Life Care Benefits continues even if the resident's financial condition deteriorates and the resident is unable to continue to make his or her payments. Accordingly, Stayton's ability to continue providing such Life Care Benefits is an important concern of Stayton's Residents.

17.     In addition to Continuing Care Contracts, Stayton also offers contracts for direct admission into an AL suite (the "*Assisted Living Residency Agreement*") and the SNF (the "*SNF Residency Agreement*" and collectively with Continuing Care Contracts and Assisted Living Residency Agreements, the "*Residency Agreements*").

###     B.     <u>Fees Due Under Stayton's Residency Agreements</u>

18.     Stayton receives revenue from several sources, which include: (a) entrance fees ("*Entrance Fees*"), (ii) monthly fees for IL, AL, and MS ("*Monthly Fees*"), (c) per diem rates for SNF services, and (d) fees for optional services.

###     1.     Entrance Fees

19.     A one-time Entrance Fee is required for residency in an IL unit at Stayton. Ten percent (10%) of the Entrance Fee is paid when a resident reserves an IL unit at Stayton and the balance is paid upon occupancy. The amount of the Entrance Fee depends on the type of unit selected. The Debtor has offered 100%, 90%, 70%, 50%, and 0% refundable contracts. As of

January 1, 2024, the Entrance Fees range from approximately $493,000.00 for the smallest one-bedroom apartment to approximately $1,580,000.00 for the largest three-bedroom apartment. The refund is paid ten (10) days after receipt of sufficient proceeds to fund the refund obligation from the next re-sale(s) and occupancy of any residence(s) at Stayton.

### 2.    Monthly Fees

20.    The Continuing Care Contract also requires residents to pay Monthly Fees to Stayton. In consideration for payment of the Entrance Fees, Monthly Fees and other fees charged by Stayton (collectively, the "***Fees***"), residents are furnished with a residence and are given access to a wide array of services. Stayton uses the Fees to fund its operations, service its debt obligations and make capital improvements to the Facility.

   a.   **IL**. The amount of the Monthly Fee depends on the type of unit selected. As of January 1, 2024, Monthly Fees range from $4,292.00 for the smallest one-bedroom apartment to $9,786.00 for the largest three-bedroom apartment. For dual occupancy, an additional 1,751.00 second person fee is charged. Monthly Fees are adjusted in accordance with the Continuing Care Contract.

   b.   **AL**. Depending on the unit type selected, direct entrants (residents who have not executed a Continuing Care Contract and did not transfer from an IL unit) to AL are charged a Monthly Fee ranging from $9,597.00 to $11,906.00 (as of January 1, 2024), depending on the unit selected. Dual occupancy, regardless of unit type, is an additional $3,342.00 per month (as of January 1, 2024. An Entrance Fee is not required for direct entrants to AL; however a security deposit may be required.

   c.   **MS**. Direct entrants to MS are charged a Monthly Fee of $1,1294 (as of January 1, 2024) for single occupancy of a MS studio. An Entrance Fee is not required for direct entrants to MS; however a security deposit may be required.

### 3.    Per Diem

21.    The per diem rate for the SNF is $496 per day for a private room and $404 for a semi-private room for direct entrants to the SNF. An Entrance Fee is not required for direct entrants to the SNF; however, a security deposit may be required.

### C.    **Corporate Governance**

22.    Stayton is governed by a Board of Directors that is designated by Buckner. Stayton's board is comprised of three members:  Dr. Albert Reyes, Charlie Wilson, and Jeff Gentry.  Buckner has been the sole corporate member of Stayton since June 1, 2024.  Buckner is a faith-based nonprofit corporation chartered under the laws of the State of Texas and a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "*IRC*").  Buckner's mission is to inspire happiness for its residents, creating communities that provide seniors with connection, independence, purpose, security, and exceptional service. Buckner owns and operates six (6) other nonprofit senior living communities across Texas, making it one of the largest nonprofit senior living providers in Texas.

23.    Prior to June 1, 2024, Stayton's sole corporate member and sponsor was Lifespace. Lifespace is a non-profit corporation chartered under the laws of the State of Iowa and a tax-exempt organization under section 501(c)(3) of the IRC.

### D.    **Management by Buckner**

24.    Pursuant to that certain *Management Services Agreement* (as may be amended, supplemented, or modified from time to time, the "***Management Agreement***"), effective as of June 1, 2024, Buckner agreed to serve as exclusive manager of the day-to-day operations of Stayton.  The services provided by Buckner include, but are not limited to, the following: (i) general management services to administer the policies, directives, and strategic direction of Stayton's operations; (ii) financial management services, including providing periodic financial reports and budgeting; (iii) legal services and compliance support; (iv) human resource services, including establishing employment policies, hiring, developing, and retaining employees, and setting wage, salary, and benefit terms; and (vii) marketing, public relations, and fundraising support, including  providing sales and marketing services for the community.  Pursuant to the

Management Agreement, Stayton pays Buckner a management fee of five percent (5%) of its monthly gross revenues, as defined in the Management Agreement, for the services provided.

### E.    **Regulators**

25.    The CCRC industry nationwide is regulated by various state and federal agencies. Each state has a different regulatory scheme governing CCRCs.  As a Medicare-certified CCRC operating in the State of Texas, Stayton is regulated by, among others, the Centers for Medicare and Medicaid Services, the State of Texas Department of Health, and the Texas Department of Insurance.

26.    Prior to the Petition Date, Stayton and Buckner engaged with the Texas Department of Insurance in connection with the Membership Substitution and Refinancing Transaction.

### F.    **Prepetition Capital Structure**

27.    As of August 31, 2024, on a book value basis, Stayton had approximately $118.7 million in assets consisting of approximately: (i) $10.7 million in cash and cash equivalents; (ii) $1.8 million in accounts receivable; (iii) $93.4 million in fixed assets, net of accumulated depreciation; (v) $6.9 million of restricted cash; and (vi) $5.8 million of other assets, net of accumulated amortization and depreciation.

28.    As of August 31, 2024, Stayton had approximately $ 208 million of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs, and original issue premium, which consisted of approximately: (i) $1.9 million of trade accounts payable; (ii) $10.4 million of current resident refund obligations; (iv) $75.6 million in entrance fee liabilities; (v) $112.3 million in principal amount of long-term municipal bond obligations; and (vi) 7.8 million of other liabilities, including $6.67 million of obligations under that certain *Subordinated Promissory Note*, dated May 31, 2024, between the Debtor and Buckner Foundation, Inc. (the "***Subordinated Note***").

### 1.    Long-Term Municipal Bond Obligations

29.    On January 1, 2020, Tarrant County Cultural Education Facilities Finance Corporation (the "***Issuer***") and UMB Bank, National Association, as former trustee, entered into an Indenture of Trust (the "***Bond Indenture***"), pursuant to which the Issuer issued Series 2020 retirement facility revenue bonds in the initial principal amount of $112,261,464 (the "***Bonds***").

30.    Contemporaneously with the issuance of the Bonds, the Issuer loaned the proceeds of the Bonds to Stayton, pursuant to a Loan Agreement between Stayton and the Issuer (the "***Loan Agreement***"), to provide for the refinancing of a portion of the cost of acquiring, constructing, and equipping the Facility.    Additionally, on January 1, 2020, Stayton issued the Tarrant County Senior Living Center, Inc. Series 2020 Note (the "***Series 2020 Note***") under the *Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement*, amended and restated as of January 1, 2020, between the Debtor and UMB Bank, National Association, as predecessor to the Trustee (the "***Original Master Indenture***").    The Series 2020 Note secures the obligations of Stayton to pay the principal of and interest on the Bonds.    The Bond Indenture, Loan Agreement, Original Master Indenture, and Series 2020 Note are collectively referred to herein as the "***Original Bond Documents***."    As of the date hereof, the outstanding principal amount owed by Stayton under the Original Bond Documents is approximately $112,261,464.00 (together with interest, fees, expenses, and other amounts due under the Original Bond Documents, the "***Bond Obligations***").

31.    Under the terms of the Original Bond Documents, certain accounts were established by Stayton and are being held by the Trustee, including, among others, the Revenue Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, the Working Capital Fund, the Operating Reserve Fund, and the Liquidity Support Fund (each as defined in the Original Bond Documents).    As of September 30, 2024, the total amount

of funds held by the Trustee in said accounts was approximately $5.5 million (the "***Trustee-Held Funds***").

### 2.      Subordinated Note Obligations

32.      On May 31, 2024, Buckner Foundation, a Texas not-for-profit corporation and affiliate of the Plan Sponsor, and Stayton entered into the Subordinated Note.  Pursuant to the Subordinated Note, Buckner Foundation agreed to loan up to $10,000,000 in funds to Stayton in three tranches.  As of the date hereof, the Buckner Foundation has transferred $6,666,666.66 to Stayton and has committed to provide the remaining $3,333,333.34 to Stayton as needed to increase the Days Cash On Hand to meet the Liquidity Requirement set forth in the *Amended and Restated Master Trust Indenture, Deed of Trust and Security Agreement* (the "***Amended Master Indenture***").  Stayton is required to repay to Buckner Foundation any amounts drawn on the Subordinated Note, with interest thereon, in accordance with the Subordinated Note and the Amended Master Indenture.  The Subordinated Note is subordinated to the Bond Obligations.  The Plan contemplates that Stayton's rights and obligations under the Subordinated Note will be reinstated.  On and after the Effective Date, Stayton's repayment obligation under the Subordinated Note will constitute Subordinated Indebtedness (as defined in the Amended Master Indenture) as set forth in the Subordinated Note and the Amended Master Indenture.

### 3.      Resident Refund Obligations

33.      As previously discussed, upon the occurrence of certain conditions, a certain percentage of the Entrance Fee is refundable under a Continuing Care Contract.  Refundable percentages are stated in the terms of the agreements.  The refund is paid ten (10) days after receipt of sufficient proceeds to fund the refund obligation from the next re-sale(s) and occupancy of any

residence(s) at Stayton.  As of August 31, 2024, Stayton had contingent entrance fee liabilities totaling $75.6 million.

## II.    EVENTS LEADING TO PREPACKAGED BANKRUPTCY

34.    Stayton relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its resident refund obligations.  However, Stayton has faced challenges that have threatened Stayton's ability to pay principal and interest on the Bonds and maintain its operational stability.

35.    Following its initial construction, Stayton was hampered by ramp up delays both in construction and original move-in sales which caused a ripple effect that has threatened Stayton's operational stability.  These challenges first led Stayton to restructure its balance sheet pursuant to prepackaged chapter 11 cases commenced in November of 2019 – *In re Tarrant County Senior Living Center, Inc*., Case No. 19-33756 (SGJ), in the United States Bankruptcy Court for the Northern District of Texas (the "***2019 Restructuring***").  As part of the refinancing transactions implemented in the 2019 Restructuring, Lifespace provided additional liquidity to the Stayton through a Liquidity Support Agreement ("***LSA***"), and Stayton completed a consensual, tax-exempt refinancing of its then outstanding bonds by (i) issuing the Bonds in the full amount of its outstanding debt obligations plus all accrued interests, fees, and other costs, (ii) delaying principal payments on the Bonds until December 15, 2024, and (iii) providing for mandatory sinking fund payments commencing in 2025.  In December 2019, the Bankruptcy Court entered an order confirming the Stayton's 2019 plan of reorganization and the plan went effective in January 2020.

36.    Since the 2019 Restructuring, however, worsening market conditions continued to place pressure on the company's profitability.  When the Covid-19 pandemic impacted the United States of America starting in March 2020, it severely disrupted the senior living industry, especially because older adults are particularly vulnerable to the effects of COVID-19.  As a result

of the pandemic, Stayton incurred significant, additional operating expenses, to, among other things, retain qualified staff, pay for additional staffing costs, and pay for the acquisition of personal protection equipment for all staff members. To attempt to offset these additional costs, Stayton implemented four monthly service fee increases between 2020 and 2022. Stayton was able to implement these fee increases while maintaining consistent occupancy trends in the majority of its facility.[3]  Still, despite its strong operating performance, due to pressures in the market caused by the Covid-19 pandemic, the resulting rise in the cost and availability of health care employees and suppliers, and the highly competitive market conditions in Fort Worth and surrounding areas as well as other factors, Stayton continued to face pressure on its margins and was not able to keep pace with the rise in its expenses. From 2021 to 2022, Stayton's expenses grew 17%, while operating revenue grew 11% due to high inflation, labor pressure, and new vendors.

37.    As a result of these challenges, Stayton defaulted on its Bond Obligations, the principal amount of which totals approximately $112 million, by, among other things, failing to (i) meet its debt service coverage ratio covenant on June 30, 2021 and December 31, 2021, and (ii) make debt service payments due on the Bonds on December 1, 2022. Because the debt service coverage ratio was less than 1.0 on December 31, 2021, an event of default occurred under the Original Master Indenture. To address its financial issues, in 2021, Stayton retained legal counsel and restructuring professionals to help it (i) evaluate its operations and marketing strategies and (ii) provide strategic advice on addressing the Stayton's financial issues. Thereafter, Stayton and the Trustee, at the direction of the Supporting Holders, entered into a forbearance agreement on January 13, 2023, to enable the company to pursue a sale of the operating enterprise or its assets

---

[3] Stayton's SNF experienced a decline in occupancy related to the Covid-19 pandemic but had recovered to its pre-pandemic levels of occupancy by 2022.

(the "**Strategic Transaction**").  Additionally, Stayton and Lifespace entered into an amendment of the LSA to allow the Trustee to withdraw $900,000 from the LSA account to pay the fees and expenses of its former counsel and existing advisors to pursue the Strategic Transaction.

38.   Following the amendment to the LSA, in the first quarter of 2023, Stayton, with the aid of its financial advisor, Houlihan Lokey, commenced a marketing process for Stayton and its assets.  The Strategic Transaction was structured as a competitive overbid process, pursuant to which Stayton entered into the Plan Support Agreement and Membership Substitution Agreement with Buckner acting as stalking horse and subjected Buckner's offer to higher or otherwise superior bids.  The Stayton set the auction for March 5, 2024, and Stayton received competing bids from three other senior living operators, including Lifespace.  Ultimately, the Plan Sponsor's bid was selected by Stayton, in consultation with the Trustee and the Supporting Holders, as the highest and best bid received, and the parties elected to proceed with the proposed Refinancing Transaction.

### A.   Proposed Refinancing Transaction.

### 1.   Buckner Substitutes as Sole Corporate Member of Stayton

39.   Buckner and Lifespace entered into that certain *Membership Substitution Agreement*, dated as of February 6, 2024, between Stayton, Lifespace, and Buckner (the "**MSA**") to allow Buckner to substitute as sole corporate member of Stayton (the "**Membership Substitution**") in accordance with the terms and conditions of the MSA.  On the Membership Substitution Effective Date, all conditions precedent to the Membership Substitution were satisfied, and Buckner became the sole corporate member of Stayton on June 1, 2024.  Following the close of the MSA, Stayton is continuing to operate as follows:

    a.   Separate Corporate Identity.  Stayton maintains its corporate identity separate and apart from Buckner and its affiliated entities.  Stayton retains

separate ownership of its assets and remains separately responsible for its operations and liabilities

b.  <u>Management</u>.  Buckner is responsible for management of Stayton, including strategic, operational, financial, and legal oversight from Buckner's headquarters.

c.  <u>Impact on Residents</u>.  Stayton will honor the terms of all existing Residency Agreements, including, but not limited to, the entrance fee obligations outlined in the Residency Agreements.  In addition, the Buckner has committed that Stayton will continue the existing charity care policy at the Stayton for a period for three (3) years and, thereafter, to continue such charity care policy consistent with the other retirement communities owned by Buckner and its affiliated entities.

**2.  Second Forbearance Agreement, Liquidity Support Agreement and Plan Support Agreement**

40.  To effectuate the Bond Refinancing, Stayton, Buckner, the Trustee, and the Steering Committee, as applicable, have negotiated and agreed to the terms of the: (i) Forbearance Agreement, (ii) Subordinated Note, and (iii) Plan Support Agreement.  The salient terms of each of these agreements are discussed in greater detail below:

a.  <u>Forbearance Agreement</u>.  Pursuant to that certain *Forbearance Agreement*, dated as of May 31, 2024, between Stayton and the Trustee, the Trustee has agreed to forbear from exercising remedies under the Original Bond Documents until December 31, 2024, unless terminated earlier, to provide the time necessary for Stayton to implement the Bond Refinancing through the Chapter 11 Case.

Pursuant to the Forbearance Agreement, Stayton is required to acknowledge, among other things, the validity of the Original Bond Documents, the outstanding amount owed under the Original Bond Documents, and the validity and priority of the Trustee's liens.

As a condition of the Forbearance Agreement, Stayton is required to meet, or cause to be met, certain milestones, including commencing the Chapter 11 Case by no later than October 1, 2024.

Finally, to induce the Trustee to enter into the Forbearance Agreement, Stayton released and discharged the Trustee, the Supporting Holders, and related parties from any and all claims, causes of actions, suits, and damages arising out of or related to the Original Bond Documents.

b.      <u>Subordinated Note</u>.  Pursuant to the Subordinated Note between Stayton and Buckner Foundation, Buckner Foundation (i) transferred $3,333,333.33 to the Stayton on the Membership Substitution Effective Date, (ii) transferred an additional $3,333,333.33 on July 1, 2024, and (iii) has committed to provide the remaining $3,333,333.34 to the Stayton as needed to increase the Days Cash On Hand to meet the Liquidity Requirement (each as defined in the Amended Master Indenture) set forth in the Amended Master Indenture so long as the total outstanding amount under the Subordinated Note does not exceed $10,000,000.00.

The Subordinated Note provides $10,000,000.00 in delayed draw subordinated debt to fund future capital expenses at Stayton and provide additional liquidity support for Stayton.

Stayton is required to repay to Buckner Foundation any amounts drawn on the Subordinated Note, with interest thereon, in accordance with the Subordinated Note and the Amended Master Indenture.   Stayton's repayment obligation under the Subordinated Note will constitute Subordinated Indebtedness (as defined in the Amended Master Indenture) as set forth in the Subordinated Note and the Amended Master Indenture.

c.      <u>Plan Support Agreement</u>.  Pursuant to the terms of the Plan Support Agreement, Stayton has agreed to commence the Chapter 11 Case in the Bankruptcy Court to implement the Bond Refinancing.  The Plan Support Agreement contemplates that Stayton will restructure and exchange the Bonds for new bonds to be issued by the Issuer and designated "Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (The Stayton at Museum Way Project), Series 2024" (the "***Series 2024 Bonds***").  The Series 2024 Bonds will be issued under an Indenture of Trust (the "***Series 2024 Bond Indenture***") between the Issuer and the Trustee, as bond trustee, and the proceeds thereof will be loaned to Stayton pursuant to the terms of a Loan Agreement between the Issuer and Stayton (the "***Series 2024 Loan Agreement***").  The Series 2024 Bonds will be limited obligations of the Issuer and will be secured in part by the Series 2024 Note (the "***Series 2024 Note***") issued by Stayton pursuant to the Amended Master Indenture, which will amend and restate the Original Master Indenture, as well as substantially all assets of Stayton. The forms of Series 2024 Bond Indenture (including the Series 2024 Bonds), Series 2024 Loan Agreement, and Amended Master Indenture (including the Series 2024 Note) are collectively referred to as the "***2024 Bond Documents***."

Pursuant to the Plan Support Agreement, the Trustee has agreed to permit Stayton to use its cash collateral for funding for the Chapter 11 Case in accordance with the terms and conditions set forth in a Cash Collateral Order, which shall be in form and substance acceptable to the Stayton, the Plan Sponsor, and the Trustee.

The Supporting Holders agreed that, subject to the terms and conditions of the Plan Support Agreement and so long as no Agreement Termination Event (as defined in the Plan Support Agreement) has occurred, they would, among other things, support confirmation of the Plan and vote to accept the Plan.

**B.    Prepetition Solicitation**

41.    In accordance with the Plan Support Agreement, on August 30, 2024, the Debtor caused its solicitation and voting agent, Kroll Restructuring Administration LLC ("*Kroll*" or the "*Voting Agent*"), to distribute packages containing the following materials (the "*Solicitation Package*") to the Holders of Bond Claims, as the only Holders of Claims entitled to vote to accept or reject the Plan as of August 26, 2024 (the "*Voting Record Date*"):

i.    The Disclosure Statement

- Exhibit A – Plan
- Exhibit B - Plan Support Agreement
- Exhibit C - 2024 Bond Documents
- Exhibit D - Financial Projections

ii.    Ballots with voting instructions

iii.    Cover letter

42.    A voting deadline of 5:00 p.m., prevailing Central Time, on September 27, 2024 (the "*Voting Deadline*") was established to cast votes on the Plan.  The Voting Deadline was reflected in all of the materials included in the Solicitation Package.

43.    Holders of Bond Claims were directed in the Disclosure Statement, Ballots, and cover letter to follow the instructions contained in the Ballot to complete and submit the Ballot to cast a vote to accept or reject the Plan.  The Holders of Bond Claims were explicitly informed in the Disclosure Statement and applicable Ballot that they needed to submit their Ballot such that it was actually received by the Voting Agent on or before the Voting Deadline to be counted.

44.    The other Holders of Claims were not provided a Solicitation Package because such Holders are Unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code.

**C.    The Chapter 11 Case**

45.    As the final step in the Refinancing Transaction, Stayton commenced this Chapter 11 Case to pursue the Bond Refinancing contemplated under the Plan.  Among other things, the Plan provides as follows:

a.    Stayton shall cause the Issuer to issue new Series 2024 Bonds in an aggregate principal amount equal to $81,000,000.00, on the terms and conditions set forth in the 2024 Bond Documents.  The primary economic terms of the Series 2024 Bonds are described below:[4]

| | |
|---|---|
| **Principal:** | $81,000,000.00 on the terms and conditions set forth in the 2024 Bond Documents. |
| **Rate of Interest and Payment Terms:** | The Series 2024 Bonds will bear interest at a fixed rate of 5.75% per annum. |
| **Maturity Date:** | December 1, 2054 |
| **Collateral:** | Pursuant to the Amended Master Indenture, the Liens and security interests granted in the Original Master Indenture will continue to secure the obligations under the Amended Master Indenture.  Pursuant to such grants, the Trustee has first priority liens and security interests in substantially all of the Debtor's assets, including all real and personal property, including Debtor's Gross Revenues (as defined in the Amended Master Indenture), except as otherwise provided in the 2024 Bond Documents. |

---

[4] The information set forth in the accompanying chart is solely for summary purposes.  To the extent there is any discrepancy between the information set forth in the chart and the 2024 Bond Documents, the 2024 Bond Documents, copies of which are attached as Exhibit C to the Disclosure Statement, control.

21

<table>
<tr><td>**Amortization:**</td><td>The Series 2024 Bonds shall amortize pursuant to the Amortization Schedule attached as Addendum A to the Plan Support Agreement.[5]</td></tr>
</table>

b.      The Plan provides for the following classes of Claims and treatment of such

| Class and Designation | Treatment | Impairment and Entitled to Vote |
|---|---|---|
| Class 1: Priority Non-Tax Claims | Paid in full in cash. | Unimpaired (**Not entitled to vote**. Deemed to Accept) |
| Class 2: Other Secured Claims | Reinstated. | Unimpaired (**Not entitled to vote**. Deemed to Accept) |
| Class 3: Bond Claims | Each Holder of an Allowed Bond Claim will receive its Pro Rata share of the Series 2024 Bonds. | Impaired (**Entitled to vote**) |
| Class 4: General Unsecured Claims | Unaltered by the Plan. The Reorganized Debtor shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Case had never been commenced. | Unimpaired (**Not entitled to vote**. Deemed to Accept) |
| Class 5: Subordinated Note Claims | Reinstated. | Unimpaired (**Not entitled to vote**. Deemed to Accept) |

c.      All executory contracts and unexpired leases, including Residency Agreements, will be assumed pursuant to section 365 of the Bankruptcy Code.

d.      Stayton will release certain parties, including, without limitation, the Trustee and the Supporting Holders.

46.      As discussed in greater detail below, the Debtor has filed the Combined Hearing Motion seeking entry of an order that, among other things, schedules a combined hearing on approval of the Disclosure Statement and confirmation of the Plan within forty-five (45) days of the Petition Date.

---

[5] A copy of the Plan Support Agreement is attached as <u>Exhibit B</u> to the Disclosure Statement.

## III.    FACTS IN SUPPORT OF FIRST DAY PLEADINGS

47.    Contemporaneously with the filing of its chapter 11 petition, Stayton has filed the First Day Pleadings.  Stayton requests that the First Day Pleadings described below be granted, as they constitute a critical element in ensuring the stabilization of its operations at the outset of this Chapter 11 Case.  Capitalized terms not otherwise defined in this section shall have the meanings ascribed to such terms in the relevant First Day Pleading.

### A.    <u>Schedules Extension Motion</u>

48.    By the Schedules Extension Motion, Stayton requests that the Court enter an order (i) extending the time by which Stayton must file its Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statement of Financial Affairs (collectively, the "***Schedules and Statements***") until sixty (60) days after the Petition Date (the "***Extended Deadline***") and (ii) permanently waiving the requirement to file the same upon confirmation of the Plan.

49.    The Court's grant of an extension of time to file the Schedules and Statements through and including the Extended Deadline is necessary and appropriate under the circumstances of this prepackaged Chapter 11 Case.  First, the Debtor has many potential creditors, and the ordinary operation of the Debtor's business requires the Debtor to maintain voluminous books and records.  Accordingly, substantial time would be required for the Debtor to complete the Schedules and Statements.  Second, no party in interest will be prejudiced by the Court granting the Debtor's request for an extension through and including the Extended Deadline.  All Holders of Bond Claims have already voted in sufficient number and amount to accept the Plan.  All other creditors are Unimpaired under the Plan and will be paid in full in the ordinary course of business. Accordingly, I believe that the additional extension until sixty (60) days after the Petition Date will provide sufficient time to prepare and file the Schedules and Statements.

50.    Moreover, given the nature of this prepackaged Chapter 11 Case, the involvement by the majority of parties entitled to vote on the Plan, and the overwhelming support of the Plan by those parties entitled to vote, I believe that a waiver of the requirement to file the Schedules and Statements in the event of confirmation of the Plan is in the best interests of Stayton, its Estate, its residents, and all stakeholders.  Therefore, I believe the Schedules Extension Motion should be approved.

**B.    <u>Kroll Retention Application</u>**

51.    Pursuant to the Kroll Retention Application, Stayton seeks authorization to retain Kroll as its claims, noticing, and solicitation agent with respect to this Chapter 11 Case.  Kroll assisted the Debtor in its pre-petition solicitation efforts.

52.    Upon information and belief, Kroll is an experienced claims, noticing, and solicitation agent and is frequently used by debtors in large chapter 11 cases, and I believe the professionals at Kroll are well-qualified to provide such services, expertise, consultation and assistance to Stayton and serve as claims, noticing, and solicitation Agent in this Chapter 11 Case. Stayton believes that Kroll is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk or, in the alternative, Stayton of such burden.  The employment of Kroll will provide efficient management of the claims and noticing processes in this Chapter 11 Case, thereby allowing Stayton's management and advisors to focus on Stayton's reorganization efforts. Accordingly, I believe such experience, knowledge, and assistance will be valuable to Stayton during this Chapter 11 Case, and the Kroll Retention Application should be approved.

**C.    <u>Confidentiality and Email Service Motion</u>**

53.    By the Confidentiality and Email Service Motion, Stayton requests entry of an order authorizing the implementation of procedures to protect confidential information of Stayton's

Residents and Patients as required by the Health Insurance Portability and Accountability Act of 1996 ("***HIPAA***").

54.     In the ordinary course of providing care for its Residents and Patients, Stayton is required to maintain the confidentiality of patient information pursuant to HIPAA.  However, Stayton recognizes that such requirements may conflict with the duty to disclose certain information under the Bankruptcy Code.

55.     Stayton proposes the following procedures to maintain Resident and Patient confidentiality during the pendency of this Chapter 11 Case (the "***Resident and Patient Confidentiality Procedures***"):

    a.     Stayton, with the assistance of its professionals, is authorized to prepare and maintain (i) a separate creditor matrix of the Residents and Patients (the "***Resident and Patient Matrix***"), and, if necessary, (ii) separate schedules of claims that may be asserted by and against the Residents and Patients (the "***Resident and Patient Schedules***");

    b.     Stayton is not required to file the Resident and Patient Matrix and the Resident and Patient Schedules but is permitted to file a redacted version of the Resident and Patient Schedules that redacts the names and addresses of the Residents and Patients and assigns a unique identification number to each of the Residents and Patients, *provided however*, that the Resident and Patient Matrix and the Resident and Patient Schedules may be reviewed by (i) this Court, (ii) the Office of the United States Trustee, (iii) any applicable state regulatory agency (through the respective state attorney general), and (iv) any other party in interest that obtains, after notice and a hearing, an order directing Stayton to disclose the Resident and Patient Matrix and Resident and Patient Schedules to such party;

    c.     To the extent Stayton is required to list Residents and Patients on any document filed with the Court, including the list of the top 30 unsecured creditors, Stayton is authorized to list such Residents and Patients by their assigned unique identification numbers on such document;

    d.     If Stayton's HIPAA compliant noticing and claims agent, Kroll, serves any document upon any person listed on the Resident and Patient Matrix, Kroll is authorized to note in the certificate of service that the parties served include individuals listed on the Resident and Patient Matrix; and

e.  To the extent any Resident or Patient discloses his or her own "protected health information" ("**PHI**") (as such term is defined in HIPAA) in any pleading, proof of claim, notice, or other publicly available document, Stayton and its professionals shall be permitted, and to the extent required by the Bankruptcy Code, the Bankruptcy Rules, or any other applicable law, rule, or court order, directed to include such PHI in any subsequent pleading, notice, document, list, or other public disclosure made in connection with this Chapter 11 Case, and such disclosure shall not be deemed to be a "wrongful disclosure" within the meaning of HIPAA or any regulation promulgated thereunder.

56.    Similarly, Stayton seeks to protect other individuals' (the "***Other Individuals***") confidential information.  From time to time, Stayton may need to disclose identifying information for other individuals who are neither Residents nor Patients, but, that disclosure could subject the Other Individuals to the risk of identity theft or create other risks to their safety and welfare.

57.    Stayton therefore proposes the following procedures to protect the Other Individuals' confidential information (the "***Other Individuals Confidentiality Procedures***"):

a.  Stayton is authorized to redact the names, home addresses, email addresses, and any other personally identifiable information ("***PII***") of any Other Individuals, including but not limited to the Debtor's employees, directors, officers, or other individual creditors; and

b.  Stayton is authorized to provide upon request an unredacted version of any document for which PII has been redacted pursuant to subparagraph (i) this Court, (ii) the Office of the United States Trustee, (iii) any applicable state regulatory agency (through the respective state attorney general), and (iv) any other party in interest that obtains, after notice and a hearing, an order directing the Debtor to disclose requested PII to such party.

58.    Finally, I believe that email service on all interested parties is not only warranted, but is in all parties' best interest.  Email service is the most efficient and cost-effective manner to serve interested parties.  It is also the most likely to facilitate creditor responses, and it will help alleviate administrative burdens and costs for Stayton.

59.    I believe that the implementation of the Resident and Patient Confidentiality Procedures and the Other Individuals' Confidentiality Procedures will allow Stayton to protect

Resident and Patient information, and Other Individuals' information, while still complying with the Bankruptcy Code. Further, I believe that email service on all parties will be the most effective and most efficient. Accordingly, I believe that the relief sought in the Confidentiality and Email Service Motion is in the best interests of the Debtor, its Estate, its Residents and Patients, and its creditors, and should, therefore, be approved.

**D.    Cash Management Motion**

60.    By the Cash Management Motion, Stayton seeks entry of an order granting the following relief:[6]

a.    Authorizing Stayton to continue to use the Cash Management System (defined below), subject to any modification or other relief granted by order of this Court relating thereto, including the following:

i.    the continued use of the existing Bank Accounts (defined below) with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date;

ii.    the ability of Stayton to deposit funds into and withdraw funds from the Bank Accounts by all usual means, including but not limited to checks, wire transfers, electronic funds transfers, ACH, and other debits;

iii.    the ability of Stayton to otherwise treat the Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor-in-possession accounts;

iv.    authorizing and directing the Banks to maintain, service, and administer the Bank Accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and Stayton relating to such accounts;

v.    authorizing and directing the Banks to rely on the representations of Stayton as to which disbursements are authorized to be honored or dishonored, whether or not such disbursements are dated prior to,

---

[6] As explained in greater detail below, the Debtor is seeking authority to continue to pay all of its ordinary course creditors in full, which may be impacted should the Debtor discontinue use of its current Cash Management System.

on, or subsequent to the Petition Date, and whether or not the Bank believes the payment is authorized by an order of the Court; and

vi.    authorizing the Banks to charge and collect, and authorizing but not directing Stayton to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of its account agreements and/or other service documentation with Stayton and/or other service documentation with Stayton;

b.    Authorizing Stayton to continue to use its existing preprinted Business Forms without alteration or change; and

c.    A waiver of the section 345(b) of the Bankruptcy Code deposit and investment requirements.

61.    I believe that by using the existing Bank Accounts and investment practices Stayton will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of Stayton, delay the administration of Stayton's Estate, and increase the costs to the Estate.

62.    Prior to the Petition Date and in the ordinary course of business, Stayton utilized a relatively streamlined cash management system (the "***Cash Management System***"). A chart depicting the Cash Management System is attached to the Cash Management Motion as **<u>Exhibit C</u>**. As of the Petition Date, Stayton's Cash Management System utilized a total of seven (7) bank accounts (collectively, the "***Bank Accounts***") with (a) Regions Bank, (b) Synovus, (C) Bankers Trust, and JPMorgan Chase (together, the "***Banks***"). In addition, several reserve accounts are held by BOKF, N.A., d/b/a BOK Financial, as Bond Trustee, pursuant to the Original Bond Documents (collectively, the "***Trustee-Held Reserve Accounts***").

63.    With respect to each of the Bank Accounts, the Cash Management Motion sets forth the name of the institution at which the account is maintained, the account number (last four digits only), and a description of the purpose of the account. Stayton manages its cash receipts, transfers, and disbursements through one or more of the Bank Accounts. In doing so, Stayton routinely

deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer, and electronic funds transfer. Daily, Stayton processes large numbers of transactions through the Cash Management System. Stayton maintains current and accurate records of all transactions processed through the Cash Management System.

64.    Stayton's Cash Management System is similar to those commonly employed by not-for-profits of comparable size and complexity. Among other benefits, the Cash Management System permits Stayton to accurately monitor cash availability. The Cash Management System also permits Stayton to centrally manage and track the collection and transfer of funds which reduces administrative burdens and expenses and maximizes interest income.

65.    In addition to the Cash Management System and Bank Accounts, Stayton uses in the ordinary course of its business numerous business forms. Stayton has a supply of these forms on hand. It would be expensive, wasteful, and disruptive to Stayton's business to destroy these forms and order new ones.

66.    Contemporaneously with the filing of the Cash Management Motion, Stayton has filed other motions seeking authority to pay certain prepetition obligations, including obligations to employees, all ordinary course creditors, and other entities. With respect to certain of these prepetition obligations, Stayton may have already issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system. In other instances, Stayton will issue checks or other debits postpetition on account of the prepetition obligations once the Court has entered an appropriate order permitting Stayton to do so. Stayton intends to inform the Banks which prepetition checks and other debits should be honored or dishonored pursuant to orders of the Court authorizing such payments.

67.    I believe that the relief requested in the Cash Management Motion will help to ensure Stayton's orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert Stayton's attention from more pressing matters during this Chapter 11 Case.

68.    Given the nature of Stayton's business operations, any disruption of its accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact Stayton's efforts to reorganize.  At this critical juncture, Stayton must be able to conduct "business as usual" to the extent possible.  To this end, it is essential that Stayton be permitted to continue to use its existing Cash Management System and Bank Accounts.

69.    To the extent Stayton's cash management practices does not strictly comply with the guidelines identified in section 345 of the Bankruptcy Code, Stayton's investments are nevertheless safe, prudent, and designed to yield maximum reasonable return on the funds invested, considering the safety of such deposits and investments.  Accordingly, Stayton requests a waiver of the requirement of section 345(b) of the Bankruptcy Code.

70.    Stayton has a complex cash management system that provides it with the ability to transfer funds rapidly to ensure its safety and to maximize its investment value.  In light of these factors, I believe that Stayton should be permitted to maintain its Cash Management System. Accordingly, I believe the Cash Management Motion should be granted.

**E.**    **Wage Motion**

71.    By the Wage Motion, Stayton is requesting entry of interim and final orders: (i) authorizing Stayton to pay prepetition wages, salaries, and other compensation, taxes and withholdings, reimbursable employee expenses, and any payroll related fees to third parties; (ii) authorizing Stayton to honor and continue benefit programs for employees; and (iii) authorizing and directing the applicable banks and financial institutions at which Stayton

maintains disbursement and other accounts to honor and process checks and transfers related to such employee obligations.

72.     Stayton provides the following wages and benefits to its employees based on the employee's position:

      a.      Wages, salaries, bonuses, reimbursements, and other compensation;

      b.      Employee benefits, including, but not limited to:

            i.      Medical, prescription, dental, and vision insurance;

            ii.      401(k) plan; and

            iii.      Life, accidental death and dismemberment, sort-term disability, and long-term disability insurance;

      c.      Paid time off; and

      d.      Miscellaneous employee-related obligations.

73.     Stayton has approximately 182 employees in the aggregate - 126 employees are paid full-time hourly, 15 employees are paid part-time hourly, 15 are full-time salaried employees and 26 are *pro re nata* (collectively, the "***Employees***").  Stayton's approximate cost for wages, salaries, and benefits for each payroll date is $266,000.00.  Stayton estimates that approximately $57,000.00 in unpaid salary, wages, and other compensation is due to its Employees as of the Petition Date.

74.     I believe that any delay in paying prepetition employee obligations will adversely impact Stayton's relationship with its Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation in the chapter 11 process.  At this early stage in the Chapter 11 Case, Stayton simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' morale and cooperation attributable to Stayton's failure to pay wages, salary, benefits, and other similar items.  Furthermore, Stayton relies on the

Employees to provide necessary services to its Residents and Patients and the loss of Employees would endanger their health, safety, and welfare.

75.     In addition, I believe that all unpaid, prepetition compensation is entitled to priority treatment in accordance with Bankruptcy Code sections 507(a)(4) in light of the fact that none of Stayton's employees are owed more than $15,150.

76.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe the relief sought in the Wage Motion should be approved.

F.      **Tax Motion**

77.     Pursuant to the Tax Motion, Stayton requests entry of interim and final orders authorizing Stayton to pay, in its sole discretion, any sales, real property, licensing, and other similar taxes subsequently determined to be owed (collectively, the "***Taxes***") that accrued or that arose before the Petition Date that will become due during the pendency of this Chapter 11 Case to the applicable federal, state, and local taxing authorities (collectively, the "***Taxing Authorities***") in the ordinary course of business, without prejudice to Stayton's right to contest the amounts and/or priority of any Taxes on any grounds they deem appropriate.

78.     Stayton, in the ordinary course of its business, pays Taxes to the Taxing Authorities. Stayton's books and records reflect that it is current on the payment of all of its Taxes except for the reconciliation of state unemployment taxes.[7]   However, the Taxing Authorities will continue to invoice Stayton for Taxes relating to periods prior to the Petition Date following the commencement of this Chapter 11 Case.

---

[7] The Debtor is in discussion with the state with respect to the reconciliation of state unemployment taxes that came due prior to its acquisition by Buckner Retirement Services, Inc.  These taxes make up the majority of the Debtor's estimate for State and Local Taxes set forth below.

79.    As of the Petition Date, there is approximately $110,000.00 in prepetition Taxes that will become due and payable within the first twenty-one (21) days of this Chapter 11 Case, which Stayton seeks to pay.

80.    Stayton is subject to the following Taxes:

   a.    Sales Taxes. In the ordinary course of business, the Debtor collects sales and use taxes ("***Sales and Use Taxes***") from the (i) sale of food and beverages (including alcohol) to customers (usually visiting families of Residents) sold on the premises and (ii) occupancy of guest rooms on the premises by the Residents' visitors. The Debtor holds such Sales and Use Taxes in trust prior to remitting them to the applicable Taxing Authority. As of the Petition Date, the Debtor estimates that approximately $4,500 in Sales and Use Taxes have accrued. The Debtor seeks authority to pay the accrued Sales and Use Taxes as they become due, as well as to continue to pay Sales and Use Taxes in the course of its business postpetition.

   b.    Property Taxes. Pursuant to the Texas tax code, Stayton is exempt from paying property taxes. The Texas tax code provides for property tax exemption for CCRCs that provide benevolent care each year in a minimum amount of four percent 4% of the CCRC's net resident revenues. Stayton has implemented a benevolent care policy and provides benevolent care in the form of uncompensated care to qualifying financially or medically indigent senior citizens of at least 4% of Stayton's net resident revenues each year.

   c.    Licensing Fees and Other Taxes. Due to the nature of Stayton's business, Stayton incurs licensing and permit fees to various government and regulatory agencies which are de minimus in amount. Stayton does not believe that any such fees are due but, out of an abundance of caution, seeks to pay such fees if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

   d.    State and Local Taxes. The Debtor may be subject to additional taxes and fees in the state and county in which it operates including, but not limited to, state unemployment tax ("***State and Local Taxes***"). As of the Petition Date, the Debtors estimate that approximately $105,000 in State and Local Taxes have accrued. The Debtor seeks to pay such fees and taxes if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

   e.    Provider Fees. Every five (5) years, Stayton pays a re-validation fee (the "***Provider Fees***") calculated by the number of Medicare certified beds at its Facility. The last payment was made in 2022 (so the next payment is not anticipated to be due until 2027), but out of an abundance of caution, to

the extent Stayton discovers any unexpected Provider Fees that must be paid post-petition, Stayton seeks authority to do so.

81.     The continued payment of the prepetition Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate.  The Debtor may suffer immediate and irreparable harm if the prepetition Taxes are not paid when they become due and payable.  If the Debtor does not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtor's licenses, suspend the Debtor's operations, impose fees and penalties, or pursue other remedies that will harm the estate.  In all cases, the Debtor's failure to pay Taxes could have a material adverse impact on its ability to operate in the ordinary course of business.

**G.     Utilities Motion**

82.     By the Utilities Motion, Stayton is requesting interim and final orders (i) prohibiting Utility Providers (as defined below) from altering, refusing or discontinuing service to Stayton, (ii) deeming the Utility Providers adequately assured of future performance, and (iii) establishing procedures for determining requests to Stayton for additional adequate assurance by the Utility Providers.

83.     In the ordinary course of business, Stayton obtains various utility services, including, but not limited to, electricity, gas, water, sewer, telephone, other telecommunications services such as cable, and other similar type services from approximately ten (10) utility providers (each, a "*Utility Provider*" and collectively, the "*Utility Providers*").  A list of the Utility Providers is attached to the Utilities Motion as **Exhibit C**.  On average, Stayton spends approximately $91,830.00 each month for utility services.

84.     At all relevant times, Stayton has attempted to remain current with regard to its utility bills.  Furthermore, to the best of my knowledge, Stayton is current on all amounts owing

to the Utility Providers, other than payment interruptions that may be caused by the commencement of this Chapter 11 Case.

85.    I believe that uninterrupted utility services are essential to the ongoing operations of Stayton, and therefore, to the successful resolution of this Chapter 11 Case.  Any interruption of utility services, even for a brief period of time, would put the health, safety and welfare of the residents at risk.  It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 Case.

86.    Stayton proposes to provide "assurance of payment" to the Utility Providers by placing a cash deposit equal to approximately two weeks' worth of payments to each Utility Provider, $46,000.00, into a separate account (the "*Utility Deposit Account*") to be held for the exclusive purpose of paying the Utility Providers.  Stayton submits that the establishment of the Utility Deposit Account, in conjunction with Stayton's ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

87.    Stayton is also concurrently seeking access to Cash Collateral (as defined below), which means that it will have the liquidity sufficient to keep current on its utility obligations.

88.    Further, Stayton proposes to protect the Utility Providers by establishing the procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to Stayton that would merit greater protection.

89.    Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion is in the best interests of Stayton, its Estate, its residents, and all stakeholders and should be approved.

### H.      **Insurance Motion**

90.      By the Insurance Motion, Stayton seeks authorization to (i) maintain existing insurance policies and pay all obligations arising therefrom, including Premium Payments (collectively, the "***Insurance Obligations***") and (ii) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in its business judgment.  Stayton further requests that financial institutions be directed to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the Insurance Obligations, whether such checks were presented or electronic requests submitted prior to or after the Petition Date.

91.      In particular, Stayton maintains several insurance policies that are administered by several insurance carriers and collectively provide coverage for, among other things (i) management lines (director and officer, employment practice, fiduciary, and crime liability), (ii) cyber liability, (iii) kidnap and ransom liability, (iv) active assailant liability, (v) excess liability, (vi) general and professional liability, (vii) automobile liability, (viii) property liability, (ix) property wind and hail deductible buyback, and (x) workers compensation liability (collectively, the "***Insurance Policies***").

92.      In order to protect and safeguard Stayton's ongoing operations and ensure compliance with the United States Trustee Guidelines, it is critical that Stayton be allowed to pay its Insurance Obligations on an ongoing and uninterrupted basis and renew, revise, extend, supplement, or change its existing Insurance Policies and enter into new insurance policies as needed in Stayton's business judgment.  Stayton's failure to pay amounts related to the Insurance Obligations as and when they come due could result in attempts by Stayton's insurance companies to terminate or decline to renew the Insurance Policies, or decline to enter into new insurance policies with Stayton in the future.  If any of the Insurance Policies are terminated, Stayton could be exposed to substantial liability, to the detriment of all interested parties.  Therefore, I believe

that the relief requested in the Insurance Motion is in the best interests of Stayton, its Estate, its residents, and all stakeholders and should be approved.

### I.      Ordinary Course Creditors Motion

93.     By the Ordinary Course Creditors Motion, Stayton seeks authorization to continue its prepetition business operations, policies, and programs and to pay Ordinary Course Claims (as defined below), on a postpetition basis in the ordinary course of business.

94.     In the ordinary course of business, Stayton incurs numerous fixed, liquidated, and undisputed obligations (collectively, the "***Ordinary Course Claims***") to a variety of creditors, including, among others, residents, providers of goods and services (such as food and therapy service providers), healthcare insurers, private pay sources, Medicare, and numerous other vendors and unsecured creditors (collectively, the "***Ordinary Course Creditors***").  No parties in interest will be prejudiced by the relief requested herein because all Ordinary Course Claims are Unimpaired and will be paid in full pursuant to the Plan, subject to provisions of the Bankruptcy Code with respect to allowance of such claims.  Indeed, payment of the Ordinary Course Claims ensures that the claims are Unimpaired under the Plan.  The relief sought in the Ordinary Course Creditors Motion seeks to alter only the timing—not the amount—of payments.  Furthermore, the Debtor does not propose to pay the claims of any insiders through the Ordinary Course Creditors Motion.  Accordingly, I believe that the relief requested in the Ordinary Course Creditors Motion is in the best interests of Stayton, its Estate, its residents, and all stakeholders and should be approved.

### J.      Cash Collateral Motion

95.     By the Cash Collateral Motion, Stayton requests entry of interim and final orders (i) authorizing Stayton to use the cash collateral (the "***Cash Collateral***") of the Trustee, (ii) approving the form of adequate protection provided to the Trustee, (iii) granting a superiority

administrative expense claim to the Buckner Foundation for any postpetition advances made under the Subordinated Note, and (iv) modifying the automatic stay.

96.    The Trustee has the right to enforce Stayton's obligation to pay the amounts borrowed from the Issuer, pursuant to its rights under the Master Indenture, and by the fact that the Issuer's rights under the Loan Agreement and the Notes (and its rights under the other Bond Documents) were assigned to the Trustee pursuant to the Bond Indenture.  Subject to certain exceptions, the Trustee has a security interest, lien, and mortgage on substantially all of Stayton's assets.

97.    As of the Petition Date, Stayton had approximately $10 million of cash on hand. Without the use of Cash Collateral, Stayton would suffer immediate and irreparable harm and would likely be required to cease operations immediately or, at a minimum, Stayton's inability to use Cash Collateral would disrupt Stayton as a going concern and would otherwise not be in the best interests of Stayton, its Estate, its residents, and all stakeholders.  The Trustee has consented to Stayton's use of Cash Collateral, subject to the terms and conditions set forth in the Cash Collateral Motion.

98.    As part of their negotiations of the Plan Support Agreement, the parties agreed that, to the extent that the Debtor acquired additional liquidity during the Chapter 11 Case, advances may be made under the Subordinated Note in advance of the Bond Refinancing and the Debtor's entry into the Amended Master Indenture.  In exchange for the Buckner Foundations agreement to make additional advances under the Subordinated Note, as needed, during the Chapter 11 Case, the Stayton, the Supporting Holders, and the Trustee agreed that such advances would be entitled to superpriority status under section 364(c)(1) of the Bankruptcy Code.  *See* Plan Support Agreement ¶ 4.c.  The Debtor has requested access to the Subordinated Note during the Chapter

11 Case out of an abundance of caution. The availability of additional liquidity under the Subordinated Note provides the Debtor with assurance that it will be able to continue to operate as a going concern, notwithstanding any unforeseen events that may affect the Debtor's revenue during the case.

99.    I believe that the relief sought in the Cash Collateral Motion is fair, reasonable, and consistent with the Bankruptcy Code. Granting the Cash Collateral Motion will allow Stayton to continue the operations necessary to maintain residents' health and well-being while facilitating this Chapter 11 Case. Therefore, I believe the relief sought in the Cash Collateral Motion is in the best interests of Stayton, its Estate, its residents, and all stakeholders and should be approved.

### K.    **Combined Hearing Motion**

100.    By the Combined Hearing Motion, Stayton seeks entry of an order:

   a.    scheduling a combined hearing (the "***Combined Hearing***") on the adequacy of the Disclosure Statement and confirmation of the Plan;

   b.    establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan (the "***Objection Deadline***") and approving related procedures;

   c.    establishing a deadline to file a combined pleading in support of confirmation of the Plan and replying to any objections (the "***Reply Deadline***");

   d.    approving the solicitation procedures regarding votes to accept or reject the Plan;

   e.    approving the form and manner of notice of the Combined Hearing and the form and manner of the Publication Notice; and

   f.    conditionally directing the United States Trustee for the Northern District of Texas not to convene a meeting of creditors pursuant to section 341 of the Bankruptcy Code.

101.    In connection with the relief requested in the Combined Hearing Motion, Stayton submits the following schedule of dates, some of which remain subject to the Court's availability:

| Event | Date |
|-------|------|
| Voting Record Date[8] | August 26, 2024 |
| Commencement of Solicitation | August 30, 2024 |
| Voting Deadline | September 27, 2024 |
| Notice Date[9] | On or before October 7, 2024 |
| Confirmation Brief | October 28, 2024 |
| Objection Deadline | On or before November 4, 2024 |
| Reply Deadline | On or before November 7, 2024 |
| Combined Hearing | November 12, 2024 |

102.   As described more fully above, in accordance with the Plan Support Agreement, Stayton commenced this Chapter 11 Case as a prepackaged bankruptcy filing, with the goal of obtaining expedient confirmation of the Plan.  Accordingly, Stayton requests authority to proceed with this Chapter 11 Case on the expedited confirmation schedule set forth in the Combined Hearing Motion.

103.   To consummate the Refinancing Transaction set forth in the Plan and emerge from chapter 11 as expeditiously as possible, Stayton and its stakeholders invested significant resources in achieving consensus prepetition.  Accordingly, I believe that no parties in interest will be prejudiced by the proposed confirmation schedule.   I, therefore, respectfully submit that considering the adequacy of the Disclosure Statement and the confirmation of the Plan on the schedule set forth in the Combined Hearing Motion, as well as the other relief requested therein, is in the best interests of the Debtor, its Estate, its residents, and all stakeholders and should be approved.

---

[8] The "Voting Record Date" is the date as of which a Holder of a Claim entitled to vote on the Plan must have held such Claim to cast a vote to accept or reject the Plan.
[9] The "Notice Date" is the date by which the Combined Hearing Notice will be served upon the Debtor's creditor matrix and all interest holders of record to provide notice of the Combined Hearing.

L.      **Ombudsman Motion**

104.    By the Ombudsman Motion, Debtor seeks relief from the requirement under section 333 to appoint a patient care ombudsman ("**PCO**"), and, in lieu of appoint a patient care ombudsman, to allow Debtor to self-report.  Debtor seeks this relief because a PCO "is not necessary for the protection of patients under the specific facts of [this] case."  11 U.S.C. § 333(a)(1).

105.    Debtor is known for its exceptional service and quality as evidenced by its five-star overall rating and four-star health inspection rating by the Centers for Medicare and Medicaid Services.  Additionally, the Debtor is the recipient of a Silver Achievement in Quality Award by the American Health Care Association and National Center for Assisted Living.

106.    The Debtor has not commenced this Chapter 11 case as a result of any litigation, fall in patient care standards, or any factor that would indicate that a POC is necessary under these circumstances.

107.    The Debtor is a highly regulated entity that must comply with applicable laws, many of which are designed to provide safeguards for residents.  Among other agencies, a local patient care ombudsman associated with the Area Agency on Aging visits the Facility approximately once per month to advocate for quality care of the patients and residents.

108.    The involvement of the Regulatory Authorities gives patients and residents the ability to protect their rights and lodge complaints with the relevant Regulatory Authority during the pendency of this Chapter 11 Case.

109.    The Debtor and its sole corporate member, Buckner, have an exemplary history of patient care with five-star ratings from the Centers for Medicare and Medicaid Services.

110.    The Debtor is going to great lengths to ensure adequate care and protection of its patients during this reorganization, and the residents are represented by counsel and have their own committee (the "***Residents' Committee***").

111.    The Residents' Committee has been consulted and agrees that appointment of a PCO is not necessary in this case.

112.    Residents have access to an around-the-clock team of nurses and other staff.

113.    The Debtor's management team, including its Executive Director, Health Care Administrator, and Director of Nursing, has extensive experience in providing nursing care to the elderly.

114.    The Debtor's nursing management team and nursing staff conduct daily, weekly, and monthly meetings regarding the quality of care provided to residents and patients.

115.    The Debtor's staffing ratio exceeds state and federal average rates.

116.    In light of all of the above, I believe that the relief requested in the Ombudsman Motion is in the best interests of Stayton, its Estate, its Residents, its Patients, and all stakeholders, and should be approved.

## **CONCLUSION**

117.    For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Pleadings and such other and further relief as is appropriate.

*[Remainder of page intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this 1st day of October, 2024.                    _/s/ Jeff Gentry_____

88693483.v4